UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RICHARD M. GILMAN, et al.,

NO. CIV. S-05-830 LKK/GGH

        Plaintiffs,

    v.

<u>O R D E R</u>

J. DAVIS., et al.,

        Defendants.

_____/

    On November 4, 2008, the California electorate passed Proposition 9, the "Victims' Bill of Rights Act of 2008: Marsy's Law." Proposition 9 changed numerous aspects of California's parole system, including the availability and frequency of parole hearings for prisoners not initially found suitable for parole.

    Plaintiffs, eight individuals seeking to represent a class of California state prisoners currently serving life sentences with possibility of parole, bring a claim under 42 U.S.C. section 1983 arguing that these changes violate both the Ex Post Facto and Due Process clauses of the United States Constitution. Plaintiffs have also brought eight other claims not at issue in this order.

Plaintiffs move for a preliminary injunction barring enforcement of these changes. Defendants conversely move to dismiss plaintiffs' challenge to Proposition 9, and by the same motion seek dismissal of plaintiffs' ninth claim, which challenges Article V, Section 8(b) of the California Constitution. The ninth claim and the challenge thereto are the subject of a separate concurrently filed order.

The court resolves these motions on the papers and after oral argument. For the reasons stated herein, the court grants plaintiffs' motion for a preliminary injunction, and grants in part and denies in part defendants' motion to dismiss.

## I. BACKGROUND

Proposition 9 changed numerous aspects of the California parole system. Plaintiffs challenge only the changes to the scheduling of parole hearings for prisoners who are not found suitable for parole at their initial hearing. To describe those changes, the court first surveys the California parole system, then discusses the hearing deferral process prior to Proposition 9, and finally describes the new system.

### A. California's Process for Parole Determinations

California's parole system is overseen largely by the Board of Parole Hearings. The Board of Parole Hearings was formerly the Board of Prison Terms, and is hereinafter referred to as the Board. The Board has "the power to allow prisoners imprisoned in the state prisons . . . to go upon parole outside the prison walls and enclosures." Cal. Pen. Code § 3040. The penal code provides

statutory guidance for the exercise of this power, and the Board has enacted regulations further specifying the parole process, pursuant to its authority under California Penal Code § 5076.2.

All prisoners whose sentences include life but do not include "without possibility of parole," become "eligible" for parole after serving a minimum number of years, marked by the arrival of the prisoner's "minimum eligible parole date." Cal. Code Regs. tit. 15 §§ 2000(b)(3), (b)(67). This date is determined by the prisoner's sentence and any credit the prisoner has earned for good conduct. A prisoner with a straight "life" sentence and maximum good conduct credit becomes eligible for parole in seven years. Cal. Pen. Code § 3046(a)(1). Parole eligibility comes later for prisoners whose sentences specify a minimum term, e.g., "15 to life." For prisoners convicted of first or second degree murder prior to 1998, the minimum term is the term of years provided by their sentence--in the example above, fifteen years--reduced by up to one third for good behavior.

Once a prisoner is eligible for parole, the Board convenes a panel to determine whether the prisoner is to be released on parole, and if so, when.[1] The first inquiry is whether the prisoner is "suitable" for release. Cal. Pen. Code § 3041. The panel "shall" find the prisoner suitable for parole, and move on

_____

[1] California Penal Code section 3041(a) provides that this meeting shall occur one year prior to the minimum eligible parole date. Plaintiffs assert that in practice, this initial meeting occurs after the date has passed. Such a delay, if any, is not at issue in the present motion.

to the next step of setting a release date,

> unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Id. § 3041(b). In making this determination, "the fundamental consideration in parole decisions is public safety . . . [which] involves an assessment of an inmate's *current* dangerousness." In re Lawrence, 44 Cal. 4th 1181, 1205 (2008) (emphasis in original). The Board has promulgated regulations identifying various criteria that may be considered in determining whether the prisoner poses a risk. These factors include the circumstances, manner and motive of the commitment offense; whether the prisoner has a history of other criminal or violent acts; the prisoner's social history; the prisoner's past and present mental state, including psychological problems, attitude toward the crime and remorse; institutional behavior; the prisoner's understanding and plans for the future; age; and whether imposition of any special conditions may allow a prisoner who would otherwise be a risk to be safely released. Cal. Code Reg. tit. 15 §§ 2281(b)-(d). The California Supreme Court has upheld these regulations, but it has emphasized that any criterion is legally relevant only insofar as it is evidence in the particular case that the prisoner is a current risk to public safety. Lawrence, 44 Cal. 4th at 1205-06. The panel's determination as to whether these factors indicate suitability for

parole is an exercise of the panel's judgment and discretion. In re Shaputis, 44 Cal. 4th 1241, 1258 (2008) (quoting In re Rosenkrantz, 29 Cal. 4th 616, 654 (2002)).[2]

Because suitability is a function of a prisoner's *current* dangerousness, a finding that the prisoner is unsuitable for parole is not permanent. If the panel determines that the prisoner is presently unsuitable for parole, the panel "defers" the parole hearing until a later date, at which point a panel will determine whether intervening changes have rendered the prisoner suitable. Cal. Pen. Code § 3041.5. The deferral process is discussed in the following sections.

If the panel instead determines that the prisoner is suitable for parole, the next step is to set a date for release. The panel determines the "base term" for the prisoner, which is based on "the gravity of the base offense, taking into account all of the circumstances of the crime." Cal. Code. Regs. tit. 15 § 2282(a). The actual calculation is performed by reference to matrices enumerating base terms for the circumstances of various offenses. Id. §§ 2282-2289. The panel then considers whether a departure from the base term is warranted by any of a number of other factors specifically enumerated by the regulations, such as the prisoner's good behavior. Id. § 2404. If the time already served by the

---

[2] Plaintiffs state, without citation to any authority, that the panel's suitability determination is made on a preponderance of the evidence standard. Although it may be that this standard is implicit in the penal code, plaintiffs have not demonstrated that this is so, and no standard of proof appears in either section 3041 or in Lawrence, Shaputis, or Rosenkrantz.

prisoner exceeds the term calculated by this method, the Board tentatively designates the prisoner for release.  If not, the board will set a release date for a time after the completion of this term.  See In re Jackson, 39 Cal. 3d 464, 474 n.10 (1985).

This system plainly contemplates that some prisoners will be found suitable for parole prior to the expiration of the term calculated in the second step.  However, plaintiffs assert that "Since 1990, . . . it is rare for a life prisoner to be found suitable for and granted parole before he is well beyond any punishment term that can be imposed for his offense."[3]  Pls.' Mem. Supp. Mot. Prelim. Inj., 16 n.11.  Defendants have not contested this assertion.  Plaintiffs further assert that "All the named plaintiffs are beyond any terms that would be (or have been) set for them and all will be released as soon as parole is granted and the Governor lets the grant stand."  Id.  The court notes, however, that the class definition is not so limited, and the class potentially includes unnamed class members who have not completed such terms.

After the panel makes a decision as to suitability or unsuitability, the Governor has an opportunity to review and reverse or modify that decision.  See Cal. Const. Art. V § 8(b); Cal. Penal Code §§ 3041.1, 3041.2; In re Johnson 8 Cal. App. 4th

---

[3] Plaintiffs assert that the function of the second step in the parole process is to ensure that the prisoner serves a sentence long enough to satisfy the punitive purpose of incarceration. Although this is certainly a plausible interpretation, no party has provided authority indicating that this is the intended function of the delayed release dates.

618 (1992).  The governor's review must be based on "the same factors which the parole authority is required to consider."  Cal. Const. Art. V § 8(b).  If the Governor reverses a grant of parole, the prisoner receives a one-year deferral and is considered again by the Board the following year.

