UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RICHARD M. GILMAN, et al.,

                                        NO. CIV. S-05-830 LKK/GGH

        Plaintiffs,

    v.
                                        O R D E R
J. DAVIS., et al.,

        Defendants.
_____/

On November 4, 2008, the California electorate passed Proposition 9, the "Victims' Bill of Rights Act of 2008: Marsy's Law." Proposition 9 changed numerous aspects of California's parole system, including the availability and frequency of parole hearings for prisoners not initially found suitable for parole.

Plaintiffs, eight individuals seeking to represent a class of California state prisoners currently serving life sentences with possibility of parole, bring a claim under 42 U.S.C. section 1983 arguing that these changes violate both the Ex Post Facto and Due Process clauses of the United States Constitution. Plaintiffs have also brought eight other claims not at issue in this order.

1

1   Plaintiffs move for a preliminary injunction barring
2   enforcement of these changes.  Defendants conversely move to
3   dismiss plaintiffs' challenge to Proposition 9, and by the same
4   motion seek dismissal of plaintiffs' ninth claim, which challenges
5   Article V, Section 8(b) of the California Constitution.  The ninth
6   claim and the challenge thereto are the subject of a separate
7   concurrently filed order.

8   The court resolves these motions on the papers and after oral
9   argument.  For the reasons stated herein, the court grants
10  plaintiffs' motion for a preliminary injunction, and grants in part
11  and denies in part defendants' motion to dismiss.

**I.  BACKGROUND**

13  Proposition 9 changed numerous aspects of the California
14  parole system.  Plaintiffs challenge only the changes to the
15  scheduling of parole hearings for prisoners who are not found
16  suitable for parole at their initial hearing.  To describe those
17  changes, the court first surveys the California parole system, then
18  discusses the hearing deferral process prior to Proposition 9, and
19  finally describes the new system.

20  **A.   California's Process for Parole Determinations**

21  California's parole system is overseen largely by the Board
22  of Parole Hearings.  The Board of Parole Hearings was formerly the
23  Board of Prison Terms, and is hereinafter referred to as the Board.
24  The Board has "the power to allow prisoners imprisoned in the state
25  prisons . . . to go upon parole outside the prison walls and
26  enclosures."  Cal. Pen. Code § 3040.  The penal code provides

statutory guidance for the exercise of this power, and the Board has enacted regulations further specifying the parole process, pursuant to its authority under California Penal Code § 5076.2.

All prisoners whose sentences include life but do not include "without possibility of parole," become "eligible" for parole after serving a minimum number of years, marked by the arrival of the prisoner's "minimum eligible parole date."  Cal. Code Regs. tit. 15 §§ 2000(b)(3), (b)(67).  This date is determined by the prisoner's sentence and any credit the prisoner has earned for good conduct.  A prisoner with a straight "life" sentence and maximum good conduct credit becomes eligible for parole in seven years. Cal. Pen. Code § 3046(a)(1).  Parole eligibility comes later for prisoners whose sentences specify a minimum term, e.g., "15 to life."  For prisoners convicted of first or second degree murder prior to 1998, the minimum term is the term of years provided by their sentence--in the example above, fifteen years--reduced by up to one third for good behavior.

Once a prisoner is eligible for parole, the Board convenes a panel to determine whether the prisoner is to be released on parole, and if so, when.[1]  The first inquiry is whether the prisoner is "suitable" for release.  Cal. Pen. Code § 3041.  The panel "shall" find the prisoner suitable for parole, and move on

---

[1] California Penal Code section 3041(a) provides that this meeting shall occur one year prior to the minimum eligible parole date.  Plaintiffs assert that in practice, this initial meeting occurs after the date has passed.  Such a delay, if any, is not at issue in the present motion.

3

1  to the next step of setting a release date,

2          unless it determines that the gravity of the
3          current convicted offense or offenses, or the
           timing and gravity of current or past
4          convicted offense or offenses, is such that
           consideration of the public safety requires a
5          more lengthy period of incarceration for this
           individual, and that a parole date, therefore,
           cannot be fixed at this meeting.

6

7  Id. § 3041(b).  In making this determination, "the fundamental

8  consideration in parole decisions is public safety . . . [which]

9  involves an assessment of an inmate's *current* dangerousness."  In

10 re Lawrence, 44 Cal. 4th 1181, 1205 (2008) (emphasis in original).

11 The Board has promulgated regulations identifying various criteria

12 that may be considered in determining whether the prisoner poses

13 a risk.  These factors include the circumstances, manner and motive

14 of the commitment offense; whether the prisoner has a history of

15 other criminal or violent acts; the prisoner's social history; the

16 prisoner's past and present mental state, including psychological

17 problems, attitude toward the crime and remorse; institutional

18 behavior; the prisoner's understanding and plans for the future;

19 age; and whether imposition of any special conditions may allow a

20 prisoner who would otherwise be a risk to be safely released.  Cal.

21 Code Reg. tit. 15 §§ 2281(b)-(d).  The California Supreme Court has

22 upheld these regulations, but it has emphasized that any criterion

23 is legally relevant only insofar as it is evidence in the

24 particular case that the prisoner is a current risk to public

25 safety.  Lawrence, 44 Cal. 4th at 1205-06.  The panel's

26 determination as to whether these factors indicate suitability for

4

1  parole is an exercise of the panel's judgment and discretion.  <u>In</u>

2  <u>re Shaputis</u>, 44 Cal. 4th 1241, 1258 (2008) (quoting <u>In re</u>

3  <u>Rosenkrantz</u>, 29 Cal. 4th 616, 654 (2002)).[2]

4      Because suitability is a function of a prisoner's *current*

5  dangerousness, a finding that the prisoner is unsuitable for parole

6  is not permanent.  If the panel determines that the prisoner is

7  presently unsuitable for parole, the panel "defers" the parole

8  hearing until a later date, at which point a panel will determine

9  whether intervening changes have rendered the prisoner suitable.

10  Cal. Pen. Code § 3041.5.  The deferral process is discussed in the

11  following sections.

12      If the panel instead determines that the prisoner is suitable

13  for parole, the next step is to set a date for release.  The panel

14  determines the "base term" for the prisoner, which is based on "the

15  gravity of the base offense, taking into account all of the

16  circumstances of the crime."  Cal. Code. Regs. tit. 15 § 2282(a).

17  The actual calculation is performed by reference to matrices

18  enumerating base terms for the circumstances of various offenses.

19  <u>Id.</u> §§ 2282-2289.  The panel then considers whether a departure

20  from the base term is warranted by any of a number of other factors

21  specifically enumerated by the regulations, such as the prisoner's

22  good behavior.  <u>Id.</u> § 2404.  If the time already served by the

23

24      [2] Plaintiffs state, without citation to any authority, that
the panel's suitability determination is made on a preponderance
of the evidence standard.  Although it may be that this standard
25  is implicit in the penal code, plaintiffs have not demonstrated
that this is so, and no standard of proof appears in either section
26  3041 or in <u>Lawrence</u>, <u>Shaputis</u>, or <u>Rosenkrantz</u>.

1  prisoner exceeds the term calculated by this method, the Board

2  tentatively designates the prisoner for release.  If not, the board

3  will set a release date for a time after the completion of this

4  term.  See In re Jackson, 39 Cal. 3d 464, 474 n.10 (1985).

5       This system plainly contemplates that some prisoners will be

6  found suitable for parole prior to the expiration of the term

7  calculated in the second step.  However, plaintiffs assert that

8  "Since 1990, . . . it is rare for a life prisoner to be found

9  suitable for and granted parole before he is well beyond any

10 punishment term that can be imposed for his offense."[3]  Pls.' Mem.

11 Supp. Mot. Prelim. Inj., 16 n.11.  Defendants have not contested

12 this assertion.  Plaintiffs further assert that "All the named

13 plaintiffs are beyond any terms that would be (or have been) set

14 for them and all will be released as soon as parole is granted and

15 the Governor lets the grant stand."  Id.  The court notes, however,

16 that the class definition is not so limited, and the class

17 potentially includes unnamed class members who have not completed

18 such terms.