The effect of the Penal Code section 3041 and the implementing regulations is to vest all California prisoners "whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date."  Irons v. Carey, 479 F.3d 658, 662 (9th Cir. 2007) (citing Sass v. California Board of Prison Terms, 461 F.3d 1123, 1127 (9th Cir. 2006), Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003), and McQuillion v. Duncan, 306 F.3d 895, 901-901 (9th Cir. 2002)).  Notwithstanding the fact that class members were sentenced to life terms, the statute operates to create a protected expectation in release on parole for prisoners who match the criteria.

**B.    The Deferral Process Prior to Proposition 9**[4]

Prior to the amendments provided by Proposition 9, when a panel determined that a prisoner was unsuitable for parole, the length of deferral was determined by California Penal Code section 3041.5(b)(2) (2008).  This section provided that when the Board

---

[4] Plaintiffs' motion for a preliminary injunction discusses thirty years of various amendments to the parole hearing process. The present motion seeks to enjoin the amendments caused by Proposition 9, and not any of the prior amendments.  Therefore, the history of these amendments is not directly relevant to the present motion.  The court describes the law as it existed immediately prior to the passage of Proposition 9.

found a prisoner unsuitable for parole,

> The board shall hear each case annually thereafter, except the board may schedule the next hearing no later than the following:
>
> (A) Two years after any hearing . . . if the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following year . . .
>
> (B) Up to five years after any hearing at which parole is denied if the prisoner has been convicted of murder, and the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following years . . . . If the board defers a hearing five years, the prisoner's central file shall be reviewed by a deputy commissioner within three years at which time the deputy commissioner may direct that a hearing be held within one year.

In determining how long to defer a hearing, and in making suitability determinations at the subsequent hearings, the panel applies the same criteria used for the initial suitability determination. Cal. Pen. Code § 3041.5(b)(2)(A)-(B) (2008), Cal. Code Regs. tit. 15, §§ 2268(b), 2270(d).[5] Thus, the panel evaluates whether the factors informing its assessment of the prisoner's potential threat to public safety are likely to change; if so, when; and whether these changes will be sufficient to render the prisoner suitable for parole.

---

[5] Prior to Proposition 9, the Board had the power to set regulations specifying the factors to be considered in determining the length of deferral; the Board's regulations specified that these factors were the same as those used in determining suitability. Proposition 9 incorporates these regulations in to the statute itself. Thus, the penal code now specifies that public safety is the determinant of both suitability and the deferral period.

1    Plaintiffs provide several statistics illustrating the manner
2  in which this statute was applied.  According to the Board, in
3  2007, 35 percent of prisoners who were denied parole following a
4  hearing were given deferral periods of one year, 32 percent
5  received deferrals of two years, and 33 percent received deferrals
6  of three years or more.  In 2008 (through December 10), these
7  percentages were 40, 33, and 27 percent, respectively.[6]  Pls.' Mem.
8  Supp. Mot. Prelim. Inj. 14, n.9.

9    Once a deferred hearing date had been set, that hearing date
10 could potentially be advanced.  If the deferral was for five years,
11 the Board was obliged to review the prisoner's situation at three
12 years to determine whether the hearing should be advanced.  Cal.
13 Pen. Code § 3041.5(b)(2)(B).  Moreover, a prisoner could separately
14 request an advanced hearing date, although the former statute
15 provided no formal mechanism for such requests.  In re Jackson, 39
16 Cal. 3d 464, 475 (1985); see also Cal. Dep't of Corr. v. Morales,
17 514 U.S. 499, 512 (1995) (relying on this statement in Jackson).
18 The court has no knowledge of whether, during the history of the
19 prior statute, such a request was ever actually made or granted.

20 **C.    The Proposition 9 Amendments to The Deferral Process**

21    Proposition 9 drastically altered the deferral process,
22 replacing former subsection 3041.5(b)(2) with the following, now
23 codified at subsection (b)(3):

24          The board shall schedule the next hearing,
25          after considering the views and interests of

26    [6] These figures are apparently undisputed.

9

the victim, as follows:

(A)  Fifteen years after any hearing at which
parole is denied, unless the board finds
by clear and convincing evidence that the
criteria relevant to the setting of
parole release dates enumerated in
subdivision (a) of Section 3041 are such
that consideration of the public and
victim's safety does not require a more
lengthy period of incarceration for the
prisoner than 10 additional years.

(B)  Ten years after any hearing at which
parole is denied, unless the board finds
by clear and convincing evidence that . .
. . consideration of the public and
victim's safety does not require a more
lengthy period of incarceration for the
prisoner than seven additional years.

(C)  Three years, five years, or seven years
after any hearing at which parole is
denied, because . . . consideration of
the public and victim's safety requires
a more lengthy period of incarceration
for the prisoner, but does not require a
more lengthy period of incarceration for
the prisoner than seven additional years.

Soon after Proposition 9 was passed, the Board issued an
Administrative Directive identifying various effects of the
proposition. BPH Administrative Directive No. 08/01, Regulatory
Sections Impacted by Proposition 9, December 8, 2008. One such
effect, which was repeatedly stated in the directive, was that the
Board now had "no discretion to set a denial period for any term
other than those enumerated," i.e., for a period other than "15,
10, 7, 5, or 3 years." Id.

The amended statute provides two ways in which a deferred
hearing date may be changed once it has been set. First, the Board
may in its discretion, after considering the

10

> views and interests of the victim, advance a
> hearing set pursuant to paragraph (3) to an
> earlier date, when a change in circumstances
> or new information establishes a reasonable
> likelihood that consideration of the public
> and victim's safety does not require the
> additional period of incarceration of the
> prisoner provided in paragraph (3).

Cal. Pen. Code § 3041.5(b)(4). Second, an inmate may request that the board advance the hearing. Id. § 3041.5(d). Such a request must "set forth the change in circumstances or new information" required by subsection (b)(4). Id. § 3041.5(d)(1). The statute limits when a prisoner may make such a request:

> An inmate may make only one written request as
> provided in paragraph (1) during each
> three-year period. Following either a summary
> denial of a request made pursuant to paragraph
> (1), or the decision of the board after a
> hearing described in subdivision (a)[7] to not
> set a parole date, the inmate shall not be
> entitled to submit another request for a
> hearing pursuant to subdivision (a) until a
> three-year period of time has elapsed from the
> summary denial or decision of the board.

Id. § 3041.5(d)(3). After the court held oral argument on the motion for a preliminary injunction, the Board promulgated a second administrative directive, which interpreted this language as imposing a three-year delay only once the prisoner has filed a request for an advanced hearing, such that a prisoner need not wait three years before filing an initial request for an advanced hearing. BPH Administrative Directive No. 09/01, "Penal Code Statutes Enacted by Proposition 9 That Allow An Advanced Hearing

---

[7] Subdivision (a) refers to "all hearings for the purpose of reviewing a prisoner's parole suitability." Cal. Pen. Code § 3041.5(a).

Date," February 5, 2009. Plaintiffs do not challenge this interpretation in this motion.[8]

This second directive also states that pursuant to section 3041.5(b)(4), when the Board advances a hearing date, there is not "a minimum time period that must be served from the hearing at which the denial length was determined." Thus, the Board contends that when a hearing date is advanced, whether on the Board's initiative under (b)(4) or on a prisoner's request under (d), the Board is not limited to the time periods specified for deferral of the hearing.

**D.  Alleged Punitive Purpose of Proposition 9**

As part of their argument that Proposition 9 violates the Ex Post Facto Clause, plaintiffs also allege that Proposition 9 has a demonstrably punitive purpose. Plaintiffs offer the following evidence in support of this argument. Section 2 of the Act, the Findings and Recommendations, stated that "Crime victims are entitled to . . . above all, the right to an expeditious and just punishment of the criminal wrongdoer."  ¶ 1.  These findings further state that the prior system created a "failure to impose

_____

[8] In their moving papers (submitted prior to the promulgation of this directive), plaintiffs adopted a contrary interpretation of the statute, interpreting it as obliging prisoners to wait three years after any unsuitability finding before submitting a request for an advanced hearing.  Plaintiffs have since responded to the administrative directive by stating that while they suspect that the directive contradicts the clear language of the statute, they do not challenge it in the present motion.  Accordingly, the court assumes for purposes of this motion only that the administrative directive is valid and presents a controlling interpretation of the statute.

actual and just punishment upon [victims'] wrongdoers." Id. at ¶ 9.