19      After the panel makes a decision as to suitability or

20 unsuitability, the Governor has an opportunity to review and

21 reverse or modify that decision.  See Cal. Const. Art. V § 8(b);

22 Cal. Penal Code §§ 3041.1, 3041.2; In re Johnson 8 Cal. App. 4th

23 _____

24      [3] Plaintiffs assert that the function of the second step in
   the parole process is to ensure that the prisoner serves a sentence
   long enough to satisfy the punitive purpose of incarceration.
25 Although this is certainly a plausible interpretation, no party has
   provided authority indicating that this is the intended function
26 of the delayed release dates.

618 (1992).   The governor's review must be based on "the same factors which the parole authority is required to consider."   Cal. Const. Art. V § 8(b).   If the Governor reverses a grant of parole, the prisoner receives a one-year deferral and is considered again by the Board the following year.

The effect of the Penal Code section 3041 and the implementing regulations is to vest all California prisoners "whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date."   Irons v. Carey, 479 F.3d 658, 662 (9th Cir. 2007) (citing Sass v. California Board of Prison Terms, 461 F.3d 1123, 1127 (9th Cir. 2006), Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003), and McQuillion v. Duncan, 306 F.3d 895, 901-901 (9th Cir. 2002)). Notwithstanding the fact that class members were sentenced to life terms, the statute operates to create a protected expectation in release on parole for prisoners who match the criteria.

**B.    The Deferral Process Prior to Proposition 9**[4]

Prior to the amendments provided by Proposition 9, when a panel determined that a prisoner was unsuitable for parole, the length of deferral was determined by California Penal Code section 3041.5(b)(2) (2008).   This section provided that when the Board

---

[4] Plaintiffs' motion for a preliminary injunction discusses thirty years of various amendments to the parole hearing process. The present motion seeks to enjoin the amendments caused by Proposition 9, and not any of the prior amendments.   Therefore, the history of these amendments is not directly relevant to the present motion.   The court describes the law as it existed immediately prior to the passage of Proposition 9.

found a prisoner unsuitable for parole,

> The board shall hear each case annually thereafter, except the board may schedule the next hearing no later than the following:
>
> (A) Two years after any hearing . . . if the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following year . . .
>
> (B) Up to five years after any hearing at which parole is denied if the prisoner has been convicted of murder, and the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following years . . . . If the board defers a hearing five years, the prisoner's central file shall be reviewed by a deputy commissioner within three years at which time the deputy commissioner may direct that a hearing be held within one year.

In determining how long to defer a hearing, and in making suitability determinations at the subsequent hearings, the panel applies the same criteria used for the initial suitability determination. Cal. Pen. Code § 3041.5(b)(2)(A)-(B) (2008), Cal. Code Regs. tit. 15, §§ 2268(b), 2270(d).[5] Thus, the panel evaluates whether the factors informing its assessment of the prisoner's potential threat to public safety are likely to change; if so, when; and whether these changes will be sufficient to render the prisoner suitable for parole.

_____

[5] Prior to Proposition 9, the Board had the power to set regulations specifying the factors to be considered in determining the length of deferral; the Board's regulations specified that these factors were the same as those used in determining suitability. Proposition 9 incorporates these regulations in to the statute itself. Thus, the penal code now specifies that public safety is the determinant of both suitability and the deferral period.

1    Plaintiffs provide several statistics illustrating the manner

2  in which this statute was applied.  According to the Board, in

3  2007, 35 percent of prisoners who were denied parole following a

4  hearing were given deferral periods of one year, 32 percent

5  received deferrals of two years, and 33 percent received deferrals

6  of three years or more.  In 2008 (through December 10), these

7  percentages were 40, 33, and 27 percent, respectively.[6]  Pls.' Mem.

8  Supp. Mot. Prelim. Inj. 14, n.9.

9    Once a deferred hearing date had been set, that hearing date

10  could potentially be advanced.  If the deferral was for five years,

11  the Board was obliged to review the prisoner's situation at three

12  years to determine whether the hearing should be advanced.  Cal.

13  Pen. Code § 3041.5(b)(2)(B).  Moreover, a prisoner could separately

14  request an advanced hearing date, although the former statute

15  provided no formal mechanism for such requests.  In re Jackson, 39

16  Cal. 3d 464, 475 (1985); see also Cal. Dep't of Corr. v. Morales,

17  514 U.S. 499, 512 (1995) (relying on this statement in Jackson).

18  The court has no knowledge of whether, during the history of the

19  prior statute, such a request was ever actually made or granted.

20  **C.   The Proposition 9 Amendments to The Deferral Process**

21    Proposition 9 drastically altered the deferral process,

22  replacing former subsection 3041.5(b)(2) with the following, now

23  codified at subsection (b)(3):

24         The board shall schedule the next hearing,
         after considering the views and interests of
25

26         [6] These figures are apparently undisputed.

                                9

the victim, as follows:

(A) Fifteen years after any hearing at which parole is denied, unless the board finds by clear and convincing evidence that the criteria relevant to the setting of parole release dates enumerated in subdivision (a) of Section 3041 are such that consideration of the public and victim's safety does not require a more lengthy period of incarceration for the prisoner than 10 additional years.

(B) Ten years after any hearing at which parole is denied, unless the board finds by clear and convincing evidence that . . . consideration of the public and victim's safety does not require a more lengthy period of incarceration for the prisoner than seven additional years.

(C) Three years, five years, or seven years after any hearing at which parole is denied, because . . . consideration of the public and victim's safety requires a more lengthy period of incarceration for the prisoner, but does not require a more lengthy period of incarceration for the prisoner than seven additional years.

Soon after Proposition 9 was passed, the Board issued an Administrative Directive identifying various effects of the proposition. BPH Administrative Directive No. 08/01, Regulatory Sections Impacted by Proposition 9, December 8, 2008. One such effect, which was repeatedly stated in the directive, was that the Board now had "no discretion to set a denial period for any term other than those enumerated," i.e., for a period other than "15, 10, 7, 5, or 3 years." Id.

The amended statute provides two ways in which a deferred hearing date may be changed once it has been set. First, the Board may in its discretion, after considering the

> views and interests of the victim, advance a
> hearing set pursuant to paragraph (3) to an
> earlier date, when a change in circumstances
> or new information establishes a reasonable
> likelihood that consideration of the public
> and victim's safety does not require the
> additional period of incarceration of the
> prisoner provided in paragraph (3).

Cal. Pen. Code § 3041.5(b)(4).  Second, an inmate may request that the board advance the hearing.  Id. § 3041.5(d).  Such a request must "set forth the change in circumstances or new information" required by subsection (b)(4).  Id. § 3041.5(d)(1).  The statute limits when a prisoner may make such a request:

> An inmate may make only one written request as
> provided in paragraph (1) during each
> three-year period. Following either a summary
> denial of a request made pursuant to paragraph
> (1), or the decision of the board after a
> hearing described in subdivision (a)[7] to not
> set a parole date, the inmate shall not be
> entitled to submit another request for a
> hearing pursuant to subdivision (a) until a
> three-year period of time has elapsed from the
> summary denial or decision of the board.

Id. § 3041.5(d)(3).  After the court held oral argument on the motion for a preliminary injunction, the Board promulgated a second administrative directive, which interpreted this language as imposing a three-year delay only once the prisoner has filed a request for an advanced hearing, such that a prisoner need not wait three years before filing an initial request for an advanced hearing.  BPH Administrative Directive No. 09/01, "Penal Code Statutes Enacted by Proposition 9 That Allow An Advanced Hearing

---

[7] Subdivision (a) refers to "all hearings for the purpose of reviewing a prisoner's parole suitability."  Cal. Pen. Code § 3041.5(a).

Date," February 5, 2009.  Plaintiffs do not challenge this interpretation in this motion.[8]

This second directive also states that pursuant to section 3041.5(b)(4), when the Board advances a hearing date, there is not "a minimum time period that must be served from the hearing at which the denial length was determined."  Thus, the Board contends that when a hearing date is advanced, whether on the Board's initiative under (b)(4) or on a prisoner's request under (d), the Board is not limited to the time periods specified for deferral of the hearing.