Section 3 of the Act, the "statement of purposes and intent," provides that

>    It is the purpose of the People of the State of California in enacting this initiative measure to:
>
>    1.  Provide victims with rights to justice and due process.
>
>    2.  Invoke the rights of families of homicide victims to be spared the ordeal of prolonged and unnecessary suffering, and to stop the waste of millions of taxpayer dollars, by eliminating parole hearings in which there is no likelihood a murderer will be paroled, and to provide that a convicted murderer can receive a parole hearing no more frequently than every three years, and can be denied a follow-up parole hearing for as long as 15 years.

**E.    Procedural History**

This suit was initially filed by plaintiff Richard Gilman on April 7, 2005. At the time, Gilman was proceeding pro se. As his claim was about to proceed to trial in June of 2008, the Magistrate Judge assigned to this case appointed counsel, and granted leave to file an amended complaint naming additional plaintiffs. After several stipulated extensions, plaintiffs moved for leave to file a fourth amended and supplemented complaint. Plaintiffs concurrently filed a motion for class certification and the instant motion for a preliminary injunction. The court heard argument on these motions on January 30, 2009. The court granted the motion to amend and the motion for class certification. Order Granting

13

Leave to Amend (Dkt. No. 183), 2009 WL 577768, 2009 U.S. Dist. LEXIS 21609 (E.D. Cal. March 4, 2009); Order Granting Class Certification (Dkt. No. 182), 2009 WL 577767, 2009 U.S. Dist. LEXIS 21614 (E.D. Cal. March 4, 2009).

Defendants then filed a petition to appeal this court's class certification order under Fed. R. Civ. P. 23(f), and concurrently moved to dismiss plaintiffs' eighth claim (challenging Prop. 9) and plaintiffs' ninth claim (challenging Article V, section 8(b) of the California Constitution). The court heard argument on the motion to dismiss on May 18, 2009. The Ninth Circuit granted permission to appeal class certification on May 28, 2009.

On August 11, 2009, the court ordered the parties to provide supplemental briefing addressing the appeal's effect on the pending motions. Both parties agreed that the court could continue to entertain the motions, but plaintiffs conceded that if a preliminary injunction is granted, it should extend solely to the named plaintiffs. <u>See</u> Plaintiffs' Brief Regarding Effect of Interlocutory Appeal, Sept. 1, 2009 (Dkt. No. 207).[9]

_____

[9] The court expresses some reservation about limiting the current motion to the named plaintiffs. As explained in the October 15, 2009 denial of defendants' motion for a stay, the court remains convinced that class certification is proper. Moreover, prisoners in various other proceedings are requesting to join in this action, or are being referred thereto. <u>See</u> Motion to Intervene by Michael L. Hughes (Dkt. No. 200); <u>see also</u> <u>Bair v.</u> <u>Warden, Deuel Vacational Inst.</u>, No. 2:09-cv-1730, 2009 U.S. Dist. LEXIS 111735 (E.D. Cal. Dec. 1, 2009) (ordering parties to show cause as to why pro se prisoner's habeas corpus petition challenging Proposition 9 should not be related to this case). It is also a virtual certainty that the result of this court's grant of a preliminary injunction will be a flood of parallel filings by other prisoners. Nonetheless, the court follows plaintiffs'

14

1  Defendants then moved to stay proceedings pending resolution

2  of the interlocutory appeal.  The court denied this motion on

3  October 15, 2009.  (Dkt. No. 212), 2009 WL 3365858, 2009 U.S. Dist.

4  LEXIS 101937.  The court has not issued any subsequent orders in

5  this case.

**II.  STANDARDS**

**A.    Standard for a Motion for a Preliminary Injunction**

7  The purpose of the preliminary injunction as provided by Fed.

9  R. Civ. P. 65 is to preserve the relative positions of the

10 parties--the status quo--until a full trial on the merits can be

11 conducted.  See University of Texas v. Camenisch, 451 U.S. 390, 395

12 (1981).  The limited record usually available on such motions

13 renders a final decision on the merits inappropriate.  See Brown

14 v. Chote, 411 U.S. 452, 456 (1973).

15 "A plaintiff seeking a preliminary injunction must establish

16 that he is [1] likely to succeed on the merits, [2] that he is

17 likely to suffer irreparable harm in the absence of preliminary

18 relief, [3] that the balance of equities tips in his favor, and [4]

19 that an injunction is in the public interest."  Am. Trucking Ass'ns

20 v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009)

21 (quoting Winter v. Natural Res. Def. Council, ___ U.S. ___, ___,

22 129 S.Ct. 365, 374 (2008)).  In Winter, the Supreme Court raised

23 the bar for establishing irreparable harm from a showing of mere

24 possibility, which had previously applied under the Ninth Circuit's

26 suggestion to limit discussion to the named plaintiffs.

sliding scale approach, to a showing of likelihood of irreparable

harm.  <u>Winter</u>, __ U.S. at ___, 129 S.Ct. at 375-76.

**B.    Standard for a Motion to Dismiss**

A Fed. R. Civ. P. 12(b)(6) motion challenges a complaint's

compliance with the pleading requirements provided by the Federal

Rules.  Under Fed. R. Civ. P. 8(a)(2), a pleading must contain a

"short and plain statement of the claim showing that the pleader

is entitled to relief."  The complaint must give defendant "fair

notice of what the claim is and the grounds upon which it rests."

<u>Bell Atlantic v. Twombly</u>, 550 U.S. 544, 555 (2007) (internal

quotation and modification omitted).  To meet this requirement, the

complaint must be supported by factual allegations.  <u>Ashcroft v.

Iqbal</u>, ___ U.S. ___, 129 S. Ct. 1937, 1950 (2009).  "While legal

conclusions can provide the framework of a complaint," neither

legal  conclusions  nor  conclusory  statements  are  themselves

sufficient, and such statements are not entitled to a presumption

of truth.  <u>Id.</u> at 1949-50.  <u>Iqbal</u> and <u>Twombly</u> therefore prescribe

a two step process for evaluation of motions to dismiss.  The court

first identifies the non-conclusory factual allegations, and the

court then determines whether these allegations, taken as true and

construed in the light most favorable to the plaintiff, "plausibly

give rise to an entitlement to relief."  <u>Id.</u>; <u>Erickson v. Pardus</u>,

551 U.S. 89 (2007).

"Plausibility," as it is used in <u>Twombly</u> and <u>Iqbal</u>, does not

refer to the likelihood that a pleader will succeed in proving the

allegations.  Instead,  it  refers  to  whether  the  non-conclusory

16

factual allegations, when assumed to be true, "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 557). A complaint may fail to show a right to relief either by lacking a cognizable legal theory or by lacking sufficient facts alleged under a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).

### III. ANALYSIS

Evaluation of both the motion to dismiss and the motion for a preliminary injunction begins with the merits of plaintiffs' claim. As explained below, the court concludes that plaintiffs' due process claim fails, but that plaintiffs have demonstrated a likelihood of success on their Ex Post Facto argument. The court then turns to the remaining preliminary injunction factors, and concludes that an injunction is warranted.