**D.   Alleged Punitive Purpose of Proposition 9**

As part of their argument that Proposition 9 violates the Ex Post Facto Clause, plaintiffs also allege that Proposition 9 has a demonstrably punitive purpose.  Plaintiffs offer the following evidence in support of this argument.  Section 2 of the Act, the Findings and Recommendations, stated that "Crime victims are entitled to . . . above all, the right to an expeditious and just punishment of the criminal wrongdoer."  ¶ 1.  These findings further state that the prior system created a "failure to impose

_____

[8] In their moving papers (submitted prior to the promulgation of this directive), plaintiffs adopted a contrary interpretation of the statute, interpreting it as obliging prisoners to wait three years after any unsuitability finding before submitting a request for an advanced hearing.  Plaintiffs have since responded to the administrative directive by stating that while they suspect that the directive contradicts the clear language of the statute, they do not challenge it in the present motion.  Accordingly, the court assumes for purposes of this motion only that the administrative directive is valid and presents a controlling interpretation of the statute.

actual and just punishment upon [victims'] wrongdoers." <u>Id.</u> at ¶ 9.

Section 3 of the Act, the "statement of purposes and intent," provides that

> It is the purpose of the People of the State of California in enacting this initiative measure to:
>
> 1.   Provide victims with rights to justice and due process.
>
> 2.   Invoke the rights of families of homicide victims to be spared the ordeal of prolonged and unnecessary suffering, and to stop the waste of millions of taxpayer dollars, by eliminating parole hearings in which there is no likelihood a murderer will be paroled, and to provide that a convicted murderer can receive a parole hearing no more frequently than every three years, and can be denied a follow-up parole hearing for as long as 15 years.

**E.   Procedural History**

This suit was initially filed by plaintiff Richard Gilman on April 7, 2005.  At the time, Gilman was proceeding <u>pro se</u>.  As his claim was about to proceed to trial in June of 2008, the Magistrate Judge assigned to this case appointed counsel, and granted leave to file an amended complaint naming additional plaintiffs.  After several stipulated extensions, plaintiffs moved for leave to file a fourth amended and supplemented complaint.  Plaintiffs concurrently filed a motion for class certification and the instant motion for a preliminary injunction.  The court heard argument on these motions on January 30, 2009.  The court granted the motion to amend and the motion for class certification.  Order Granting

Leave to Amend (Dkt. No. 183), 2009 WL 577768, 2009 U.S. Dist. LEXIS 21609 (E.D. Cal. March 4, 2009); Order Granting Class Certification (Dkt. No. 182), 2009 WL 577767, 2009 U.S. Dist. LEXIS 21614 (E.D. Cal. March 4, 2009).

Defendants then filed a petition to appeal this court's class certification order under Fed. R. Civ. P. 23(f), and concurrently moved to dismiss plaintiffs' eighth claim (challenging Prop. 9) and plaintiffs' ninth claim (challenging Article V, section 8(b) of the California Constitution).  The court heard argument on the motion to dismiss on May 18, 2009.  The Ninth Circuit granted permission to appeal class certification on May 28, 2009.

On August 11, 2009, the court ordered the parties to provide supplemental briefing addressing the appeal's effect on the pending motions.  Both parties agreed that the court could continue to entertain the motions, but plaintiffs conceded that if a preliminary injunction is granted, it should extend solely to the named plaintiffs.  See Plaintiffs' Brief Regarding Effect of Interlocutory Appeal, Sept. 1, 2009 (Dkt. No. 207).[9]

_____

[9] The court expresses some reservation about limiting the current motion to the named plaintiffs.  As explained in the October 15, 2009 denial of defendants' motion for a stay, the court remains convinced that class certification is proper.  Moreover, prisoners in various other proceedings are requesting to join in this action, or are being referred thereto.  See Motion to Intervene by Michael L. Hughes (Dkt. No. 200); see also Bair v. Warden, Deuel Vacational Inst., No. 2:09-cv-1730, 2009 U.S. Dist. LEXIS 111735 (E.D. Cal. Dec. 1, 2009) (ordering parties to show cause as to why pro se prisoner's habeas corpus petition challenging Proposition 9 should not be related to this case).  It is also a virtual certainty that the result of this court's grant of a preliminary injunction will be a flood of parallel filings by other prisoners.  Nonetheless, the court follows plaintiffs'

1    Defendants then moved to stay proceedings pending resolution

2   of the interlocutory appeal.   The court denied this motion on

3   October 15, 2009.  (Dkt. No. 212), 2009 WL 3365858, 2009 U.S. Dist.

4   LEXIS 101937.  The court has not issued any subsequent orders in

5   this case.

6                            **II.  STANDARDS**

7   **A.    Standard for a Motion for a Preliminary Injunction**

8        The purpose of the preliminary injunction as provided by Fed.

9   R. Civ. P. 65 is to preserve the relative positions of the

10  parties--the status quo--until a full trial on the merits can be

11  conducted.  See University of Texas v. Camenisch, 451 U.S. 390, 395

12  (1981).   The limited record usually available on such motions

13  renders a final decision on the merits inappropriate.  See Brown

14  v. Chote, 411 U.S. 452, 456 (1973).

15       "A plaintiff seeking a preliminary injunction must establish

16  that he is [1] likely to succeed on the merits, [2] that he is

17  likely to suffer irreparable harm in the absence of preliminary

18  relief, [3] that the balance of equities tips in his favor, and [4]

19  that an injunction is in the public interest."  Am. Trucking Ass'ns

20  v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009)

21  (quoting Winter v. Natural Res. Def. Council, ___ U.S. ___, ___,

22  129 S.Ct. 365, 374 (2008)).  In Winter, the Supreme Court raised

23  the bar for establishing irreparable harm from a showing of mere

24  possibility, which had previously applied under the Ninth Circuit's

25  _____

26  suggestion to limit discussion to the named plaintiffs.

1  sliding scale approach, to a showing of likelihood of irreparable

2  harm.  <u>Winter</u>, __ U.S. at ___, 129 S.Ct. at 375-76.

3  **B.    Standard for a Motion to Dismiss**

4       A Fed. R. Civ. P. 12(b)(6) motion challenges a complaint's

5  compliance with the pleading requirements provided by the Federal

6  Rules.  Under Fed. R. Civ. P. 8(a)(2), a pleading must contain a

7  "short and plain statement of the claim showing that the pleader

8  is entitled to relief."  The complaint must give defendant "fair

9  notice of what the claim is and the grounds upon which it rests."

10 <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544, 555 (2007) (internal

11 quotation and modification omitted).  To meet this requirement, the

12 complaint must be supported by factual allegations.  <u>Ashcroft v.</u>

13 <u>Iqbal</u>, ___ U.S. ___, 129 S. Ct. 1937, 1950 (2009).  "While legal

14 conclusions can provide the framework of a complaint," neither

15 legal  conclusions  nor  conclusory  statements  are  themselves

16 sufficient, and such statements are not entitled to a presumption

17 of truth.  <u>Id.</u> at 1949-50.  <u>Iqbal</u> and <u>Twombly</u> therefore prescribe

18 a two step process for evaluation of motions to dismiss.  The court

19 first identifies the non-conclusory factual allegations, and the

20 court then determines whether these allegations, taken as true and

21 construed in the light most favorable to the plaintiff, "plausibly

22 give rise to an entitlement to relief."  <u>Id.</u>; <u>Erickson v. Pardus</u>,

23 551 U.S. 89 (2007).

24      "Plausibility," as it is used in <u>Twombly</u> and <u>Iqbal</u>, does not

25 refer to the likelihood that a pleader will succeed in proving the

26 allegations.  Instead, it refers to whether the non-conclusory

1  factual allegations, when assumed to be true, "allow[] the court
2  to draw the reasonable inference that the defendant is liable for
3  the misconduct alleged."   Iqbal, 129 S.Ct. at 1949. "The
4  plausibility standard is not akin to a 'probability requirement,'
5  but it asks for more than a sheer possibility that a defendant has
6  acted unlawfully."   Id. (quoting Twombly, 550 U.S. at 557).   A
7  complaint may fail to show a right to relief either by lacking a
8  cognizable legal theory or by lacking sufficient facts alleged
9  under a cognizable legal theory. Balistreri v. Pacifica Police
10  Dep't, 901 F.2d 696, 699 (9th Cir. 1990).

11                          **III. ANALYSIS**

12      Evaluation of both the motion to dismiss and the motion for
13  a preliminary injunction begins with the merits of plaintiffs'
14  claim.  As explained below, the court concludes that plaintiffs'
15  due process claim fails, but that plaintiffs have demonstrated a
16  likelihood of success on their Ex Post Facto argument.  The court
17  then turns to the remaining preliminary injunction factors, and
18  concludes that an injunction is warranted.