### A. Merits

Plaintiffs advance two separate legal theories, arguing that the changes effectuated by Proposition 9 violate both the Ex Post Facto Clause and plaintiffs' substantive due process rights. These theories are closely related: both argue that Proposition 9 will cause some prisoners who have ceased to pose a threat to public safety to remain in prison because the prisoners will be unable to receive a timely suitability hearing. Plaintiffs' Ex Post Facto

17

claim argues that such confinement is more likely after Proposition 9, such that the likely period of incarceration has increased. Plaintiffs' substantive due process claim argues that this confinement is not reasonably related to California's stated purpose for denial of parole, the protection of public safety.

### 1.  Ex Post Facto

Article 1, section 10 of the United States Constitution provides that "No state shall . . . pass any . . . ex post facto Law." This clause prohibits any law that "makes more burdensome the punishment for a crime after its commission." <u>Beazell v. Ohio</u>, 269 U.S. 167, 169-70 (1925). A law violates this prohibition if it is both retroactive and detrimental. <u>Brown v. Palmateer</u>, 379 F.3d 1089, 1093 (9th Cir. 2004) (quoting <u>California Dept. of Corrections v. Morales</u>, 514 U.S. 499, 509 (1995), <u>Weaver v. Graham</u>, 450 U.S. 24, 29 (1981)). Here, defendants have applied the Proposition 9 amendments retroactively, i.e., to prisoners whose crimes were committed prior to the proposition's passage. Therefore, the only issue is whether the amendments are sufficiently detrimental.

The Supreme Court has twice discussed what it means for a change to be detrimental in the context of Ex Post Facto claims broadly similar to the one here. <u>Garner v. Jones</u>, 529 U.S. 244, 255 (2000), <u>Morales</u>, 514 U.S. 499. "The controlling inquiry . . . [is] whether retroactive application of the change . . . created 'a sufficient risk of increasing the measure of punishment attached to the covered crimes.'" <u>Garner</u>, 529 U.S. at 250 (quoting <u>Morales</u>,

514 U.S. at 509).  A "sufficient" risk is one that is "significant," Garner, 529 U.S. at 255, and not "speculative and attenuated," Morales, 514 U.S. at 509, 514.  Changes must be reviewed "within the whole context of [the state's] parole system." Garner, 529 U.S. at 252.  A rule may pose a sufficient risk either "by its own terms" or where "the rule's practical implementation . . . will result in a longer period of incarceration than under the old rule."  Id. at 255.

In both cases, the Court "declined to articulate a single 'formula'" for determining sufficiency.  Morales, 514 U.S. at 509. Accordingly, I review the Court's application of the above principles in Morales and Garner.  I then discuss what further principles may be derived from these illustrations, and then finally compare the facts in those cases with the facts here.

### a.    Parole Changes in Morales

In Morales a California prisoner brought a habeas corpus petition challenging the 1981 amendments to section 3041.5 of the California Penal Code.  Prior to this amendment, all life prisoners whose sentences included possibility of parole received annual parole hearings.  The 1981 amendment authorized the Board to defer subsequent suitability hearings for up to three years, but only for prisoners convicted of "more than one offense which involves the taking of a life," and only where the Board found "that it was not reasonable to expect that the parole would be granted at a hearing during the following years and state[d] the bases for the finding." Morales, 514 U.S. at 503 (quoting Cal. Pen. Code Ann. §

19

3041.5(b)(1) (West 1982)). The Court held that the risk of prolonged confinement posed by this amendment's terms was not sufficient to violate the Ex Post Facto Clause. Id. at 512.

The Court provided three reasons for this conclusion. Most importantly, the prisoners whose deferral periods were increased would be unlikely to have been found suitable at an earlier date. Id. The Court noted that in general, prisoners convicted of multiple offenses involving the taking of a life were particularly unlikely to be found suitable for parole. Id. at 511. Even among these prisoners, the deferral period would be increased only where the Board had made particular findings that an individual prisoner was unlikely to be found suitable for parole in the deferral period, and the amount of the increase would be specifically tailored to the Board's findings. Id. at 511-12. Second, if a change in circumstances called into question the Board's projection of the likelihood of a suitability finding, the prisoner could potentially seek to advance his hearing date. Id. at 512 (quoting In re Jackson, 39 Cal. 3d at 474). Finally, the Court noted that under the California system, a finding of suitability for parole is necessary but not sufficient for release. Id. at 513. Once a prisoner has been found suitable for parole, the Board must calculate the base term, modify this term, and then set a release date. In cases where the calculated release date would lie in the future, delaying a prisoner's suitability hearing to any point prior to that future date posed a minimal risk of prolonging confinement.

Because the terms of the 1981 amendment increased deferral of subsequent suitability hearings only in cases that would be unlikely to delay any actual finding of suitability, because advanced hearings in light of changed circumstances were available, and because a delay of a finding of suitability might not delay actual release, the Court concluded that "the narrow class of prisoners covered by the amendment cannot reasonably expect that their prospects for early release on parole would be enhanced by the opportunity of annual hearings."  Id. at 512; see also Garner, 529 at 250-51 (characterizing Morales as turning on the facts that deferral was increased only when the likelihood of release was low, and that advanced reconsideration was available when circumstances changed).

### b.  Parole Changes in Garner

The Court considered a similar decrease in the frequency of parole hearings in Garner, 529 U.S. 244.  Garner concerned a challenge under 42 U.S.C. § 1983 to a change in the Georgia Parole Board's regulations.  Prior to the change, when a prisoner was initially found unsuitable for parole, the Board was required to conduct a further hearing every three years.  Id. at 247.  This regulation was amended to provide for reconsideration "at least every eight years."  Id. (quoting the amended rule).

The Court held that two features of the changed regulation, both of which were also present in Morales, precluded a finding that the regulation's terms presented an Ex Post Facto problem. Id. at 254.  The first feature was that the Georgia Parole Board

had discretion in setting the length of the deferral period, and that the Board's policy was to impose a lengthened period when it was "not reasonable to expect that parole would be granted in the intervening years." Id. Absent such a finding, the Board would set a hearing at the time provided by the old rule. The second feature was the regulation's explicit provision of "expedited parole reviews in the event of a change in [a prisoner's] circumstance or where the Board receives new information that would warrant a sooner review." Id. The Court illustrated the effect of these qualifications with the particular circumstances of the plaintiff in that case. Id. at 255. The Georgia Board had deferred the prisoner's next parole suitability hearing for the maximum period of eight years. The prisoner's history--including a prior escape from prison and a subsequent act of murder--made it extraordinarily unlikely that, even if the Board were to conduct a suitability hearing in the intervening time, the prisoner would be found suitable for parole under the Georgia criteria. However, if a change in circumstance or new information arose which would call the Board's assessment into question, the prisoner could seek earlier review. Id. Based on these provisions, the Court concluded that the regulation did not facially violate the Ex Post Facto Clause. Id. at 256. The Court left open the possibility that the Board's exercise of the discretion provided by the statute would, in practice, present a significant risk of increased punishment. Id. However, the Court found no evidence to this effect in the record before it.

**c.  Lessons from _Morales_ and _Garner_**

As illustrated above, _Morales_ and _Garner_ did not attempt to quantify the risk of prolonged incarceration.  Instead, each looked to whether prisoners who could expect release (or a significant chance thereof) at one time under the former rule would be released only at a later time under the new rule.  In both cases, the Court found that subsequent hearings would be delayed only when there was no appreciable likelihood of an earlier release.

Neither the Supreme Court nor the Ninth Circuit have clearly addressed whether a plaintiff must show that he personally faces a significant risk of prolonged punishment.  _Garner_ stated that "[i]n the case before us, [the prisoner] must show that as applied to his own sentence the law created a significant risk of increasing his punishment."  529 U.S. at 255.  The Supreme Court has also held, however, that the significant risk inquiry "looks to the challenged provision, and not to any special circumstances that may mitigate its effect on the particular individual."  _Weaver v. Graham_, 450 U.S. 24, 33 (1981), _overruled on other grounds by Collins v. Youngblood_, 497 U.S. 37, 41 (1990) _as explained by Morales_, 514 U.S. at 506 n.3.  The Ninth Circuit has held that, consistent with _Garner_, "[w]hether an individual can show definitively that he would have received a lesser sentence is not determinative."  _Himes_, 336 F.3d at 855 (citing _Miller v. Florida_, 482 U.S. 423, 432 (1987)).