19  **A.   Merits**

20      Plaintiffs advance two separate legal theories, arguing that
21  the changes effectuated by Proposition 9 violate both the Ex Post
22  Facto Clause and plaintiffs' substantive due process rights.  These
23  theories are closely related: both argue that Proposition 9 will
24  cause some prisoners who have ceased to pose a threat to public
25  safety to remain in prison because the prisoners will be unable to
26  receive a timely suitability hearing.  Plaintiffs' Ex Post Facto

                                    17

1  claim argues that such confinement is more likely after Proposition

2  9, such that the likely period of incarceration has increased.

3  Plaintiffs' substantive due process claim argues that this

4  confinement is not reasonably related to California's stated

5  purpose for denial of parole, the protection of public safety.

6      **1.  Ex Post Facto**

7      Article 1, section 10 of the United States Constitution

8  provides that "No state shall . . . pass any . . . ex post facto

9  Law." This clause prohibits any law that "makes more burdensome

10 the punishment for a crime after its commission." Beazell v. Ohio,

11 269 U.S. 167, 169-70 (1925). A law violates this prohibition if

12 it is both retroactive and detrimental. Brown v. Palmateer, 379

13 F.3d 1089, 1093 (9th Cir. 2004) (quoting California Dept. of

14 Corrections v. Morales, 514 U.S. 499, 509 (1995), Weaver v. Graham,

15 450 U.S. 24, 29 (1981)). Here, defendants have applied the

16 Proposition 9 amendments retroactively, i.e., to prisoners whose

17 crimes were committed prior to the proposition's passage.

18 Therefore, the only issue is whether the amendments are

19 sufficiently detrimental.

20     The Supreme Court has twice discussed what it means for a

21 change to be detrimental in the context of Ex Post Facto claims

22 broadly similar to the one here. Garner v. Jones, 529 U.S. 244,

23 255 (2000), Morales, 514 U.S. 499. "The controlling inquiry . .

24 . [is] whether retroactive application of the change . . . created

25 'a sufficient risk of increasing the measure of punishment attached

26 to the covered crimes.'" Garner, 529 U.S. at 250 (quoting Morales,

514 U.S. at 509). A "sufficient" risk is one that is "significant," Garner, 529 U.S. at 255, and not "speculative and attenuated," Morales, 514 U.S. at 509, 514. Changes must be reviewed "within the whole context of [the state's] parole system." Garner, 529 U.S. at 252. A rule may pose a sufficient risk either "by its own terms" or where "the rule's practical implementation . . . will result in a longer period of incarceration than under the old rule." Id. at 255.

In both cases, the Court "declined to articulate a single 'formula'" for determining sufficiency. Morales, 514 U.S. at 509. Accordingly, I review the Court's application of the above principles in Morales and Garner. I then discuss what further principles may be derived from these illustrations, and then finally compare the facts in those cases with the facts here.

### a. Parole Changes in Morales

In Morales a California prisoner brought a habeas corpus petition challenging the 1981 amendments to section 3041.5 of the California Penal Code. Prior to this amendment, all life prisoners whose sentences included possibility of parole received annual parole hearings. The 1981 amendment authorized the Board to defer subsequent suitability hearings for up to three years, but only for prisoners convicted of "more than one offense which involves the taking of a life," and only where the Board found "that it was not reasonable to expect that the parole would be granted at a hearing during the following years and state[d] the bases for the finding." Morales, 514 U.S. at 503 (quoting Cal. Pen. Code Ann. §

1  3041.5(b)(1) (West 1982)).   The Court held that the risk of

2  prolonged confinement posed by this amendment's terms was not

3  sufficient to violate the Ex Post Facto Clause.   Id. at 512.

4      The Court provided three reasons for this conclusion.   Most

5  importantly, the prisoners whose deferral periods were increased

6  would be unlikely to have been found suitable at an earlier date.

7  Id.   The Court noted that in general, prisoners convicted of

8  multiple offenses involving the taking of a life were particularly

9  unlikely to be found suitable for parole.   Id. at 511.   Even among

10 these prisoners, the deferral period would be increased only where

11 the Board had made particular findings that an individual prisoner

12 was unlikely to be found suitable for parole in the deferral

13 period, and the amount of the increase would be specifically

14 tailored to the Board's findings.   Id. at 511-12.   Second, if a

15 change in circumstances called into question the Board's projection

16 of the likelihood of a suitability finding, the prisoner could

17 potentially seek to advance his hearing date.   Id. at 512 (quoting

18 In re Jackson, 39 Cal. 3d at 474).   Finally, the Court noted that

19 under the California system, a finding of suitability for parole

20 is necessary but not sufficient for release.   Id. at 513.   Once a

21 prisoner has been found suitable for parole, the Board must

22 calculate the base term, modify this term, and then set a release

23 date.   In cases where the calculated release date would lie in the

24 future, delaying a prisoner's suitability hearing to any point

25 prior to that future date posed a minimal risk of prolonging

26 confinement.

1    Because the terms of the 1981 amendment increased deferral of

2    subsequent suitability hearings only in cases that would be

3    unlikely to delay any actual finding of suitability, because

4    advanced hearings in light of changed circumstances were available,

5    and because a delay of a finding of suitability might not delay

6    actual release, the Court concluded that "the narrow class of

7    prisoners covered by the amendment cannot reasonably expect that

8    their prospects for early release on parole would be enhanced by

9    the opportunity of annual hearings."   Id. at 512; see also

10   Garner, 529 at 250-51 (characterizing Morales as turning on the

11   facts that deferral was increased only when the likelihood of

12   release was low, and that advanced reconsideration was available

13   when circumstances changed).

14        **b.    Parole Changes in Garner**

15        The Court considered a similar decrease in the frequency of

16   parole hearings in Garner, 529 U.S. 244.   Garner concerned a

17   challenge under 42 U.S.C. § 1983 to a change in the Georgia Parole

18   Board's regulations.   Prior to the change, when a prisoner was

19   initially found unsuitable for parole, the Board was required to

20   conduct a further hearing every three years.   Id. at 247.   This

21   regulation was amended to provide for reconsideration "at least

22   every eight years."   Id. (quoting the amended rule).

23        The Court held that two features of the changed regulation,

24   both of which were also present in Morales, precluded a finding

25   that the regulation's terms presented an Ex Post Facto problem.

26   Id. at 254.   The first feature was that the Georgia Parole Board

had discretion in setting the length of the deferral period, and that the Board's policy was to impose a lengthened period when it was "not reasonable to expect that parole would be granted in the intervening years." *Id.* Absent such a finding, the Board would set a hearing at the time provided by the old rule. The second feature was the regulation's explicit provision of "expedited parole reviews in the event of a change in [a prisoner's] circumstance or where the Board receives new information that would warrant a sooner review." *Id.* The Court illustrated the effect of these qualifications with the particular circumstances of the plaintiff in that case. *Id.* at 255. The Georgia Board had deferred the prisoner's next parole suitability hearing for the maximum period of eight years. The prisoner's history--including a prior escape from prison and a subsequent act of murder--made it extraordinarily unlikely that, even if the Board were to conduct a suitability hearing in the intervening time, the prisoner would be found suitable for parole under the Georgia criteria. However, if a change in circumstance or new information arose which would call the Board's assessment into question, the prisoner could seek earlier review. *Id.* Based on these provisions, the Court concluded that the regulation did not facially violate the Ex Post Facto Clause. *Id.* at 256. The Court left open the possibility that the Board's exercise of the discretion provided by the statute would, in practice, present a significant risk of increased punishment. *Id.* However, the Court found no evidence to this effect in the record before it.

1           **c.   Lessons from Morales and Garner**

2       As illustrated above, Morales and Garner did not attempt to

3  quantify the risk of prolonged incarceration.  Instead, each looked

4  to whether prisoners who could expect release (or a significant

5  chance thereof) at one time under the former rule would be released

6  only at a later time under the new rule.  In both cases, the Court

7  found that subsequent hearings would be delayed only when there was

8  no appreciable likelihood of an earlier release.