The Seventh Circuit has confronted this issue, holding that

The proper question to ask, then, is whether

23

> the new procedure creates a significant risk
> of increased punishment for [petitioner]
> Glascoe. This is not to be confused with the
> question of whether the new parole practice is
> harsher for a class of prisoners generally; we
> must focus on the consequence of the new
> practice on the sentence of the particular
> inmate bringing the challenge[.]

Glascoe v. Bezy, 421 F.3d 543, 547-548 (7th Cir. 2005) (citing Garner, 529 U.S. at 255). Glascoe concerned a habeas challenge to revised guidelines used in determining whether to grant parole, rather than a challenge to the timing of parole suitability hearings. Id. at 544. The Seventh Circuit held that Glascoe's "extremely violent crimes and his institutional misconduct" clearly demonstrated that he would have been denied parole under the former guidelines, such that denial of parole pursuant to the new guidelines did not increase his risk of punishment. Id. at 548.

The Seventh Circuit's opinion in Glascoe did not cite the Supreme Court's opinion in Weaver, and it appears that Glascoe cannot be reconciled with Weaver's admonition not look to "special circumstances" that may blunt a law's impact on specific individuals. As recognized by Justice Souter's dissent in Garner, because sentencing "is often a mix of rules and discretion," it can be difficult to determine whether a change has affected the sentence of a particular prisoner. Garner, 529 U.S. at 260 n.1 (Souter, J., joined by Stevens and Ginsburg, J.J., dissenting). For this reason, the Court's cases "have traditionally evaluated the effect of [a] change on the class subject to the new rule, rather than focusing solely on the individual challenging the

change." Id. (citing Weaver, 450 U.S. at 33). Since Garner, the Ninth Circuit has continued to hold that change may violate the Ex Post Facto Clause when it "disadvantage[s] . . . prisoners in general." Brown v. Palmateer, 379 F.3d 1089, 1095 (9th Cir. 2004) (citing Nulph v. Faatz, 27 F.3d 451, 456 (9th Cir. 1994)) (Ex Post Facto violation may be shown in this way, or by showing that "that it can 'be said with assurance' that [a challenger] would have received less severe punishment under the prior scheme."). Accordingly, Garner appears to require evaluation of a change's effects on individuals serving a particular sentence or convicted of a particular offense, but not evaluation of other facts or circumstances specific to individual challengers. Facts other than the specific sentence may be relevant on a class wide basis,[10] as was the case in Morales, where the Court rested its decision in part on the conclusion that the *class* of individuals affected by the change were those unlikely to be granted parole under the former law. To the extent that Garner discussed the petitioner's specific circumstances, such as his prior escape from prison, this discussion merely illustrated the way in which the Georgia parole board applied its discretion under the revised rule. 529 U.S. at 254-55.[11]

---

[10] Here, "class" refers to the class of persons affected by a change, rather than the particular class certified in this case.

[11] If, contrary to the analysis above, plaintiffs were required to show an individualized significant risk of prolonged incarceration for purposes of the merits of the Ex Post Facto challenge, the court would find that such a showing had been made for the reasons underlying the court's irreparable injury analysis.

25

1           **d.    Ex Post Facto Analysis of Proposition 9**

2        As demonstrated above, the Court's decisions in <u>Garner</u> and

3  <u>Morales</u> were informed by the particular features of the laws under

4  consideration.   <u>See</u> <u>Morales</u>, 514 U.S. at 509 n.5 (explicitly

5  declining to opine on whether alternate changes to the timing of

6  parole hearings could be unconstitutional). Here, plaintiffs argue

7  that the changes effectuated by Proposition 9 present a factually

8  distinct scenario.

9        One difference between Proposition 9 and the laws at issue in

10 <u>Morales</u> and <u>Garner</u> is the number of distinct changes effectuated

11 by Proposition 9.   Both <u>Morales</u> and <u>Garner</u> considered mere

12 extensions of the maximum possible deferral date.   Proposition 9

13 (1) increased the minimum deferral, (2) reduced, in various ways,

14 the Board's ability to defer for less than the maximum possible

15 term,   and   (3)   increased   the   maximum   deferral.     Although

16 <u>Garner</u> explained that the operation of challenges laws must be

17 analyzed "within the whole context of Georgia's parole system," 529

18 U.S. at 252, the court begins by discussing each category of change

19 individually.   <u>See also</u> <u>Morales</u>, 514 U.S. at 513.

20          **I.    Increase to the Minimum Deferral Period**

21        <u>Garner</u> and <u>Morales</u> both emphasized that under the new laws,

22 a longer deferral would be imposed only when the parole board had

23 found it unreasonable to expect that parole would be granted in the

24 interim.   <u>Garner</u>, 529 U.S. at 254, <u>Morales</u>, 514 U.S. at 511-12.

25 In contrast, Proposition 9 increases the minimum deferral period

26 for all prisoners from one to three years, regardless of the

26

Board's expectation about whether the prisoner may become eligible for parole at an earlier date. <u>See</u> Cal. Penal Code § 3041.5(b)(3)(C), BPH Administrative Directive No. 08/01, Regulatory Sections Impacted by Proposition 9, December 8, 2008. Thus, while the laws reviewed by <u>Garner</u> and <u>Morales</u> provided the relevant parole boards with discretion to impose the pre-amendment deferral period, this discretion is not present under Proposition 9.

Moreover, in this case, the Board's practice prior to Proposition 9 implied that the Board reasonably expected that many prisoners would become suitable, and potentially be released, in one or two years.[12] Defendants do not contest plaintiffs' assertion that unlike in <u>Morales</u>, many, if not most, of the prisoners affected by the challenged provisions have been already served their "base terms" such that, if the prisoners were found suitable for parole, the Board would set a prompt release date. Thus, plaintiffs argue that if these prisoners are not able to demonstrate their suitability for three years, they are exposed to a significant risk of prolonged confinement.

Defendants effectively concede this risk, but argue that the risk is ameliorated by the Board's ability to advance hearing dates

_____

[12] Plaintiffs note that the Board granted one or two year deferrals to approximately two thirds of prisoners found unsuitable for parole. However, this statistic does not demonstrate that the Board had expected all these prisoners to become suitable within this time. The former statute permitted the Board to impose a longer deferral only prisoners convicted of murder. Even for those prisoners, the Board had discretion to impose a shorter deferral even absent an expectation that the prisoner would become suitable within two years.

in light of changed circumstances or new information and prisoners'
ability to request such advancement. By definition, a deferral is
only set when the Board concludes that the prisoner is not
presently suitable for parole. Thus, a subsequent hearing will
result in the prisoner's release only if some fact changes to
render that prisoner suitable.[13] Under the former system, the
Board would set a period of less than three years if it thought a
change might occur in that time.[14] According to defendants,
although the three year minimum prevents the Board from scheduling
an earlier hearing based on this *possibility*, if a change *actually
occurs*, that occurrence will entitle the prisoner to an advanced
hearing. Thus, defendants argue that in all the circumstances when
a prisoner would actually be released under the former system, the
prisoner will also be released under the new system, albeit
pursuant to a different procedure.