9       Neither the Supreme Court nor the Ninth Circuit have clearly

10 addressed whether a plaintiff must show that he personally faces

11 a significant risk of prolonged punishment.  Garner stated that

12 "[i]n the case before us, [the prisoner] must show that as applied

13 to his own sentence the law created a significant risk of

14 increasing his punishment."  529 U.S. at 255.  The Supreme Court

15 has also held, however, that the significant risk inquiry "looks

16 to the challenged provision, and not to any special circumstances

17 that may mitigate its effect on the particular individual."  Weaver

18 v. Graham, 450 U.S. 24, 33 (1981), overruled on other grounds by

19 Collins v. Youngblood, 497 U.S. 37, 41 (1990) as explained

20 by Morales, 514 U.S. at 506 n.3.  The Ninth Circuit has held that,

21 consistent with Garner, "[w]hether an individual can show

22 definitively that he would have received a lesser sentence is not

23 determinative."  Himes, 336 F.3d at 855 (citing Miller v. Florida,

24 482 U.S. 423, 432 (1987)).

25      The Seventh Circuit has confronted this issue, holding that

26           The proper question to ask, then, is whether

                              23

> the new procedure creates a significant risk of increased punishment for [petitioner] Glascoe.  This is not to be confused with the question of whether the new parole practice is harsher for a class of prisoners generally; we must focus on the consequence of the new practice on the sentence of the particular inmate bringing the challenge[.]

Glascoe v. Bezy, 421 F.3d 543, 547-548 (7th Cir. 2005) (citing Garner, 529 U.S. at 255).  Glascoe concerned a habeas challenge to revised guidelines used in determining whether to grant parole, rather than a challenge to the timing of parole suitability hearings.  Id. at 544.  The Seventh Circuit held that Glascoe's "extremely violent crimes and his institutional misconduct" clearly demonstrated that he would have been denied parole under the former guidelines, such that denial of parole pursuant to the new guidelines did not increase his risk of punishment.  Id. at 548.

The Seventh Circuit's opinion in Glascoe did not cite the Supreme Court's opinion in Weaver, and it appears that Glascoe cannot be reconciled with Weaver's admonition not look to "special circumstances" that may blunt a law's impact on specific individuals.  As recognized by Justice Souter's dissent in Garner, because sentencing "is often a mix of rules and discretion," it can be difficult to determine whether a change has affected the sentence of a particular prisoner.  Garner, 529 U.S. at 260 n.1 (Souter, J., joined by Stevens and Ginsburg, J.J., dissenting).  For this reason, the Court's cases "have traditionally evaluated the effect of [a] change on the class subject to the new rule, rather than focusing solely on the individual challenging the

1  change." Id. (citing Weaver, 450 U.S. at 33).  Since Garner, the
2  Ninth Circuit has continued to hold that change may violate the Ex
3  Post Facto Clause when it "disadvantage[s] . . . prisoners in
4  general." Brown v. Palmateer, 379 F.3d 1089, 1095 (9th Cir. 2004)
5  (citing Nulph v. Faatz, 27 F.3d 451, 456 (9th Cir. 1994)) (Ex Post
6  Facto violation may be shown in this way, or by showing that "that
7  it can 'be said with assurance' that [a challenger] would have
8  received less severe punishment under the prior scheme.").
9  Accordingly, Garner appears to require evaluation of a change's
10  effects on individuals serving a particular sentence or convicted
11  of a particular offense, but not evaluation of other facts or
12  circumstances specific to individual challengers.  Facts other than
13  the specific sentence may be relevant on a class wide basis,[10] as
14  was the case in Morales, where the Court rested its decision in
15  part on the conclusion that the *class* of individuals affected by
16  the change were those unlikely to be granted parole under the
17  former law.  To the extent that Garner discussed the petitioner's
18  specific circumstances, such as his prior escape from prison, this
19  discussion merely illustrated the way in which the Georgia parole
20  board applied its discretion under the revised rule.  529 U.S. at
21  254-55.[11]

22  _____

23  [10] Here, "class" refers to the class of persons affected by a
change, rather than the particular class certified in this case.

24  [11] If, contrary to the analysis above, plaintiffs were
25  required to show an individualized significant risk of prolonged
incarceration for purposes of the merits of the Ex Post Facto
26  challenge, the court would find that such a showing had been made
for the reasons underlying the court's irreparable injury analysis.

1         **d.   Ex Post Facto Analysis of Proposition 9**

2     As demonstrated above, the Court's decisions in <u>Garner</u> and

3 <u>Morales</u> were informed by the particular features of the laws under

4 consideration.  <u>See</u> <u>Morales</u>, 514 U.S. at 509 n.5 (explicitly

5 declining to opine on whether alternate changes to the timing of

6 parole hearings could be unconstitutional). Here, plaintiffs argue

7 that the changes effectuated by Proposition 9 present a factually

8 distinct scenario.

9     One difference between Proposition 9 and the laws at issue in

10 <u>Morales</u> and <u>Garner</u> is the number of distinct changes effectuated

11 by Proposition 9.  Both <u>Morales</u> and <u>Garner</u> considered mere

12 extensions of the maximum possible deferral date.  Proposition 9

13 (1) increased the minimum deferral, (2) reduced, in various ways,

14 the Board's ability to defer for less than the maximum possible

15 term, and (3) increased the maximum deferral.  Although

16 <u>Garner</u> explained that the operation of challenges laws must be

17 analyzed "within the whole context of Georgia's parole system," 529

18 U.S. at 252, the court begins by discussing each category of change

19 individually.  <u>See also</u> <u>Morales</u>, 514 U.S. at 513.

20         **I.   Increase to the Minimum Deferral Period**

21     <u>Garner</u> and <u>Morales</u> both emphasized that under the new laws,

22 a longer deferral would be imposed only when the parole board had

23 found it unreasonable to expect that parole would be granted in the

24 interim.  <u>Garner</u>, 529 U.S. at 254, <u>Morales</u>, 514 U.S. at 511-12.

25 In contrast, Proposition 9 increases the minimum deferral period

26 for all prisoners from one to three years, regardless of the

1    Board's expectation about whether the prisoner may become eligible

2    for parole at an earlier date. See Cal. Penal Code §

3    3041.5(b)(3)(C), BPH Administrative Directive No. 08/01, Regulatory

4    Sections Impacted by Proposition 9, December 8, 2008. Thus, while

5    the laws reviewed by Garner and Morales provided the relevant

6    parole boards with discretion to impose the pre-amendment deferral

7    period, this discretion is not present under Proposition 9.

8        Moreover, in this case, the Board's practice prior to

9    Proposition 9 implied that the Board reasonably expected that many

10   prisoners would become suitable, and potentially be released, in

11   one or two years.[12]   Defendants do not contest plaintiffs'

12   assertion that unlike in Morales, many, if not most, of the

13   prisoners affected by the challenged provisions have been already

14   served their "base terms" such that, if the prisoners were found

15   suitable for parole, the Board would set a prompt release date.

16   Thus, plaintiffs argue that if these prisoners are not able to

17   demonstrate their suitability for three years, they are exposed to

18   a significant risk of prolonged confinement.

19       Defendants effectively concede this risk, but argue that the

20   risk is ameliorated by the Board's ability to advance hearing dates

21   _____

22       [12] Plaintiffs note that the Board granted one or two year
     deferrals to approximately two thirds of prisoners found unsuitable
23   for parole. However, this statistic does not demonstrate that the
     Board had expected all these prisoners to become suitable within
24   this time. The former statute permitted the Board to impose a
     longer deferral only prisoners convicted of murder. Even for those
25   prisoners, the Board had discretion to impose a shorter deferral
     even absent an expectation that the prisoner would become suitable
26   within two years.

1  in light of changed circumstances or new information and prisoners'

2  ability to request such advancement.  By definition, a deferral is

3  only set when the Board concludes that the prisoner is not

4  presently suitable for parole.  Thus, a subsequent hearing will

5  result in the prisoner's release only if some fact changes to

6  render that prisoner suitable.[13]  Under the former system, the

7  Board would set a period of less than three years if it thought a

8  change might occur in that time.[14]  According to defendants,

9  although the three year minimum prevents the Board from scheduling

10 an earlier hearing based on this *possibility*, if a change *actually*

11 *occurs*, that occurrence will entitle the prisoner to an advanced

12 hearing.  Thus, defendants argue that in all the circumstances when

13 a prisoner would actually be released under the former system, the

14 prisoner will also be released under the new system, albeit

15 pursuant to a different procedure.