    The possibility of advanced hearings was one of the several

---

[13] Plaintiffs candidly note that a prisoner may be found
suitable for a parole at a subsequent hearing even if the
circumstances have not changed, because the panel at the subsequent
hearing may be constituted of individuals who view the same
circumstances differently.
    Although there is an undeniable realism to plaintiffs'
argument, the argument was foreclosed by <u>Morales</u>. <u>Morales</u> held,
for example, that changes in the membership of the state parole
board, although they may predictably effect the likelihood of
release on parole, would not ordinarily constitute an Ex Post Facto
violation. 514 U.S. at 508. The ordinary, random differences from
panel to panel are the type of "speculative, attenuated" risk that
does not rise to the level of significance. <u>Id.</u>

    [14] In the following section, part III(A)(1)(d)(ii), the court
discusses the particular standards of proof used by the Board in
making this determination.

28

factors considered in <u>Garner</u> and <u>Morales</u>.  Neither case suggests that advanced hearings are themselves sufficient.  <u>Garner</u>, 529 U.S. at 251, 256 (looking to the sum of the factors considered), <u>Morales</u>, 514 U.S. at 509.  Both <u>Garner</u> and <u>Morales</u> discussed at length that suitability hearings would be deferred only when the prisoner was not expected to become suitable for parole in the interim.  <u>Garner</u>, 529 U.S. at 254-55, <u>Morales</u>, 514 U.S. at 510-12. Advanced hearings served as a safety valve that allowed review in the event that unexpected changes rendered a prisoner suitable. Thus, neither held that ad-hoc advanced hearings, rather than scheduled hearings, were suitable to ensure release after expected or predictable changes to suitability.

Plaintiffs argue that for expected changes, advanced hearings are an inadequate substitute for scheduled hearings, and plaintiffs' argument suffices to survive a motion to dismiss and to demonstrate a likelihood of success on the merits.  At the time these motions were argued, there was no mechanism in place for initiating or accepting petitions to advance a hearing.  Once a petition is filed, the Board must receive the view of a homicide victim's next of kin before deciding whether to grant a request for an advanced hearing.  Cal. Pen. Code § 3041.5(d)(2).  If the Board decides to advance the hearing, it must calendar it, for a time which provides the victim's family with 45 days notice.  <u>Id.</u> § 3041.  For all of these reasons, there will necessarily be a delay between any meritorious request for an advanced hearing and the grant of such a hearing, and plaintiffs contend, with some

1  evidence, that this delay will likely exceed a year. See Pls.'
2  Reply to Defs.' Supp. Evid., Dkt. 180, at 5.

3      When a change in circumstances renders a prisoner suitable for
4  parole, if he is unable to secure an advanced hearing until after
5  the time at which he would have received a scheduled suitability
6  hearing under the former statute, the prisoner's incarceration will
7  have been prolonged. Because the Board's past practices
8  demonstrate that it expected a significant number of prisoners to
9  become suitable for parole in less than three years, the risk of
10 prolonged incarceration for prisoners who would have received
11 shorter deferral appears significant.

12     Plaintiffs additionally argue that advanced hearings are
13 inadequate because the amendments do not restrict the Board's
14 discretion to advance hearings, such that the Board may decline to
15 advance a hearing even when a prisoner demonstrates a change in
16 circumstance. Insofar as plaintiffs challenge Proposition 9 on its
17 face, i.e., "by its own terms," I must assume that the Board will
18 exercise a neutral grant of discretion in a manner consistent with
19 the Ex Post Facto Clause. Garner, 529 U.S. at 256 (Eleventh
20 Circuit wrongly refused to consider Georgia Parole Board's self-
21 imposed limits on exercise of its discretion). Insofar as
22 plaintiffs challenge this aspect of the statute as applied, while
23 plaintiffs have stated a claim, plaintiffs have not provided
24 evidence or argument showing a likelihood of success on this
25 particular issue.
26 ////

In summary, Proposition 9, unlike the changes considered in Morales and Garner, increases the minimum deferral period. Plaintiffs are likely to succeed in showing that many prisoners who have currently been found unsuitable for parole, including the named plaintiffs here, have a significant chance of becoming suitable in less than three years. Plaintiffs have also made a sufficient showing that many prisoners, including the named plaintiffs, have served their base terms and would be granted immediate release if found suitable for parole. C.f. Morales, 514 U.S. at 513. Finally, plaintiffs have provided reasons why the possibility of an advanced hearing is an inadequate substitute for a scheduled hearing when the board reasonably expects that a prisoner will become suitable for parole in less than three years. Although Garner and Morales relied on the possibility of advanced hearings as a factor indicating against an Ex Post Facto violation, neither of those cases considered an increase in the minimum deferral, and both cases held that parole systems needed to be evaluated as a whole. Accordingly, this aspect of Garner and Morales should be distinguished. Plaintiffs are likely to succeed in showing that the three year minimum creates a significant risk of increased punishment.

### ii. Limits to the Board's Discretion

Aside from raising the minimum deferral period, Proposition 9 limited the Board's ability to impose the minimum period. Under the former rule, the default was the minimum period, and the Board had discretion to impose a longer deferral only when "it [was] not

31

reasonable to expect that parole would be granted at a hearing during the following year[s]." Former Cal. Pen. Code § 3041.5(b)(2)(A)-(B). Further, the statute provided that the Board "may" impose a longer deferral in these circumstances. Id. The Board thus had discretion to impose less than the maximum even when it was not reasonable to expect that parole would be granted sooner. Finally, because the statute was silent as to the standard of proof to be used in forming these "reasonable expectations," the Board had discretion to determine this standard. Shaputis, 44 Cal. 4th at 1258.

Proposition 9 restricts the Board's discretion in regard to each of the above matters. The default deferral is now the maximum. Cal. Pen. Code § 3041.5(b)(3)(A). The Board may set a lesser deferral only where it "finds by clear and convincing evidence that . . . . consideration of the public and victim's safety does not require a more lengthy period of incarceration." Id. Because consideration of the public safety is the determinant of parole suitability, Proposition 9 allows a deferral for less than the maximum only when clear and convincing evidence indicates that parole will actually be granted at the next hearing. Regardless of whether this "clear and convincing evidence" standard of proof differs from the Board's interpretation of the prior "reasonable expectation" standard, the Board no longer has discretion to schedule an earlier hearing even when it does not

expect parole to be granted.[15]

Removing discretion to set earlier hearings, rather than expanding discretion to set deferred hearings, sharply distinguishes this case from Garner and Morales. Both Garner and Morales considered changes that, like California's prior system, granted the Board discretion to postpone hearings when the Board made specific findings that an earlier release was unlikely. Garner, 529 U.S. at 254 (deferral where "it is not reasonable to expect that parole would be granted during the intervening years"), Morales, 514 U.S. at 507, 511 ("it is not reasonable to expect that parole would be granted at a hearing during the following years"). When a rule "sufficiently circumscribe[s] official discretion," the rule can violate the Ex Post Facto Clause "even if the change does not automatically lead to a more onerous result than would have occurred under the prior law." Himes, 336 F.3d at 856 (citing Miller, 482 U.S. at 432-33); see also Lindsey, 301 U.S. at 401. In Miller, the Supreme Court considered a challenge to Florida's sentencing guidelines. 482 U.S. at 425. The former guidelines provided a presumptive range, although a judge could depart from the range if the he provided clear and convincing reasons for the

---

[15] The parties have provided little discussion of the effect of the Board's prior discretion to schedule earlier hearings even absent a reasonable expectation that parole would be granted. It appears likely to the court that in many cases, the evidence will not support a prediction one way or the other regarding future suitability for parole. In such a case, the prior system afforded the Board discretion to expect the unexpected and schedule an earlier hearing. Proposition 9 eliminates this discretion, putting the burden of proof on the prisoner to clearly and convincingly predict future suitability.

departure.  Id. at 426.  The amended guidelines were similar, but with a higher presumptive range.  Id.  The challenger was sentenced according to the new presumptive range.  Id. at 426-27.  The Court found that the change violated the Ex Post Facto Clause despite the fact that the challenger could have received the same sentence under the former law, because the changes limited the judge's discretion to impose a lower sentence.  Id. at 435.