16      The possibility of advanced hearings was one of the several

17 _____

18      [13] Plaintiffs candidly note that a prisoner may be found
   suitable for a parole at a subsequent hearing even if the
19 circumstances have not changed, because the panel at the subsequent
   hearing may be constituted of individuals who view the same
20 circumstances differently.
        Although there is an undeniable realism to plaintiffs'
21 argument, the argument was foreclosed by Morales.  Morales held,
   for example, that changes in the membership of the state parole
22 board, although they may predictably effect the likelihood of
   release on parole, would not ordinarily constitute an Ex Post Facto
23 violation.  514 U.S. at 508.  The ordinary, random differences from
   panel to panel are the type of "speculative, attenuated" risk that
24 does not rise to the level of significance.  Id.

25      [14] In the following section, part III(A)(1)(d)(ii), the court
   discusses the particular standards of proof used by the Board in
26 making this determination.

                              28

factors considered in Garner and Morales.  Neither case suggests
that advanced hearings are themselves sufficient.  Garner, 529 U.S.
at 251, 256 (looking to the sum of the factors considered),
Morales, 514 U.S. at 509.  Both Garner and Morales discussed at
length that suitability hearings would be deferred only when the
prisoner was not expected to become suitable for parole in the
interim.  Garner, 529 U.S. at 254-55, Morales, 514 U.S. at 510-12.
Advanced hearings served as a safety valve that allowed review in
the event that unexpected changes rendered a prisoner suitable.
Thus, neither held that ad-hoc advanced hearings, rather than
scheduled hearings, were suitable to ensure release after expected
or predictable changes to suitability.

Plaintiffs argue that for expected changes, advanced hearings
are an inadequate substitute for scheduled hearings, and
plaintiffs' argument suffices to survive a motion to dismiss and
to demonstrate a likelihood of success on the merits.  At the time
these motions were argued, there was no mechanism in place for
initiating or accepting petitions to advance a hearing.  Once a
petition is filed, the Board must receive the view of a homicide
victim's next of kin before deciding whether to grant a request for
an advanced hearing.  Cal. Pen. Code § 3041.5(d)(2).  If the Board
decides to advance the hearing, it must calendar it, for a time
which provides the victim's family with 45 days notice.  Id. §
3041.  For all of these reasons, there will necessarily be a delay
between any meritorious request for an advanced hearing and the
grant of such a hearing, and plaintiffs contend, with some

1   evidence, that this delay will likely exceed a year.  <u>See</u> Pls.'
2   Reply to Defs.' Supp. Evid., Dkt. 180, at 5.

3       When a change in circumstances renders a prisoner suitable for
4   parole, if he is unable to secure an advanced hearing until after
5   the time at which he would have received a scheduled suitability
6   hearing under the former statute, the prisoner's incarceration will
7   have been prolonged.  Because the Board's past practices
8   demonstrate that it expected a significant number of prisoners to
9   become suitable for parole in less than three years, the risk of
10  prolonged incarceration for prisoners who would have received
11  shorter deferral appears significant.

12      Plaintiffs additionally argue that advanced hearings are
13  inadequate because the amendments do not restrict the Board's
14  discretion to advance hearings, such that the Board may decline to
15  advance a hearing even when a prisoner demonstrates a change in
16  circumstance.  Insofar as plaintiffs challenge Proposition 9 on its
17  face, i.e., "by its own terms," I must assume that the Board will
18  exercise a neutral grant of discretion in a manner consistent with
19  the Ex Post Facto Clause.  <u>Garner</u>, 529 U.S. at 256 (Eleventh
20  Circuit wrongly refused to consider Georgia Parole Board's self-
21  imposed limits on exercise of its discretion).  Insofar as
22  plaintiffs challenge this aspect of the statute as applied, while
23  plaintiffs have stated a claim, plaintiffs have not provided
24  evidence or argument showing a likelihood of success on this
25  particular issue.
26  ////

1     In summary, Proposition 9, unlike the changes considered in

2 _Morales_ and _Garner_, increases the minimum deferral period.

3 Plaintiffs are likely to succeed in showing that many prisoners who

4 have currently been found unsuitable for parole, including the

5 named plaintiffs here, have a significant chance of becoming

6 suitable in less than three years.  Plaintiffs have also made a

7 sufficient showing that many prisoners, including the named

8 plaintiffs, have served their base terms and would be granted

9 immediate release if found suitable for parole.  _C.f._ _Morales_, 514

10 U.S. at 513.  Finally, plaintiffs have provided reasons why the

11 possibility of an advanced hearing is an inadequate substitute for

12 a scheduled hearing when the board reasonably expects that a

13 prisoner will become suitable for parole in less than three years.

14 Although _Garner_ and _Morales_ relied on the possibility of advanced

15 hearings as a factor indicating against an Ex Post Facto violation,

16 neither of those cases considered an increase in the minimum

17 deferral, and both cases held that parole systems needed to be

18 evaluated as a whole.  Accordingly, this aspect of _Garner_ and

19 _Morales_ should be distinguished.  Plaintiffs are likely to succeed

20 in showing that the three year minimum creates a significant risk

21 of increased punishment.

22      **ii.  Limits to the Board's Discretion**

23      Aside from raising the minimum deferral period, Proposition

24 9 limited the Board's ability to impose the minimum period.  Under

25 the former rule, the default was the minimum period, and the Board

26 had discretion to impose a longer deferral only when "it [was] not

reasonable to expect that parole would be granted at a hearing during the following year[s]." Former Cal. Pen. Code § 3041.5(b)(2)(A)-(B). Further, the statute provided that the Board "may" impose a longer deferral in these circumstances. Id. The Board thus had discretion to impose less than the maximum even when it was not reasonable to expect that parole would be granted sooner. Finally, because the statute was silent as to the standard of proof to be used in forming these "reasonable expectations," the Board had discretion to determine this standard. Shaputis, 44 Cal. 4th at 1258.

Proposition 9 restricts the Board's discretion in regard to each of the above matters. The default deferral is now the maximum. Cal. Pen. Code § 3041.5(b)(3)(A). The Board may set a lesser deferral only where it "finds by clear and convincing evidence that . . . . consideration of the public and victim's safety does not require a more lengthy period of incarceration." Id. Because consideration of the public safety is the determinant of parole suitability, Proposition 9 allows a deferral for less than the maximum only when clear and convincing evidence indicates that parole will actually be granted at the next hearing. Regardless of whether this "clear and convincing evidence" standard of proof differs from the Board's interpretation of the prior "reasonable expectation" standard, the Board no longer has discretion to schedule an earlier hearing even when it does not

expect parole to be granted.[15]

Removing discretion to set earlier hearings, rather than expanding discretion to set deferred hearings, sharply distinguishes this case from <u>Garner</u> and <u>Morales</u>.  Both <u>Garner</u> and <u>Morales</u> considered changes that, like California's prior system, granted the Board discretion to postpone hearings when the Board made specific findings that an earlier release was unlikely. <u>Garner</u>, 529 U.S. at 254 (deferral where "it is not reasonable to expect that parole would be granted during the intervening years"), <u>Morales</u>, 514 U.S. at 507, 511 ("it is not reasonable to expect that parole would be granted at a hearing during the following years"). When a rule "sufficiently circumscribe[s] official discretion," the rule can violate the Ex Post Facto Clause "even if the change does not automatically lead to a more onerous result than would have occurred under the prior law."  <u>Himes</u>, 336 F.3d at 856 (citing <u>Miller</u>, 482 U.S. at 432-33); <u>see also</u> <u>Lindsey</u>, 301 U.S. at 401. In <u>Miller</u>, the Supreme Court considered a challenge to Florida's sentencing guidelines.  482 U.S. at 425.  The former guidelines provided a presumptive range, although a judge could depart from the range if the he provided clear and convincing reasons for the

---

[15] The parties have provided little discussion of the effect of the Board's prior discretion to schedule earlier hearings even absent a reasonable expectation that parole would be granted.  It appears likely to the court that in many cases, the evidence will not support a prediction one way or the other regarding future suitability for parole.  In such a case, the prior system afforded the Board discretion to expect the unexpected and schedule an earlier hearing. Proposition 9 eliminates this discretion, putting the burden of proof on the prisoner to clearly and convincingly predict future suitability.

departure.  Id. at 426.  The amended guidelines were similar, but with a higher presumptive range.  Id.  The challenger was sentenced according to the new presumptive range.  Id. at 426-27.  The Court found that the change violated the Ex Post Facto Clause despite the fact that the challenger could have received the same sentence under the former law, because the changes limited the judge's discretion to impose a lower sentence.  Id. at 435.