Here, plaintiffs are likely to succeed in showing that there is a significant chance that some prisoners not presently suitable for parole will become suitable in the fewer than the next fifteen years, but that these prisoners are unable to currently demonstrate by clear and convincing evidence that this change will occur, or when.  Moreover, for the reasons stated in the previous section, plaintiffs are likely to succeed in showing that there is a significant risk that forcing these prisoners to demonstrate their changed status through an advanced hearing will result in longer incarceration than would result under the former rule, which would have provided for an earlier scheduled hearing either because of the Board's exercise of discretion or because of the prior rule's lower maximum.

### iii. Increase in Maximum

As noted above, Proposition 9 increased the maximum deferral period from 5 years to 15 years.  Garner and Morales each demonstrated that an increase in the maximum deferral period, standing alone, does not violate the Ex Post Facto Clause.  In both cases, however, the increase in the maximum deferral would only

34

affect prisoners who were not likely to receive parole during the length of their deferral. Here, where the increase in the maximum is accompanied by changes that limit the Board's ability to impose less than the maximum, the increase further contributes to the risk of prolonged incarceration. As noted above, <u>Garner</u> held that changes must be reviewed "within the whole context of [the state's] parole system." <u>Garner</u>, 529 U.S. at 252.[16]

### iv. Conclusions Regarding Plaintiffs' Ex Post Facto Challenge

Both <u>Morales</u> and <u>Garner</u> indicated that changes to the timing of parole suitability hearings could violate the Ex Post Facto Clause. Although the Court found no violation in those cases, Proposition 9 is factually distinct in numerous ways. Unlike the laws reviewed in <u>Morales</u> and <u>Garner</u>, Proposition 9 increases the minimum deferral period--here, from one to three years. Proposition 9 further sharply limits the Board's discretion to set deferrals for less than the maximum. Finally, Proposition 9

---

[16] The court reiterates that it is likely to be hard to predict, from a decade in advance, when many prisoners will become suitable for parole. It may be that a significant number of prisoners become eligible even though their eligibility could not have been clearly and convincingly predicted. This possibility demonstrates the importance of holding periodic suitability hearings regardless of individual predictions. <u>Garner</u> and <u>Morales</u> allowed periodic hearings to be skipped, but both implied that the burden of proof was on the state to provide specific reasons for believing that parole would not be granted at these hearings. Proposition 9, on the other hand, puts the burden of proof on the prisoner. If, as the court expects, it is frequently impossible to make a prediction one way or the other, allocation of the burden of proof is crucial. Proposition 9's shifting of the burden of proof, together with its 15 year default deferral, effectively removes the prior presumption of periodic scheduled hearings.

drastically increases the maximum deferral period. These changes create a risk of prolonged incarceration, and plaintiffs are likely to succeed in showing that this risk is significant despite the possible availability of advanced hearings.

Plaintiffs separately argue that Proposition 9 has an explicitly punitive purpose, independent of its punitive effect. Because the court concludes that plaintiffs have shown a likelihood of success as to punitive effect, and because defendants' motion to dismiss does not address this argument, the court does not further discuss any possible punitive purpose here.

## 2. Substantive Due Process

Plaintiffs separately argue that Proposition 9's changes to the parole deferral process violate the Substantive Due Process Clause. See, e.g., Lawrence v. Texas, 539 U.S. 558, 571 (2003) (discussing the Due Process Clause's substantive protections). The court grants defendants' motion to dismiss as to this claim.

In a substantive due process challenge, the initial inquiry is whether the asserted right is one that is "fundamental." Wash. v. Glucksberg, 521 U.S. 702, 722 (1997). Where a sentence includes simply the possibility of parole, the interest in release on parole is not a right inherent in the United States Constitution. Greenholtz v. Inmates of Neb. Penal & Correctional Complex, 442 U.S. 1, 7 (1979). Plaintiffs concede that no fundamental right is at issue here, and that the amendments therefore need only survive rational basis review. Kelch v. Director, Nevada State Department of Prisons, 10 F.3d 684 (9th Cir. 1993), cited by plaintiffs,

36

provides a typical formulation of this standard: "Substantive due process requires that government action depriving a person of life, liberty or property have a rational, non-arbitrary connection to a legitimate purpose."  Id. at 688.  California law grants prisoners a protected, albeit non-fundamental, liberty interest in parole.  See, e.g., Sass, 461 F.3d at 1128.

Plaintiffs approach rational basis review by first identifying the government's interest.  They first argue that under California Penal Code section 3041, California has declared that the only interest furthered by a denial of parole (once the minimum term is served) is prevention of a prisoner's threat to public safety. Plaintiffs then argue that whenever a prisoner's circumstances change such that he is no longer a threat to public safety, any further incarceration of the prisoner does not further this interest.  Pls.' Mem. Supp. Mot. Prelim. Inj. 21.  Plaintiffs then reiterate much of their Ex Post Facto argument, arguing that as a result of Proposition 9's increased deferral periods, prisoners whose circumstances have changed will often remain in custody for prolonged periods while waiting for a suitability hearing at which the prisoner may demonstrate this change.

Although plaintiffs accurately characterize section 3041, other Penal Code sections are not so narrow.  For example, the California Supreme Court has recognized that one purpose behind the 1982 amendments to section 3041.5 was to save the expense of additional hearings.  Jackson, 39 Cal. 3d at 473 (quoting the legislative history of the 1982 amendment).  Proposition 9 itself

declares that one of its purposes was to save the expense of additional hearings.  Proposition 9 § 3(2).  Thus, these statutes recognize government interests other than public safety.

At its heart, plaintiffs' argument is that Penal Code section 3041 ties the state's hands, trumping any other statutes purporting to assert other interests.  This argument fails, because federal courts lack "the authority to enjoin the administration of, or to declare invalid, state laws on the grounds that they are incompatible with other state laws, much less to rule that state laws are contrary to the state legislature's intent."  <u>McQuillion v. Schwarzenegger</u>, 369 F.3d 1091, 1099 (9th Cir. 2004).  Plaintiffs may abhor a practice that risks prolonging incarceration merely to save the expense of additional hearings.  Plaintiffs have not argued, however, that cost is not a legitimate interest justifying such detention.

The state's interest in saving expenses is rationally related to any resulting deprivation of prisoners' interests in parole.  The state could rationally conclude that the savings realized from avoiding frequent parole hearings is great enough to offset any added expense incurred by continued incarceration of those few prisoners who would have been found suitable for parole.

**B.   Likelihood of Irreparable Injury**

Even where plaintiffs are likely to succeed on the merits, a preliminary injunction may not issue unless plaintiffs have shown that they are "likely to suffer irreparable harm in the absence of preliminary relief."  <u>Winter</u>, ___ U.S. at ___, 129 S. Ct. at 374.

Confinement in violation of plaintiffs' constitutional rights is an irreparable injury. See Nelson v. NASA, 530 F.3d 865, 882 (9th Cir. 2008). The issue is whether this irreparable injury "is likely [to occur] in the absence of an injunction." Winter, ___ U.S. at ___, 129 S. Ct. at 375.

Winter differs from this case--and from many other cases seeking injunctive relief--because in Winter, plaintiffs' showing as to the merits had little connection to a likelihood of specific irreparable harm. Winter concerned a claim under the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA"). Plaintiffs challenged the Navy's use of long-range sonar, arguing that the Navy had not adequately studied the sonar's effects on marine mammals. Winter, ___ U.S. at ___, 129 S.Ct. at 371. Because NEPA's requirements are only procedural, NEPA may be violated even when there is not any harm to the environment or other ultimate injury. The Court rested on this distinction to hold that, even assuming that plaintiffs had shown a likelihood of success on the merits of their NEPA claim, plaintiffs must also separately show a likelihood of irreparable harm to the environment. Id. at ___, 129 S.Ct. at 375.