Here, plaintiffs are likely to succeed in showing that there is a significant chance that some prisoners not presently suitable for parole will become suitable in the fewer than the next fifteen years, but that these prisoners are unable to currently demonstrate by clear and convincing evidence that this change will occur, or when.  Moreover, for the reasons stated in the previous section, plaintiffs are likely to succeed in showing that there is a significant risk that forcing these prisoners to demonstrate their changed status through an advanced hearing will result in longer incarceration than would result under the former rule, which would have provided for an earlier scheduled hearing either because of the Board's exercise of discretion or because of the prior rule's lower maximum.

### iii. Increase in Maximum

As noted above, Proposition 9 increased the maximum deferral period from 5 years to 15 years.  Garner and Morales each demonstrated that an increase in the maximum deferral period, standing alone, does not violate the Ex Post Facto Clause.  In both cases, however, the increase in the maximum deferral would only

affect prisoners who were not likely to receive parole during the length of their deferral.  Here, where the increase in the maximum is accompanied by changes that limit the Board's ability to impose less than the maximum, the increase further contributes to the risk of prolonged incarceration.  As noted above, Garner held that changes must be reviewed "within the whole context of [the state's] parole system."  Garner, 529 U.S. at 252.[16]

### iv.  Conclusions Regarding Plaintiffs' Ex Post Facto Challenge

Both Morales and Garner indicated that changes to the timing of parole suitability hearings could violate the Ex Post Facto Clause.  Although the Court found no violation in those cases, Proposition 9 is factually distinct in numerous ways.  Unlike the laws reviewed in Morales and Garner, Proposition 9 increases the minimum deferral period--here, from one to three years. Proposition 9 further sharply limits the Board's discretion to set deferrals for less than the maximum.  Finally, Proposition 9

---

[16] The court reiterates that it is likely to be hard to predict, from a decade in advance, when many prisoners will become suitable for parole.  It may be that a significant number of prisoners become eligible even though their eligibility could not have been clearly and convincingly predicted.  This possibility demonstrates the importance of holding periodic suitability hearings regardless of individual predictions.  Garner and Morales allowed periodic hearings to be skipped, but both implied that the burden of proof was on the state to provide specific reasons for believing that parole would not be granted at these hearings. Proposition 9, on the other hand, puts the burden of proof on the prisoner.  If, as the court expects, it is frequently impossible to make a prediction one way or the other, allocation of the burden of proof is crucial.  Proposition 9's shifting of the burden of proof, together with its 15 year default deferral, effectively removes the prior presumption of periodic scheduled hearings.

1    drastically increases the maximum deferral period.  These changes

2    create a risk of prolonged incarceration, and plaintiffs are likely

3    to succeed in showing that this risk is significant despite the

4    possible availability of advanced hearings.

5        Plaintiffs separately argue that Proposition 9 has an

6    explicitly punitive purpose, independent of its punitive effect.

7    Because the court concludes that plaintiffs have shown a likelihood

8    of success as to punitive effect, and because defendants' motion

9    to dismiss does not address this argument, the court does not

10   further discuss any possible punitive purpose here.

11       **2.   Substantive Due Process**

12       Plaintiffs separately argue that Proposition 9's changes to

13   the parole deferral process violate the Substantive Due Process

14   Clause.  See, e.g., Lawrence v. Texas, 539 U.S. 558, 571 (2003)

15   (discussing the Due Process Clause's substantive protections).  The

16   court grants defendants' motion to dismiss as to this claim.

17       In a substantive due process challenge, the initial inquiry

18   is whether the asserted right is one that is "fundamental." Wash.

19   v. Glucksberg, 521 U.S. 702, 722 (1997).  Where a sentence includes

20   simply the possibility of parole, the interest in release on parole

21   is not a right inherent in the United States Constitution.

22   Greenholtz v. Inmates of Neb. Penal & Correctional Complex, 442

23   U.S. 1, 7 (1979).  Plaintiffs concede that no fundamental right is

24   at issue here, and that the amendments therefore need only survive

25   rational basis review.  Kelch v. Director, Nevada State Department

26   of Prisons, 10 F.3d 684 (9th Cir. 1993), cited by plaintiffs,

1   provides a typical formulation of this standard: "Substantive due

2   process requires that government action depriving a person of life,

3   liberty or property have a rational, non-arbitrary connection to

4   a legitimate purpose."   Id. at 688.   California law grants

5   prisoners a protected, albeit non-fundamental, liberty interest in

6   parole.  See, e.g., Sass, 461 F.3d at 1128.

7       Plaintiffs approach rational basis review by first identifying

8   the government's interest.  They first argue that under California

9   Penal Code section 3041, California has declared that the only

10  interest furthered by a denial of parole (once the minimum term is

11  served) is prevention of a prisoner's threat to public safety.

12  Plaintiffs then argue that whenever a prisoner's circumstances

13  change such that he is no longer a threat to public safety, any

14  further incarceration of the prisoner does not further this

15  interest.  Pls.' Mem. Supp. Mot. Prelim. Inj. 21.  Plaintiffs then

16  reiterate much of their Ex Post Facto argument, arguing that as a

17  result of Proposition 9's increased deferral periods, prisoners

18  whose circumstances have changed will often remain in custody for

19  prolonged periods while waiting for a suitability hearing at which

20  the prisoner may demonstrate this change.

21      Although plaintiffs accurately characterize section 3041,

22  other Penal Code sections are not so narrow.  For example, the

23  California Supreme Court has recognized that one purpose behind the

24  1982 amendments to section 3041.5 was to save the expense of

25  additional hearings.  Jackson, 39 Cal. 3d at 473 (quoting the

26  legislative history of the 1982 amendment).  Proposition 9 itself

declares that one of its purposes was to save the expense of additional hearings.  Proposition 9 § 3(2).  Thus, these statutes recognize government interests other than public safety.

At its heart, plaintiffs' argument is that Penal Code section 3041 ties the state's hands, trumping any other statutes purporting to assert other interests.  This argument fails, because federal courts lack "the authority to enjoin the administration of, or to declare invalid, state laws on the grounds that they are incompatible with other state laws, much less to rule that state laws are contrary to the state legislature's intent."  <u>McQuillion v. Schwarzenegger</u>, 369 F.3d 1091, 1099 (9th Cir. 2004).  Plaintiffs may abhor a practice that risks prolonging incarceration merely to save the expense of additional hearings.  Plaintiffs have not argued, however, that cost is not a legitimate interest justifying such detention.

The state's interest in saving expenses is rationally related to any resulting deprivation of prisoners' interests in parole.  The state could rationally conclude that the savings realized from avoiding frequent parole hearings is great enough to offset any added expense incurred by continued incarceration of those few prisoners who would have been found suitable for parole.

**B.  Likelihood of Irreparable Injury**

Even where plaintiffs are likely to succeed on the merits, a preliminary injunction may not issue unless plaintiffs have shown that they are "likely to suffer irreparable harm in the absence of preliminary relief."  <u>Winter</u>, ___ U.S. at ___, 129 S. Ct. at 374.

38

1  Confinement in violation of plaintiffs' constitutional rights is

2  an irreparable injury. See Nelson v. NASA, 530 F.3d 865, 882 (9th

3  Cir. 2008). The issue is whether this irreparable injury "is

4  likely [to occur] in the absence of an injunction." Winter, ___

5  U.S. at ___, 129 S. Ct. at 375.

6      Winter differs from this case--and from many other cases

7  seeking injunctive relief--because in Winter, plaintiffs' showing

8  as to the merits had little connection to a likelihood of specific

9  irreparable harm. Winter concerned a claim under the National

10 Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA").

11 Plaintiffs challenged the Navy's use of long-range sonar, arguing

12 that the Navy had not adequately studied the sonar's effects on

13 marine mammals. Winter, ___ U.S. at ___, 129 S.Ct. at 371.

14 Because NEPA's requirements are only procedural, NEPA may be

15 violated even when there is not any harm to the environment or

16 other ultimate injury. The Court rested on this distinction to

17 hold that, even assuming that plaintiffs had shown a likelihood of

18 success on the merits of their NEPA claim, plaintiffs must also

19 separately show a likelihood of irreparable harm to the

20 environment. Id. at ___, 129 S.Ct. at 375.

21     In this case, unlike in Winter, the merits of the claim and

22 the likelihood of irreparable injury overlap in that both consist

23 of potential confinement in violation of the Ex Post Facto Clause.