In this case, unlike in Winter, the merits of the claim and the likelihood of irreparable injury overlap in that both consist of potential confinement in violation of the Ex Post Facto Clause. Above, the court concluded that plaintiffs are likely to succeed in showing a "significant risk" of such confinement. Although Winter did not quantify "likely," in the preliminary injunction

39

context, "likely" would appear to require no more than "significant."

The relevant likelihood, however, is not the likelihood of injury absent any adjudication of this case. Instead, the question is whether such injury is likely to occur before final resolution of this matter.

As is already apparent, this case raises complex issues. It would be optimistic to conclude that proceedings before this court will be resolved within another year, and it seems clear that both sides intend to appeal any judgment in the other side's favor.

As to plaintiff Masoner, there is evidence demonstrating likelihood of injury during the pendency of this case.[17] He had routinely received one-year deferrals prior to the passage of Proposition 9, had once been found suitable by the Board only to have the grant of parole reversed by the Governor. At his 2008 hearing, the panel conceded that he was approaching suitability even as it denied parole. Under Proposition 9, he will not receive a scheduled suitability hearing until late 2011. Enjoining the enforcement of Proposition 9 would almost certainly enable Masoner to receive scheduled annual hearings, and he has shown that it is sufficiently likely that he would be released on parole at such a

---

[17] Defendants move to strike the discussion of these facts included in plaintiffs' memorandum in support of their motion. (Dkt. No. 164.) Because a Fed. R. Civ. P. 12(f) motion to strike may only be brought as to "pleadings," the court construes this motion as an evidentiary objection. Plaintiffs have supplied evidence to support their claims regarding Masoner. For the reasons stated in plaintiffs' opposition to defendants' motion to strike, the motion to strike is denied.

hearing prior to the completion of this suit.

While there is no evidence concerning the remaining plaintiffs, the operative complaint alleges that five of these seven plaintiffs have previously been found suitable for parole only to have this determination reversed by the governor.  Each plaintiffs' most recent deferral was for one or two years. Although neither party significantly discussed these allegations in connection with the motion for a preliminary injunction, it does not appear that these allegations are in dispute.  I therefore conclude that each of the named plaintiffs has shown a likelihood of irreparable injury absent a preliminary injunction.[18]

## C.    Balance of Hardships

The hardships faced by plaintiffs are longer prison terms and violations of their constitutional rights.  The hardships faced by the defendant are the cost of administering additional parole hearings.  Defendants further argue that a preliminary injunction would impair public safety, causing a hardship to the defendants, who are charged with protecting the public.  However, the injunction sought would not cause any prisoner to be released absent a determination that the prisoner was not a threat to public

---

[18] The defendants further argue that injunctive relief is unnecessary because the individuals can file habeas petitions.  The court first notes that plaintiffs' claims may be properly brought under 42 U.S.C. section 1983--indeed, Garner concerned an analogous section 1983 Ex Post Facto claim.  529 U.S. at 248.  Moreover, while a habeas corpus petition would provide an alternative means for terminating any unlawful confinement, defendants have provided no indication that habeas petitions would be able to prevent such confinement, and the resulting irreparable injury, from occurring.

safety and therefore suitable for parole.[19]  Balancing the other

hardships, the court concludes that notwithstanding the State of

California's present budget problems, the balance favors

plaintiffs.

Defendants also implicitly rely on a type of psychological

injury described by Proposition 9, the "prolonged and unnecessary

suffering" parole hearings inflict upon collateral victims of the

inmates' offense (i.e., relatives of the decedent).  <u>See</u>

Proposition 9, § 3(2).  Presumably, this language refers to the

stress and anguish these persons experience resulting from

attendance of parole hearings, or simply from the knowledge that

such hearings are being held.  The court is not aware of any

authority recognizing injury of this type.  Even if this type of

injury is cognizable and properly considered in the preliminary

injunction analysis (which the court does not decide), either under

the balancing of hardships or as an aspect of the public interest,

the injury is not sufficient to tip the scales against plaintiffs.

**D.    Public Interest**

In this case, both parties invoke lofty public interests.

Plaintiffs note the public's interest in upholding the

constitution.  Defendants argue that the public has an interest in

---

[19] It is conceivable that the Board may occasionally err in
its suitability determinations.  If errors are possible, then an
increase in the number of parole hearings (as would result from an
injunction) may also increase the likelihood of an error that
mistakenly releases a dangerous prisoner.  However, this risk is
too speculative and slight to weigh into the balance of hardships
analysis.

seeing its will enforced.  Proposition 9 was enacted through the exercise of California's initiative processes.  As I have previously observed, however, that happenstance provides the statute with no special insulation from review for asserted constitutional infirmity.  Rather, the Supreme Court has held that "'it is irrelevant that the voters . . . enacted [a statute], because the voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation.'"  <u>Service Employees Int'l Union v. Fair Political Practices Com.</u>, 747 F. Supp. 580, 583 (E.D. Cal. 1990) (quoting <u>Citizens Against Rent Control v. Berkeley</u>, 454 U.S. 290, 295 (1981)).[20]

Defendants cite several cases concerning injunctions that would directly affect, respectively, the public's ability to conduct an upcoming election or to receive electricity.  <u>Cardona v. Oakland Unified School Dist.</u>, 785 F. Supp. 837, 842 (N.D. Cal. 1992), <u>Sierra Club v. Georgia Power Co.</u>, 180 F.3d 1309, 1310-11 (11th Cir. 1999).  Here, an injunction would have no analogous effect on the public.  Accordingly, the public interest does not strongly weigh for or against issuance of an injunction.

## IV.  CONCLUSION

Plaintiffs have shown a likelihood of success on the merits

---

[20] Indeed, it can be agrued that the public interest favors an injunction, since "it is 'in the public interest to terminate the unconstitutional application' of a statute."  <u>Levine v. Fair Political Practices Comm'n</u>, 222 F. Supp. 2d 1182, 1191 (E.D. Cal. 2002) (Karlton, J.) (quoting <u>Zeller v. The Florida Bar</u>, 909 F. Supp. 1518, 1528 (N.D. Fla. 1995)).

43

as to their Ex Post Facto challenge to Proposition 9's amendments to California's parole process. Plaintiffs have shown that these amendments are likely to cause irreparable injury absent a preliminary injunction. These factors, as well as the balance of hardships and the public interest, demonstrate that plaintiffs are entitled to a preliminary injunction barring enforcement of Proposition 9 as to the named plaintiffs.

Plaintiffs have failed to state a claim that Proposition 9 violates the substantive due process clause.

For these reasons, the court ORDERS as follows:

1.  Plaintiffs' motion for a preliminary injunction, Dkt. No. 157, is GRANTED as to the named plaintiffs. Defendants and their agents are ENJOINED from enforcing the provisions of Proposition 9 that amend former California Penal Code section 3041.5(b)(2)(A) as to the named plaintiffs.

2.  Defendants' motion to strike, Dkt. No. 164, is DENIED.

3.  Defendants' motion to dismiss, Dkt. No. 187, is GRANTED IN PART. Plaintiffs' substantive due process challenge to Proposition 9 is DISMISSED WITHOUT PREJUDICE. See Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1108 (9th Cir. 2003) (Initial dismissal under Fed. R. Civ. P. 12(b)(6) should ordinarily be without prejudice). Defendants' motion to dismiss is DENIED as to plaintiffs' Ex Post Facto challenge to Proposition 9. As explained in the concurrently filed order,

1    defendant's motion to dismiss is also DENIED as to

2    plaintiffs' ninth claim, challenging Cal. Const. Art. V,

3    § 8(b).

4

5    IT IS SO ORDERED.
     DATED:  February 4, 2010.

6                                    /s/Lawrence K. Karlton
                                     LAWRENCE K. KARLTON
7                                    SENIOR JUDGE
                                     UNITED STATES DISTRICT COURT

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26