24 Above, the court concluded that plaintiffs are likely to succeed

25 in showing a "significant risk" of such confinement. Although

26 Winter did not quantify "likely," in the preliminary injunction

context, "likely" would appear to require no more than "significant."

The relevant likelihood, however, is not the likelihood of injury absent any adjudication of this case. Instead, the question is whether such injury is likely to occur before final resolution of this matter.

As is already apparent, this case raises complex issues. It would be optimistic to conclude that proceedings before this court will be resolved within another year, and it seems clear that both sides intend to appeal any judgment in the other side's favor.

As to plaintiff Masoner, there is evidence demonstrating likelihood of injury during the pendency of this case.[17]  He had routinely received one-year deferrals prior to the passage of Proposition 9, had once been found suitable by the Board only to have the grant of parole reversed by the Governor. At his 2008 hearing, the panel conceded that he was approaching suitability even as it denied parole. Under Proposition 9, he will not receive a scheduled suitability hearing until late 2011. Enjoining the enforcement of Proposition 9 would almost certainly enable Masoner to receive scheduled annual hearings, and he has shown that it is sufficiently likely that he would be released on parole at such a

_____

[17] Defendants move to strike the discussion of these facts included in plaintiffs' memorandum in support of their motion. (Dkt. No. 164.)  Because a Fed. R. Civ. P. 12(f) motion to strike may only be brought as to "pleadings," the court construes this motion as an evidentiary objection.  Plaintiffs have supplied evidence to support their claims regarding Masoner.  For the reasons stated in plaintiffs' opposition to defendants' motion to strike, the motion to strike is denied.

1   hearing prior to the completion of this suit.

2       While there is no evidence concerning the remaining

3   plaintiffs, the operative complaint alleges that five of these

4   seven plaintiffs have previously been found suitable for parole

5   only to have this determination reversed by the governor.  Each

6   plaintiffs' most recent deferral was for one or two years.

7   Although neither party significantly discussed these allegations

8   in connection with the motion for a preliminary injunction, it does

9   not appear that these allegations are in dispute.  I therefore

10   conclude that each of the named plaintiffs has shown a likelihood

11   of irreparable injury absent a preliminary injunction.[18]

12 **C.    Balance of Hardships**

13       The hardships faced by plaintiffs are longer prison terms and

14   violations of their constitutional rights.  The hardships faced by

15   the defendant are the cost of administering additional parole

16   hearings.  Defendants further argue that a preliminary injunction

17   would impair public safety, causing a hardship to the defendants,

18   who are charged with protecting the public.  However, the

19   injunction sought would not cause any prisoner to be released

20   absent a determination that the prisoner was not a threat to public

21

22      [18] The defendants further argue that injunctive relief is

23 unnecessary because the individuals can file habeas petitions.  The
court first notes that plaintiffs' claims may be properly brought

24 under 42 U.S.C. section 1983--indeed, <u>Garner</u> concerned an analogous
section 1983 Ex Post Facto claim.  529 U.S. at 248.  Moreover,

25 while a habeas corpus petition would provide an alternative means
for terminating any unlawful confinement, defendants have provided

26 no indication that habeas petitions would be able to prevent such
confinement, and the resulting irreparable injury, from occurring.

1  safety and therefore suitable for parole.[19]  Balancing the other

2  hardships, the court concludes that notwithstanding the State of

3  California's  present  budget  problems,  the  balance  favors

4  plaintiffs.

5       Defendants also implicitly rely on a type of psychological

6  injury described by Proposition 9, the "prolonged and unnecessary

7  suffering" parole hearings inflict upon collateral victims of the

8  inmates' offense (i.e., relatives of the decedent).  See

9  Proposition 9, § 3(2).  Presumably, this language refers to the

10  stress  and  anguish  these  persons  experience  resulting  from

11  attendance of parole hearings, or simply from the knowledge that

12  such hearings are being held.  The court is not aware of any

13  authority recognizing injury of this type.  Even if this type of

14  injury is cognizable and properly considered in the preliminary

15  injunction analysis (which the court does not decide), either under

16  the balancing of hardships or as an aspect of the public interest,

17  the injury is not sufficient to tip the scales against plaintiffs.

18  **D.   Public Interest**

19       In this case, both parties invoke lofty public interests.

20  Plaintiffs  note  the  public's  interest  in  upholding  the

21  constitution.  Defendants argue that the public has an interest in

22

23       [19] It is conceivable that the Board may occasionally err in
    its suitability determinations.  If errors are possible, then an
24  increase in the number of parole hearings (as would result from an
    injunction) may also increase the likelihood of an error that
25  mistakenly releases a dangerous prisoner.  However, this risk is
    too speculative and slight to weigh into the balance of hardships
26  analysis.

1  seeing its will enforced.   Proposition 9 was enacted through the

2  exercise of California's initiative processes.   As I have

3  previously observed, however, that happenstance provides the

4  statute with no special insulation from review for asserted

5  constitutional infirmity.   Rather, the Supreme Court has held that

6  "'it is irrelevant that the voters . . . enacted [a statute],

7  because the voters may no more violate the Constitution by enacting

8  a ballot measure than a legislative body may do so by enacting

9  legislation.'"   <u>Service Employees Int'l Union v. Fair Political</u>

10 <u>Practices Com.</u>, 747 F. Supp. 580, 583 (E.D. Cal. 1990) (quoting

11 <u>Citizens Against Rent Control v. Berkeley</u>, 454 U.S. 290, 295

12 (1981)).[20]

13     Defendants cite several cases concerning injunctions that

14 would directly affect, respectively, the public's ability to

15 conduct an upcoming election or to receive electricity.   <u>Cardona</u>

16 <u>v. Oakland Unified School Dist.</u>, 785 F. Supp. 837, 842 (N.D. Cal.

17 1992), <u>Sierra Club v. Georgia Power Co.</u>, 180 F.3d 1309, 1310-11

18 (11th Cir. 1999).   Here, an injunction would have no analogous

19 effect on the public.   Accordingly, the public interest does not

20 strongly weigh for or against issuance of an injunction.

21                          **IV. CONCLUSION**

22     Plaintiffs have shown a likelihood of success on the merits

23

24     [20] Indeed, it can be agrued that the public interest favors an
injunction, since "it is 'in the public interest to terminate the
unconstitutional application' of a statute."   <u>Levine v. Fair</u>

25 <u>Political Practices Comm'n</u>, 222 F. Supp. 2d 1182, 1191 (E.D. Cal.
2002) (Karlton, J.) (quoting <u>Zeller v. The Florida Bar</u>, 909 F.

26 Supp. 1518, 1528 (N.D. Fla. 1995)).

                                  43

as to their Ex Post Facto challenge to Proposition 9's amendments to California's parole process.  Plaintiffs have shown that these amendments are likely to cause irreparable injury absent a preliminary injunction.  These factors, as well as the balance of hardships and the public interest, demonstrate that plaintiffs are entitled to a preliminary injunction barring enforcement of Proposition 9 as to the named plaintiffs.

Plaintiffs have failed to state a claim that Proposition 9 violates the substantive due process clause.

For these reasons, the court ORDERS as follows:

1.  Plaintiffs' motion for a preliminary injunction, Dkt. No. 157, is GRANTED as to the named plaintiffs. Defendants and their agents are ENJOINED from enforcing the provisions of Proposition 9 that amend former California Penal Code section 3041.5(b)(2)(A) as to the named plaintiffs.

2.  Defendants' motion to strike, Dkt. No. 164, is DENIED.

3.  Defendants' motion to dismiss, Dkt. No. 187, is GRANTED IN PART.  Plaintiffs' substantive due process challenge to Proposition 9 is DISMISSED WITHOUT PREJUDICE. See Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1108 (9th Cir. 2003) (Initial dismissal under Fed. R. Civ. P. 12(b)(6) should ordinarily be without prejudice). Defendants' motion to dismiss is DENIED as to plaintiffs' Ex Post Facto challenge to Proposition 9. As explained in the concurrently filed order,

1        defendant's motion to dismiss is also DENIED as to

2        plaintiffs' ninth claim, challenging Cal. Const. Art. V,

3        § 8(b).

4

IT IS SO ORDERED.
5   DATED:  February 4, 2010.

6                              /s/Lawrence K. Karlton
                               LAWRENCE K. KARLTON
7                              SENIOR JUDGE
                               UNITED STATES DISTRICT COURT
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26