UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RICHARD M. GILMAN, et al.,

        NO. CIV. S-05-830 LKK/GGH

      Plaintiffs,

  v.

         <u>O R D E R</u>

EDMUND G. BROWN, JR., et al.,

      Defendants.

_____/

    Plaintiffs are members of two certified classes of California state prisoners who have been sentenced to life terms with the possibility of parole. <u>See</u> Order Amending Definitions of Certified Class (ECF No. 340) ¶ 2.[1] The first certified class of plaintiffs were sentenced to life terms for offenses that occurred before

_____

[1] The classes were certified pursuant to Fed. R. Civ. P. 23(b)(2), which permits class members to "opt out" at the discretion of the court. <u>See, e.g.</u>, <u>Linney v. Cellular Alaska Partnership</u>, 151 F.3d 1234, 1242 n.6 (9th Cir. 1998) ("This court has held that the option to opt-out is discretionary in cases, like this one, brought under Rule 23(b)(2)"). There appears to be no reason to deny these requesters the right to opt out in this case, and accordingly their pending requests to opt out of this class (ECF Nos. 450 & 474), are hereby **GRANTED**.

1

1   November 4, 2008.  On that date, Proposition 9 increased the

2   interval between parole hearings available to these prisoners from

3   a default period of one year (with a maximum of two, three or five

4   years), to a default period of fifteen years (with a minimum of

5   three years).  The second certified class of plaintiffs were

6   sentenced to life terms for offenses that occurred before November

7   8, 1988.  On that date, Proposition 89 gave the Governor authority

8   to reverse any parole board decision finding a life term prisoner

9   "suitable" for parole.  Such parole board decisions had previously

10  been final.

11       Plaintiffs' two surviving claims assert that Propositions 9

12  (Claim 8) and 89 (Claim 9), violate their rights under the Ex Post

13  Facto Clause of the U.S. Constitution, U.S. Const., art. I, § 10.[2]

14  Defendants move to decertify the classes.[3]  They also seek summary

15  judgment on both claims.[4]  Plaintiffs oppose summary judgment on

16

17       [2] The operative complaint here is the "[Corrected] Fourth
    Amended/Supplemental Complaint" ("Complaint") (ECF No. 175).  See
18  ECF No. 183 (authorizing this complaint to be filed).  Plaintiffs
    have abandoned Claims 1, 3 and 6 (Due Process).  See Plaintiffs'
19  Opposition to Summary Judgment ("Pl. Opp. to SJ") (ECF No. 435) at
    1.  This court granted judgment on the pleadings for defendants on
20  Claims 2, 4, 5 and 7 (ECF No. 420) (May 31, 2012).

21       [3] On March 4, 2009, this court granted plaintiffs' motion for
    class certification (ECF No. 182), and the Ninth Circuit affirmed
22  that order on interlocutory appeal (Dkt. No. 257).  Gilman v.
    Schwarzenegger, 382 Fed. Appx. 544 (9th Cir. 2010)(unpublished
23  table decision).  On April 25, 2011, this court modified the class
    definitions to their current configuration.  ECF No. 340.  The
24  classes for Claims 1, 3 and 6 have already been decertified.  ECF
    No. 445 (September 7, 2012).

25       [4] On February 4, 2010, this court denied defendants' motion
26  to dismiss the Proposition 89 challenge (ECF No. 218).  Gilman v.
    Davis, 2010 WL 434215 (E.D. Cal. 2010) (Karlton, J.).  The court

2

both claims, and cross-move for summary judgment on their Proposition 89 claim, or in the alternative, for a preliminary injunction on that claim.

For the reasons that follow, the court will deny all the pending motions.[5]

**I.   CALIFORNIA PAROLE.**

Plaintiff life prisoners are eligible for parole after serving a statutorily-defined minimum number of years. See Cal. Penal Code § 3046(a) (setting minimum terms for "prisoner imprisoned under a life sentence").  The power to grant parole and set release dates lies with the Board of Parole Hearings (formerly the Board of Prison Terms).[6]  In re Vicks, 56 Cal. 4th 274, 294 (2013); Lawrence, 44 Cal. 4th at 1201.  Once a life prisoner is eligible for parole, it is up to the Board to determine whether he is "suitable" for parole. See Cal. Penal Code § 3041(b).  Suitability is determined at a hearing before a Board commissioner and deputy

---

acknowledged that the Ninth Circuit had already rejected a facial challenge to Proposition 89, citing Johnson v. Gomez, 92 F.3d 964 (9th Cir. 1996), cert. denied, 520 U.S. 1242 (1997).  However, the court determined that Garner v. Jones, 529 U.S. 244 (2000) provides for "both facial and as applied Ex Post Facto challenges."  Accordingly, the court denied the motion to dismiss, leaving plaintiff free to make an "as applied" challenge to Proposition 89.  On May 31, 2012, this court denied defendants' motion for judgment on the pleadings on the Proposition 89 challenge.  (Dkt. No. 420).  Defendants had argued that the claim was time-barred.

[5] Plaintiffs' requests to seal documents (ECF Nos. 427 & 439), all of which pertain to confidential Executive Case Summaries of prisoners, were granted in separate orders.

[6] "The Board of Parole Hearings replaced the Board of Prison Terms in July 2005."  In re Lawrence, 44 Cal. 4th 1181, 1190 n.1 (2008).

1  commissioner.  <u>Id.</u>  The first hearing to determine suitability
2  occurs one year before eligibility.  <u>Id.</u>, § 3041(a) (one year prior
3  to "minimum eligible parole release date," the Board of Parole
4  Hearings shall "normally set a parole release date").  The Board
5  is required to find a prisoner "suitable" for parole, and to set
6  a release date, unless it finds that he is a current danger to the
7  community, in which case, it must find that he is "unsuitable" for
8  parole.  <u>Lawrence</u>, 44 Cal. 4th at 1204 (the governing statute
9  provides that "'the Board <u>must</u> grant parole <u>unless</u> it determines
10  that <u>public safety</u> requires a lengthier period of incarceration'").
11  (emphasis in text), <u>quoting</u> <u>In re Rosenkrantz</u>, 29 Cal. 4th 616
12  (2002). Cal. Penal Code § 3041(b) (the Board "shall normally set
13  a parole release date" at the parole hearing); Cal. Admin. Code,
14  tit. 15, § 2281(a) ("a life prisoner shall be found unsuitable for
15  and denied parole if in the judgment of the panel the prisoner will
16  pose an unreasonable risk of danger to society if released from
17  prison").  Plaintiffs' constitutional challenges arise once the
18  Board decides whether the prisoner is either "suitable" or
19  "unsuitable" for parole.

20      **A.    Proposition 9**.[7]

21  _____

22       [7] The California Supreme Court recently decided, in a habeas
    case, that Marsy's Law does not violate the <u>Ex Post Facto</u> Clause
23  of the U.S. Constitution, on its face, or as applied to the
    petitioner. <u>In re Vicks</u>, 56 Cal. 4th 274 (2013).  Although Vicks'
24  conviction pre-dated Marsy's Law, the court "decline[d] to
    undertake an analysis of whether Marsy's Law violated ex post facto
25  principles as it is being applied to life prisoners whose
    commitment offenses occurred before the passage of Marsy's Law;
26  Vicks did not raise this contention below, and the evidence of
    which he seeks judicial notice does not provide a basis for this

1   If the Board finds the prisoner "unsuitable" for parole, it

2   sets a deferral period before the prisoner will next be considered

3   for parole.  Cal. Penal Code § 3041.5(b)(3).  Prior to the passage

4   of Proposition 9, the default deferral period was one (1) year.

5   See [former] Cal. Penal Code § 3041.5(b)(2) (1995).  That is,

6   plaintiffs were entitled to an annual parole hearing, unless the

7   Board made written findings that a longer deferral period was

8   warranted.  Id. ("The board shall hear each case annually" after

9   the initial parole hearing, absent a board finding "that it is not

10  reasonable to expect that parole would be granted" during the

11  following year or years).  Even if a longer deferral period was

12  warranted, however, the Board could only defer the next hearing for

13  two years, or for a maximum of five years.[8]  See id.

14  Proposition 9, "Marsy's Law," enacted in November 2008,

15  amended section 3041.5 "to increase the time between parole

16  hearings, absent a finding by the Board that an earlier hearing is

17  appropriate."  Vicks, 56 Cal. 4th at 283.  Indeed it dramatically

18

19  court to address the issue."  Id. at 317.  Accordingly, the
    question that is before this court is the very question the

20  California Supreme Court declined to rule upon.  In any event,
    while this court accords great respect to a constitutional decision

21  of the state's highest court, this court is not bound by its
    interpretation of the federal Constitution.  See Bittaker v.

22  Enomoto, 587 F.2d 400, 402 n.1 (9th Cir. 1978), cert. denied, 441
    U.S. 913 (1979).

23  [8]  The five year deferral possibility applied to prisoners
    convicted of murder, and was added to the law in 1994.  Cal. Penal

24  Code § 3041.5(b)(2) (1995).  Before that, deferrals could be for
    two, three or a maximum of five years, pursuant to several

25  amendments to Section 3041.5.  See Cal. Penal Code § 3041.5(b)(2)
    (1991) (reflecting 1990 amendments); Cal. Penal Code § 3041.5(b)(2)

26  (1987) (reflecting 1981 and 1982 amendments).

1  changed the timing and process for prisoners' parole hearings when

2  it was enacted in November 2008.  Specifically, the law increased

3  the <u>default</u> interval between hearings to fifteen years (abolishing

4  the annual review), increased the <u>minimum</u> deferral period to three

5  years (from one year), increased the <u>maximum</u> deferral period to

6  fifteen years (from five years), shifted the burden from the Board

7  to the prisoner to show that the default deferral period should not

8  be used, and then imposed a higher burden of proof, now requiring

9  the prisoner to show by "clear and convincing" evidence that the

10  default deferral period should not be used.  Cal. Penal Code

11  § 3041.5(b)(3); <u>Vicks</u>, 56 Cal. 4th at 284.

12      In addition, Proposition 9 expressly provided for an "advance

13  hearing," pursuant to which a prisoner could request a parole

14  hearing sooner than the default 15 year period would have allowed.

15  <u>Id.</u>, § 3041.5(d); <u>Vicks</u>, 56 Cal. 4th at 284-85.  A prisoner can

16  make an advance hearing request "at any time" after a denial of

17  parole at a regularly scheduled parole hearing, and then every

18  three years thereafter.  Cal. Penal Code § 3041.5(d)(1) (advance

19  hearing request procedure), (d)(3) (three-year restriction); <u>Vicks</u>,

20  56 Cal. 4th at 286 ("a prisoner may make his or her first request

21  for a new hearing at any time following the denial of parole at a

22  regularly scheduled hearing, and then may make another request

23  every three years").

24      **B.   Proposition 89**.

25      If the Board finds the prisoner "suitable" for parole, it sets

26  a parole release date, using standards prescribed by law and

1  regulation. Cal. Penal. Code § 3041(a).[9] Panel decisions granting

2  parole are reviewed by the Board's chief counsel (or designee).

3  Id.  During the review process, the chief counsel prepares a

4  written report on each case in which parole has been granted.

5  Plaintiffs' Statement of Undisputed Facts in Support of Plaintiffs'

6  Motion for Summary Judgment ("PSUF") (ECF No. 428-3) ¶ B.[10] Known

7  as the "Executive Case Summary" (ECS), the report is an overview

8  of the prisoner's central prison files as well as the evidence and

9  the findings from the hearing that resulted in a parole grant. Id.

10 Each ECS includes information about the prisoner's term, as set by

11 the panel that granted parole, as well as the calculated release

12 date for the prisoner based on that term. Id. At the time the

13 offenses were committed, the Board's parole decisions were not

14 subject to gubernatorial review. Defendants' Statement of

15 Undisputed Facts in Support of their Motion for Summary Judgment

16 ("DSUF") (ECF No. 425 at 47–52)[11] ¶ 20.

---

17

18  [9] The considerations include the desire to impose "uniform
terms for offenses of similar gravity and magnitude with respect

19 to their threat to the public," compliance with the sentencing
rules that the Judicial Council of California may issue, sentencing

20 information relevant to the setting of parole release dates, the
number of victims of the crime, as well as mitigating and

21 aggravating factors. Cal. Penal Code § 3041(a) see also, See Cal.
Admin. Code tit. 15, §§ 2289 (computation of parole date); Cal.

22 Admin. Code tit. 15, §§ 2282 (base term), 2283 (aggravation of the
base term); 2284 (mitigation of the base term); 2285-86

23 (enhancements for firearms use and for other reasons).

24  [10] The court cites the respective parties' statements of
undisputed facts when the opposing party has not disputed the

25 asserted fact.

26  [11] Page numbers refer to the CM/ECF page number, not the
internal document page number.

7

1      Article V, section 8 of the California Constitution was

2  amended by the voters with the passage of Proposition 89 on

3  November 8, 1988.  DSUF ¶ 19.  Proposition 89 added subdivision (b)

4  to allow the Governor a 30-day period to "affirm, modify or

5  reverse" any decision of the Board of Parole Hearings (the

6  "Board"), "with respect to the granting, denial, revocation,

7  suspension or parole of a person sentenced to an indeterminate term

8  upon a conviction of murder ...."  Id.[12]

9      As part of his review, the Governor receives the Executive

10 Case Summary for the prisoner.  PSUF ¶ D.  The Governor's review

11 authority is neutral, under the amendment, and allows him to review

12 denials as well as grants of parole.  Id.  However, from 1991

13 through 2010, the Governor reviewed only three decisions denying

14 parole, affirming all three.  Id.  During that same period, the

15 Governor reversed 1,255 grants of parole made to prisoners who were

16 convicted of murder before Proposition 89 passed.  Id. ¶ E.  These

---

[12] The amendment provides:

> No decision of the parole authority of this state with
> respect to the granting, denial, revocation, or
> suspension of parole of a person sentenced to an
> indeterminate term upon conviction of murder shall
> become effective for a period of 30 days, during which
> the Governor may review the decision subject to
> procedures provided by statute.  The Governor may only
> affirm, modify, or reverse the decision of the parole
> authority on the basis of the same factors which the
> parole authority is required to consider.  The Governor
> shall report to the Legislature each parole decision
> affirmed, modified, or reversed, stating the pertinent
> facts and reasons for the action.

Cal. Const. Art. V, § 8(b).

1  reversals represent more than 70 percent of the Board's grants of

2  parole made to prisoners with murder convictions.  PSUF ¶ E.  At

3  the time the Governor acted in those cases, over 90 percent of the

4  prisoners were beyond their calculated release dates.  Had the

5  Governor not reversed the grants, those prisoners would have been

6  immediately released; because of the Governor's reversal, however,

7  the prisoners remained in custody.  Id.

8      After passage of Proposition 89, named class members James

9  Masoner, Richard W. Brown, Edward Stewart, Mario Marquez, Richard

10 Lewis and Gloria Olson, were found suitable for parole by the

11 Board.  DSUF ¶ 21.  The Governor, exercising his authority under

12 Proposition 89, reversed the Board's decisions regarding these

13 plaintiffs.  Id.

14 **II.   STANDARDS**

15      **A.   Summary Judgment.**

16      Summary judgment is appropriate "if the movant shows that

17 there is no genuine dispute as to any material fact and the movant

18 is entitled to judgment as a matter of law."  Fed. R. Civ. P.

19 56(a); Ricci v. DeStefano, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677

20 (2009) (it is the movant's burden "to demonstrate that there is 'no

21 genuine issue as to any material fact' and that they are 'entitled

22 to judgment as a matter of law'"); Walls v. Central Contra Costa

23 Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011) (per curiam)

24 (same).

25      Consequently, "[s]ummary judgment must be denied" if the court

26 "determines that a 'genuine dispute as to [a] material fact'

1  precludes immediate entry of judgment as a matter of law." Ortiz
2  v. Jordan, 562 U.S. ___, 131 S. Ct. 884, 891 (2011), quoting Fed.
3  R. Civ. P. 56(a); Comite de Jornaleros de Redondo Beach v. City of
4  Redondo Beach, 657 F.3d 936 (9th Cir. 2011) (en banc) (same), cert.
5  denied, 132 S. Ct. 1566 (2012).

6      Under summary judgment practice, the moving party bears the
7  initial responsibility of informing the district court of the basis
8  for its motion, and "citing to particular parts of the materials
9  in the record," Fed. R. Civ. P. 56(c)(1)(A), that show "that a fact
10 cannot be ... disputed."  Fed. R. Civ. P. 56(c)(1); Nursing Home
11 Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp.
12 Securities Litigation), 627 F.3d 376, 387 (9th Cir. 2010) ("The
13 moving party initially bears the burden of proving the absence of
14 a genuine issue of material fact"), citing Celotex v. Catrett, 477
15 U.S. 317, 323 (1986).

16     However, "[w]here the non-moving party bears the burden of
17 proof at trial, the moving party need only prove that there is an
18 absence of evidence to support the non-moving party's case."
19 Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle
20 Corp. Securities Litigation), 627 F.3d 376, 387 (9th Cir. 2010).

21     If the moving party meets its initial responsibility, the
22 burden then shifts to the non-moving party to establish the
23 existence of a genuine issue of material fact.  Matsushita Elec.
24 Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986);
25 Oracle Corp., 627 F.3d at 387 (where the moving party meets its
26 burden, "the burden then shifts to the non-moving party to

1  designate specific facts demonstrating the existence of genuine

2  issues for trial"). In doing so, the non-moving party may not rely

3  upon the denials of its pleadings, but must tender evidence of

4  specific facts in the form of affidavits and/or other admissible

5  materials in support of its contention that the dispute exists.

6  Fed. R. Civ. P. 56(c)(1)(A).

7       "In evaluating the evidence to determine whether there is a

8  genuine issue of fact," the court draws "all reasonable inferences

9  supported by the evidence in favor of the non-moving party."

10 Walls, 653 F.3d at 966. Because the court only considers

11 inferences "supported by the evidence," it is the non-moving

12 party's obligation to produce a factual predicate as a basis for

13 such inferences. See Richards v. Nielsen Freight Lines, 810 F.2d

14 898, 902 (9th Cir. 1987). The opposing party "must do more than

15 simply show that there is some metaphysical doubt as to the

16 material facts .... Where the record taken as a whole could not

17 lead a rational trier of fact to find for the nonmoving party,

18 there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at

19 586-87 (citations omitted).

20      **B.   Preliminary Injunction.**

21      Fed. R. Civ. P. 65 provides authority to issue a preliminary

22 injunction. However, it is an "extraordinary remedy, never awarded

23 as of right." Winter v. Natural Resources Defense Council, Inc.,

24 555 U.S. 7, 24 (2008).

25      A plaintiff seeking a preliminary injunction must
        establish [1] that he is likely to succeed on the
26      merits, [2] that he is likely to suffer irreparable harm

11

in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.

Rodriguez v. Robbins, ___ F.3d ___, 2013 WL 1607706 at *2, 2013 U.S. App. LEXIS 7565 at *10-*11 (9th Cir. 2013), quoting Winter, 555 U.S. at 20.

**C.  Class Decertification.**

Class certification is proper, and therefore may withstand a motion to decertify, only "if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 161 (1982).  The Federal Rules provide:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable ["numerosity"];(2) there are questions of law or fact common to the class ["commonality"]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ["typicality"]; and (4) the representative parties will fairly and adequately protect the interests of the class ["adequacy" (of representation)].

Fed. R. Civ. P. 23(a).  In addition, class certification is proper only if "at least one of the requirements of Rule 23(b)" is satisfied. Ellis v. Costco Wholesale Corp., 657 F.3d 970, 979-80 (9th Cir. 2011).  Here, the class was certified under Rule 23(b)(2), which provides:

> A class action may be maintained if Rule 23(a) is satisfied and if: ... the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

Fed. R. Civ. P. 23(b)(2).  The court must be satisfied that the party that bears the burden has "affirmatively demonstrate[d]" that "there are in fact sufficiently numerous parties, common questions of law or fact, etc."  <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. ___, 131 S. Ct. 2541, 2551–52 (2011).[13]

## III. ANALYSIS - <u>EX POST FACTO</u> CLAUSE.

> The <u>ex post facto</u> prohibition forbids the Congress and the States to enact any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed."

<u>Weaver v. Graham</u>, 450 U.S. 24, 28 (1981); <u>CDC v. Morales</u>, 514 U.S. 499, 504 (1995) ("Article I, § 10, of the Constitution prohibits the states from passing any 'ex post facto law'"), <u>Lynce v. Mathis</u>, 519 U.S. 433, 441 (1997) ("To fall within the <u>ex post facto</u> prohibition, a law ... 'must disadvantage the offender affected by it,' by ... increasing the punishment for the crime") (citations omitted).  "The ban also restricts governmental power by restraining arbitrary and potentially vindictive legislation." <u>Id.</u>, 450 U.S. at 29.  A "central concern" of the Ex Post Facto

_____

[13] Plaintiffs have already met their burden to establish that class certification is proper.  Nevertheless, in this Circuit, it again bears the burden on this motion, even though it is defendants' motion:

> as to the class-decertification issue, Marlo, as "[t]he party seeking class certification [,] bears the burden of demonstrating that the requirements of Rules 23(a) and (b) are met."

<u>Marlo v. United Parcel Service, Inc.</u>, 639 F.3d 942, 947 (9th Cir. 2011).

1  Clause is "'the lack of fair notice and governmental restraint when

2  the legislature increases punishment beyond what was prescribed

3  when the crime was consummated.'" <u>Lynce</u>, 519 U.S. at 895-96.

4  "Retroactive changes in laws governing parole of prisoners, in some

5  instances, may be violative of this precept." <u>Garner</u>, 529 U.S. at

6  249-250 (involving increases in intervals between parole

7  consideration dates).

8  **IV.   ANALYSIS - PROPOSITION 9 (Claim 8).**

9      Plaintiffs challenge Proposition 9, as it applies to them,

10 asserting that the law – by increasing the deferral period between

11 parole hearings – "has created a risk of increased terms to life

12 prisoners" in violation of the <u>Ex Post Facto</u> Clause.   <u>See</u>

13 Plaintiffs' Opposition to Defendants' Motion for Summary Judgment

14 ("Pl. Opp. to D. SJ") (ECF No. 435) at 6.[14]   Plaintiffs further

15 argue that the availability of "advance hearings" does not cure the

16 constitutional deficiency.   <u>Id.</u>

17     **A.   Retrospective Increases in Intervals Between Parole**
           **Hearings.**

18

19         **1.   Morales v. California Dep't of Corrections.**

20     In 1994, the Ninth Circuit considered an <u>Ex Post Facto</u> Clause

21 challenge to an earlier change in California parole law.   <u>See</u>

22 <u>Morales v. California Dep't of Corrections</u>, 16 F.3d 1001 (9th Cir.

23 1994).  The change allowed the parole board to avoid the previously

24 required annual parole hearings, and to increase the interval

25     [14] It is undisputed that the enactment is retrospective, that
   is, it applies to prisoners whose offenses occurred before
26 Proposition 9 was enacted.

between hearings to up to five years, if the board found that

parole was unlikely to be granted during the interval.  Id., at

1004.   The Ninth Circuit held that the law change, as applied

retrospectively, violated the Ex Post Facto Clause:

> By increasing the interval between parole hearings, the
> state has denied Morales opportunities for parole that
> existed under prior law, thereby making the punishment
> for his crime greater than it was under the law in
> effect at the time his crime was committed. ... [A]ny
> retrospective law making parole hearings less accessible
> would effectively increase the sentence and violate the
> ex post facto clause.

Id., at 1004.

The Supreme Court reversed.   California Dep't of Corrections

v. Morales, 514 U.S. 499 (1995).   It concluded that "the evident

focus of the California amendment was merely 'to relieve the

[Board] from the costly and time-consuming responsibility of

scheduling parole hearings for prisoners who have no reasonable

chance of being released.'"   Id., at 507 (internal quotation marks

omitted).   The Court rejected the Ex Post Facto challenge because

the law change:

> creates only the most speculative and attenuated
> possibility of producing the prohibited effect of
> increasing the measure of punishment for covered crimes,
> and such conjectural effects are insufficient under any
> threshold we might establish under the Ex Post Facto
> Clause.

Id., 514 U.S. at 509.   In explaining its decision, however, the

Court identified several factors that defeated the Ex Post Facto

challenge.   First, the change in law addressed in Morales applied

"only to a class of prisoners for whom the likelihood of release

on parole is quite remote."   Id., at 510.

1    Second, the change in law was "carefully tailored" so that it

2    had "no effect on any prisoner" unless the Board had first

3    concluded, after a hearing, "not only that the prisoner is

4    unsuitable for parole, but also that 'it is not reasonable to

5    expect that parole would be granted at a hearing during the

6    following years.'" Id., at 511.  Importantly, the Board retained

7    "the authority to tailor the frequency of subsequent suitability

8    hearings to the particular circumstances of the individual

9    prisoner," Id., at 511, which included the possibility that it

10   could conduct subsequent parole hearings annually, as was possible

11   before the law change.[15]

12   Moreover, the Court noted that in addition to the safeguards

13   it had identified, "'the Board could advance the suitability

14   hearing.'" Id., at 512.[16]  The Court found that the possibility of

15   such an "expedited hearing by the Board -- either on its own

16   volition or pursuant to an order entered on an administrative

17

18   [15] Another point noted by the Court was its conclusion that it
     was purely speculative whether an earlier release date can be
     secured by more frequent parole hearings. Morales, 514 U.S. at
19   513.  That is because it held that, even if parole were granted at
     the initial hearing, the actual release date could be set years
20   after the parole hearing, depending on the Board's calculation of
     his "base term," the base term being calculated from a matrix used
21   by the Board.

22   [16] This possibility was "suggested" by the California Supreme
     Court in In re Jackson, 39 Cal. 3d 464, 475 (1985) ("it is
23   conceivable that the Board could advance the suitability hearing
     and order immediate release").  It was also "indicated" by the CDC
24   in a footnote to its Supreme Court Reply Brief, Petitioner's Reply
     Brief in CDC v. Morales, at 3 n.1, 1994 WL 707994 ("the practice
25   of the Board is that it will review for merit any communication
     from an inmate asking for an earlier suitability hearing").

26

1  appeal -- would remove any possibility of harm even under the

2  hypothetical circumstances suggested by respondent." <u>Id.</u>, at 512-

3  13.

4        **2.   <u>Garner v. Jones</u>.**

5        A few years after <u>Morales</u>, the Eleventh Circuit was faced with

6  a change in Georgia law that increased the interval between parole

7  hearings from three years to eight years. <u>See</u> <u>Jones v. Garner</u>, 164

8  F.3d 589 (11th Cir. 1998). Fully aware of the decision in <u>Morales</u>,

9  the Eleventh Circuit found that the change in law that it faced was

10 entirely different from that effected in <u>Morales</u>. The grounds of

11 distinction were, that the Georgia prisoners were not those only

12 "remotely" likely to be paroled, unlike those in <u>Morales</u>; and the

13 interval between parole hearings was not "finely tailored," as in

14 <u>Morales</u>, because it was simply increased to one hearing every eight

15 years. <u>Jones</u>, 164 F.3d at 590 ("After Jones was incarcerated, but

16 before he was initially considered for parole, the Board amended

17 its rules to require that parole reconsideration take place only

18 once every eight years"). Finally, the Eleventh Circuit

19 distinguished <u>Morales</u> after determining that the Georgia prisons'

20 policy statements regarding "expedited" hearings were

21 "unenforceable and easily changed, and adherence to them is a

22 matter of the Board's discretion." <u>Id.</u>, at 595.

23       The Supreme Court reversed. <u>Garner v. Jones</u>, 529 U.S. 244

24 (2000). It found that the grounds of distinction the Eleventh

25 Circuit relied upon were not dispositive, because the question

26 still remained "whether the amended Georgia Rule creates a

1  significant risk of prolonging respondent's incarceration."  <u>Id.</u>,

2  529 U.S. at 255.  The Court found that the record in that case did

3  not show that such a risk existed.  Rather, the Court held that

4  the parole board had discretion on how often to grant a parole

5  hearing, so long as one was held <u>at least</u> once every eight years.

6  <u>Id.</u>, 529 U.S. at 254.

7      Moreover, the Court concluded that prisoners had the ability

8  to seek an advance hearing.  The Court found that pursuant to its

9  formal policies, the parole board would consider requests for

10 advance hearings where the prisoners made a showing "of a 'change

11 in their circumstances' or upon the Board's receipt of 'new

12 information.'"  <u>Id.</u>, 529 U.S. at 257.  The Court determined that

13 it was error for the Eleventh Circuit to not consider the effect

14 of the availability of advance hearings on the likelihood that a

15 prisoner's incarceration would be lengthened beyond the term

16 imposed when the crime was committed.

17          **3.   <u>Gilman v. Schwarzenegger</u>**

18     On February 4, 2010, this court granted a preliminary

19 injunction to plaintiffs in this case.  <u>Gilman v. Davis</u>, 690 F.

20 Supp. 2d 1105 (E.D. Cal. 2010) (Karlton, J.).  The court

21 distinguished <u>Morales</u> and <u>Garner</u>.  First, unlike the law change in

22 <u>Morales</u>, Proposition 9 increased the interval between parole

23 hearings for <u>every member</u> of the plaintiff class, no matter what

24 his circumstances, no matter how quickly he may be progressing

25 toward suitability for parole, and no matter how willing the Board

26 might be to grant him more frequent parole hearings.  The ability

18

of the Board to "tailor" the parole hearing deferral to the facts before them – so critical to the decision in <u>Morales</u> – was missing in Proposition 9.  <u>See</u> <u>Gilman</u>, 690 F. Supp. 2d at 1120.  Even with the availability of advance hearings, class members can secure a parole hearing no more frequently than every three years.[17]

Second, the court found that class members here were not uniformly unlikely to be granted parole during the default deferral period.  <u>See</u> <u>Gilman</u>, 690 F. Supp. 2d at 1120.  This further distinguished these plaintiffs from those in <u>Morales</u>, who faced only a "remote" chance of parole.

Finally, the court found that the theoretical availability of advance hearings were not sufficient to overcome an <u>Ex Post Facto</u> challenge.  The court found that "[a]t the time these motions were argued, there was no mechanism in place for initiating or accepting petitions to advance a hearing." <u>Id.</u>, at 1121.  Further, the court found that an ad-hoc advance hearing system was insufficient to overcome the challenge, and that such a system itself created a significant risk of increasing the plaintiffs' incarceration because of the delays inherent in that system. <u>Id.</u>, at 1121-22.[18]

_____

[17] For example, if a prisoner is denied parole and has his next parole hearing deferred for the default interval – fifteen years – he can seek an advance hearing at any time thereafter. However, if his requested advance hearing is denied (or granted, but parole is denied), he can only seek <u>another</u> advance hearing every three years, until the fifteen year deferral is completed.

[18] This court rejected plaintiffs' argument that the Board was free to simply deny an advance hearing even if a prisoner had made the required showing.  <u>See</u> <u>Gilman</u>, 690 F. Supp. 2d at 1122 (the court "must assume that the Board will exercise a neutral grant of discretion in a manner consistent with the <u>Ex Post Facto</u> Clause").

19

1   Accordingly, this court found that the changes brought about by

2   Proposition 9 "create a risk of prolonged incarceration, and

3   plaintiffs are likely to succeed in showing that this risk is

4   significant despite the possible availability of advanced

5   hearings." Id., at 1124.

6       The Ninth Circuit reversed.  Gilman v. Schwarzenegger, 638

7   F.3d 1101 (9th Cir. 2011).  The Ninth Circuit agreed that "the

8   changes required by Proposition 9 appear to 'create[] a significant

9   risk of prolonging [Plaintiffs'] incarceration.'"  Id., at 1108.

10  However, even assuming that this significant risk did exist, the

11  Ninth Circuit concluded that:

12          Here, as in Morales, an advance hearing by the Board
            "would remove any possibility of harm" to prisoners
13          because they would not be required to wait a minimum of
            three years for a hearing.
14

15  Id., at 1108, quoting Morales, 514 U.S. at 513.  Gilman held that

16  a preliminary injunction in the case was not warranted because

17  plaintiffs failed to present any evidence that the advance hearing

18  was insufficient protection.

19      On appeal, plaintiffs pressed their objection that the

20  decision whether to grant an advance hearing was purely

21  discretionary with the Board, and that the Board could deny an

22  advance hearing even where the prisoner had made the required

23  showing that he was now suitable for parole.  The Ninth Circuit

24  rejected the objection because plaintiffs failed to produce any

25  evidence to counter the presumption "that the Board will, upon

26  request, schedule advance hearings for prisoners who become

1  suitable for parole prior to their scheduled hearings." <u>Gilman</u>,

2  638 F.3d at 1109-10.[19]

3      **B.  Defendants' Motion for Summary Judgment, Proposition 9.**

4      Defendants move for summary judgment.  They argue first, that

5  Proposition 9 is the type of procedural change that is not covered

6  by the <u>Ex Post Facto</u> clause, and that in any event, plaintiffs can

7  produce no evidence showing that Proposition 9 in fact creates a

8  "significant risk" of increasing the class members' incarceration.

9  <u>See</u> Defendants' Motion for Summary Judgment ("Defendants' Motion")

10  (ECF No. 425) at 14-20. Defendants argue second, that the

11  availability of the "advance hearing" process "necessarily defeats

12  plaintiffs' claim." <u>Id.</u>, at 20-25.

13      In opposing defendants' motion for summary judgment,

14  plaintiffs argue that the existence of advance hearings is

15  insufficient to cure the constitutional violation: the Board's

16  discretion in granting advance hearings is so broad that it could

17  deny an advance hearing even if the prisoner showed that he was

18  suitable for parole; Proposition 9 does not permit the fine

19  "tailoring" of deferral periods that were critical to the decisions

20

---

21      [19] Plaintiffs also objected that: there was "'no mechanism or procedure in place for the Board to initiate a review or to accept,

22  consider or rule on a prisoner's request [for an advance hearing,'" but they adduced no evidence that the Board "denied or failed to

23  respond to requests for advance hearings;" an advance hearing will not be held within a year of the request, but failed to adduce any

24  evidence to that effect; and prisoners would not be able to establish changed circumstances warranting earlier parole, but they

25  failed to show that the task differed from the ordinary request for parole, in which the prisoner must show changed circumstances

26  warranting parole.

1  in *Garner* and *Morales*; and the rate of summary denials of advance

2  hearing petitions is so high that it cannot rescue Proposition 89

3  from an *ex post facto* violation.

4         **1.   "Procedural" changes.**

5         Defendants weakly argue that Proposition 9 effected

6  "procedural" changes, and thus, under *Morales* and *Garner*, they are

7  immune to challenge under the *Ex Post Facto* Clause.  The court does

8  not agree.  *Morales* and *Garner* did not find that increasing

9  intervals between parole hearings passed muster under the *Ex Post*

10 *Facto* Clause because they only effected a "procedural" change.

11 Rather, they rejected the claims because petitioners failed to show

12 that the law increasing intervals between parole hearings – even

13 if "procedural" – created a significant risk of increased

14 incarceration.  See *Gilman*, 638 F.3d at 1106 ("A retroactive

15 procedural change violates the *Ex Post Facto* Clause when it

16 'creates a <u>significant risk</u> of prolonging [an inmate's]

17 incarceration"), *quoting Garner*, 529 U.S. at 251.  The claims were

18 not rejected merely because the changes were "procedural."

19        Defendants make a more energetic argument regarding

20 "procedural" changes in their motion for summary judgment on the

21 Proposition 89 claim, and so it is further discussed there.

22        **2.   Advance Hearings and Evidence of Significant Risk**
            **of Increased Incarceration.**
23
        Defendants assert that the availability of advance hearings
24
   necessarily defeats the Proposition 9 claim, citing *Morales*, *Garner*
25
   and *Gilman*.  In fact, the Ninth Circuit has already ruled, in an
26

1   appeal from this case, that:

2       as in <u>Morales</u>, an advance hearing by the Board "would
        remove any possibility of harm" to prisoners because
3       they would not be required to wait a minimum of three
        years for a hearing.
4

5   <u>Gilman</u>, 638 F.3d at 1109.  Plaintiffs assert several reasons why

6   the Ninth Circuit's decision does not defeat their claim.

7               **a.   Discretion   under   Cal.   Penal   Code**
                    **§ 3041.5(b)(4).**
8
    Plaintiffs, citing Cal. Penal Code § 3041.5(b)(4), argue that
9
10  advance hearings are inadequate because the Board may, in its

    discretion, legally decline to advance a hearing, even when the
11
    prisoner has made the required showing:
12
13      the Board's discretion in ruling on advanced hearing
        requests is so broad that the Board may legally deny an
        advanced hearing even if the prisoner establishes new
14      information/changed   circumstances   and   a   reasonable
        likelihood of a parole grant.
15

16  Pl. Opp. to DSJ at 4; Plaintiffs' Statement of Undisputed Facts

17  No. 15 (asserting that the Board "may, in its discretion, decline

18  to advance a hearing" even if the prisoner makes the required

19  showing, citing Cal. Penal Code § 3041.5(b)(4)).

20      This argument fails for several reasons.  First, the language

21  of the statute is not probative of plaintiffs' assertion that the

22  Board does <u>in fact</u> deny advance hearings despite the prisoner's

23  having made the required showing.  The statute provides only that

24  the Board "may" grant an advance hearing once the required showing

25  is made:

26      The board may in its discretion, after considering the

                                23

1    views and interests of the victim, advance a hearing set
     pursuant to paragraph (3) to an earlier date, when a
2    change in circumstances or new information establishes
     a reasonable likelihood that consideration of the public
3    and victim's safety does not require the additional
     period of incarceration of the prisoner provided in
4    paragraph (3).

5    Cal. Penal Code § 3041.5(b)(4).  The statute does not authorize the

6    Board to _decline_ to grant an advance hearing once the prisoner has

7    made the required showing, nor is such authorization a reasonable

8    inference from the statutory language.

9        Second, the Board cannot "legally" deny an advance hearing

10   once the prisoner makes the required showing, as that would be an

11   abuse of its discretion:

12       If the change in circumstances or new information
         establishes that there is no longer an evidentiary basis
13       for concluding the prisoner is a current threat to
         public safety, the Board will abuse its discretion if it
14       declines to advance the hearing date and find the
         prisoner suitable for parole.

15

16   _Vicks_, 56 Cal. 4th at 311;[20] _see also_ _Gilman_, 638 F.3d at 1109-10

17   (referring to the presumption that the Board will properly exercise

18   its discretion); _Gilman v. Davis_, 690 F. Supp. 2d at 1122

19   (rejecting plaintiffs' identical argument made at the

20   preliminary injunction stage, this court states: "I must assume

21   that the Board will exercise a neutral grant of discretion in a

22   manner consistent with the Ex Post Facto Clause").

23       Finally, the evidence the parties have presented indicates

24

25       [20] The failure to grant an advance hearing is reviewable in
     court for a "manifest abuse of discretion."  Cal. Penal Code
26   § 3041.5(d)(2).

24

1   that the Board instructs its decisionmakers to deny the advance

2   hearing <u>only</u> if the prisoner fails to make the required "prima

3   facie" showing.   <u>See, e.g.</u>, Plaintiffs' Preliminary Injunction

4   Hearing Exhibit 35 (ECF No. 341-3) (setting forth grounds for

5   summary denial); Preliminary Injunction Hearing Transcript (ECF

6   No. 347) 25-28 (Testimony of Sue Facciola) ("Facciola Test.")

7   (establishing that summary denials occur only if prisoner fails to

8   make a prima facie case for an advance hearing).   Plaintiffs have

9   introduced no contrary evidence to show, for example, that the

10  Board decision-makers fail to follow the instructions they

11  received.

12      Accordingly, this argument is insufficient to stave off

13  summary judgment on the Proposition 9 claim.

14              **b.   Three-year interval for advance hearings.**

15      Plaintiffs argue that the advance hearings are insufficient

16  because the Board "has <u>no</u> discretion since Proposition 9 to set a

17  deferral period of less than three years no matter how appropriate

18  it believes a deferral of one or two years is."   Plaintiffs'

19  Opposition at 3 n.3.   The decisions in <u>Morales</u> and <u>Garner</u> turned,

20  at least in part, on the fact that the parole board "retains the

21  authority to tailor the frequency of subsequent suitability

22  hearings to the particular circumstances of the individual

23  prisoner."   <u>Morales</u>, 514 U.S., at 511.

24      The California Supreme Court has clarified that "a prisoner

25  may make his or her first request for a new hearing <u>at any time</u>

26  <u>following the denial of parole at a regularly scheduled hearing,</u>

1  and then may make another request every three years." <u>Vicks</u>, 56

2  Cal. 4th at 286 (emphasis added).   Thus if the advance hearing

3  follows a deferral of three years, the Board must consider granting

4  a hearing less than three years into the future.

5  However, plaintiffs are correct that the request for an

6  advance hearing can be made only once every three years.  <u>Vicks</u>,

7  56 Cal. 4th at 286.[21]   Thus, the Board cannot grant, for example,

8  annual parole hearings.   As such, Proposition 9 is missing a key

9  ingredient upon which the constitutionality of the enactments in

10  <u>Morales</u> and <u>Garner</u> turned.   Plaintiffs should be permitted at trial

11  to show that this missing ingredient in fact creates a significant

12  risk that their incarceration will be prolonged.

13              **c.   Statistical evidence of the "safety net."**

14  Plaintiffs assert that the advance hearing procedures fail to

15  "catch" those prisoners who deserve advance hearings, that is,

16  those prisoners who have moved from unsuitability to suitability

17  for parole. Pl. Opp. to DSJ at 4-5.  Plaintiffs have now presented

18  evidence that of 119 advance hearing petitions filed after

19  Proposition 9, 106 of them – or over 90% – were "summarily denied."

20  <u>See</u> Plaintiffs' Statement of Additional Material Facts ("PSUF-

21

22  ────────────────

23       [21] "If the request is denied, the inmate may not make another
     request for three years.  Similarly, if the Board holds an earlier
24   parole suitability hearing — 'a hearing described in subdivision
     (a)' — rather than denying the request, and it declines to set a
25   parole date after the hearing, the inmate may not make another
     request for three years after this more recent decision of the
26   Board." <u>Vicks</u>, 56 Cal. 4th at 286.

1   Additional") (ECF No. 435-3) Nos. 17 & 18.[22]

2          In essence, plaintiffs are arguing that notwithstanding the

3   Board's legal obligation to grant an advance hearing when a

4   prisoner makes the proper showing, the evidence shows that the

5   Board nevertheless denies such hearings, using the summary denial

6   process.  The Ninth Circuit rejected this argument on appeal from

7   the preliminary injunction, but it did so on the grounds that

8   plaintiffs had "adduced no evidence that the Board has denied a

9   request for an advance hearing where a prisoner has shown a change

10  in circumstances or new evidence."  Gilman, 638 F.3d at 1109.

11         However, plaintiffs have now adduced evidence from which this

12  court can infer that the Board has denied advance hearings even

13  where a prisoner has shown the required change in circumstances.

14  First, as noted, 90% of advance hearing petitions are summarily

15  denied.  PSUF-Additional ¶ 17.[23]  Second, plaintiffs have presented

16  evidence that of these, some number of prisoners have shown – at

17  least sufficiently to avoid summary judgment – that they were, in

18  fact, suitable for parole.  PSUF-Additional ¶¶ 39 & 41.[24]

19  ─────────────────────

20         [22] In addition, eight were denied following a "full review,"
    and five were granted.  Of the five that were granted, three
    advance hearings were scheduled, and two had not been scheduled.
21  PSUF-Additional ¶¶ 17 & 18.

22         [23] Plaintiffs rely on Summary Exhibit 37 from the April 6,
    2011 preliminary injunction hearing, conducted after the Ninth
23  Circuit's decision in Gilman, for this fact.  Defendants do not
    dispute this fact.
24
25         [24] These exhibits were also admitted at the April 6, 2011
    preliminary injunction hearing.  Defendants do not dispute the
    facts asserted, although they argue that the subsequent findings
26  of suitability could just be the result of different decision-

1    Specifically, plaintiffs' evidence shows that class plaintiffs
2    Henry Bratton and James Alexander were denied parole and given
3    three-year deferrals.  Id. Their requests for advance hearings were
4    then summarily denied.[25]  Id., ¶ 42. These plaintiffs nevertheless
5    managed to get hearings before the three-year interval for other
6    reasons, and both were granted parole at those early hearings.
7    Id., ¶¶ 39 & 41.  Plaintiffs do not present direct evidence that
8    the summary denial process itself was invalid or constitutionally
9    tainted.  Accordingly, plaintiffs ask the court to infer strictly
10   from the results – over 90% summary denials, at least some number
11   of which were of prisoners who had in fact reached suitability –
12   that the advance hearing process is insufficient to avoid the Ex
13   Post Facto violation.

14   The court believes that it is a reasonable inference from
15   these undisputed facts that there is something wrong with the
16   advance hearing process.  The court of course, is required to draw
17   all reasonable inferences for plaintiffs, who oppose summary
18   judgment on this claim.  Without further development of the

19   _____

20   makers reaching different decisions.  On this summary judgment
     motion, the court draws the reasonable inference that these
21   prisoners established to the satisfaction of the Board that they
     were "suitable" for parole, and that they did so at an earlier
22   time than they could have done under the advance hearing procedure.

23     [25] Plaintiffs include class plaintiff Billy Counts in this
     group.  PSUF-Additional ¶ 40.  However, Counts' request for an
24   advance hearing was made after he had already been granted an
     earlier (one-year) deferral, and his request was denied after he
25   had already been granted parole.  The court cannot draw any
     inference from this case that the advance hearing process fails to
26   "catch" prisoners who have moved to suitability.

1  evidence, the court cannot say that the "something wrong" is a flaw

2  in the advance hearing process,[26] an unwillingness on the part of

3  the Board to grant advance hearings even when a prisoner has made

4  the required showing, or even something having no constitutional

5  relevance.   Plaintiffs are entitled to make their case on this

6  point at trial.   Accordingly, summary judgment on Proposition 9

7  will be denied.[27]

8  **V.     ANALYSIS - PROPOSITION 89 (Claim 9).**

9       Plaintiffs challenge Proposition 89 as it is applied to them,

10 because it gives the Governor the power to reverse parole grants

11 from the Board, which had previously been final with the Board.[28]

12 In Johnson v. Gomez, the Ninth Circuit found that Proposition 89

13 "simply removes final parole decisionmaking authority from the BPT

14 and places it in the hands of the governor."  92 F.3d at 967.[29]

15      The enactment was neutral, the court found, because it gives

16 the governor the power to affirm or reverse the board, and further,

17 "the governor must use the same criteria as" the Board.   Id.  The

18

19     [26] For example, it may be unnecessarily complex, preventing
20 unrepresented prisoners from successfully navigating it.

21     [27] Obviously, the court is not finding that plaintiffs have
   proven their position; rather, the court is simply saying that the
   factual posture is such as to permit them to prove their assertion
22 at trial.

23     [28] It is undisputed that the enactment is retrospective, that
   is, it applies to prisoners whose offenses occurred before
24 Proposition 89 was enacted.

25     [29] The Board of Parole Hearings, is an Executive Branch agency
   whose members are all appointed by the governor, with the consent
26 of the state senate (Cal. Gov. Code § 12838.4).

1  court indicated that an _ex post facto_ challenge to Proposition 89

2  could succeed only if plaintiffs could show "with certainty" or

3  "with assurance," that they would have been granted parole under

4  the old system, in which the Board had the final say.  _Id._, at 967

5  & 968.  Finding that plaintiff could not make this showing, the

6  Ninth Circuit held that Proposition 89 did not violate the _Ex Post_

7  _Facto_ Clause of the U.S. Constitution.  _Id._, at 968.

8      However, after the Ninth Circuit decision in _Gomez_, the

9  Supreme Court issued its decision in _Garner v. Jones_, 529 U.S. 244,

10 245-246 (2000).  As this court has previously held, _Garner_ changed

11 or clarified the law in ways that directly affect this case.

12 _See_ ECF No. 218.  The Supreme Court held:

13         In the case before us, respondent must show that as
           applied to his own sentence the law created a
14         significant risk of increasing his punishment.

15 _Garner_, 529 U.S. at 255.

16     Accordingly, even where a statute does not facially violate

17 the _ex post facto_ clause, _Garner_ establishes that plaintiffs may

18 still be able to make an "as applied" challenge.  In mounting such

19 a challenge, plaintiffs can use "evidence drawn from the rule's

20 practical implementation by the agency charged with exercising

21 discretion, that its retroactive application will result in a

22 longer period of incarceration than under the earlier rule."  In

23 addition, plaintiffs do not need to show "with certainty" or "with

24 assurance," that Proposition 89 extended their sentences.  Rather,

25 they need only show that the law created a "significant risk" of

26

1 increasing their punishment.[30]

2     **A.   Defendants' Motion for Summary Judgment, Proposition 89**

3     Defendants argue that the change effected by Proposition 89

4 does not violate the <u>Ex Post Facto</u> Clause as a matter of law, and

5 accordingly move for summary judgment on three legal grounds.  None

6 of defendants' arguments are persuasive.

7         **1.   Whether Proposition 89 Left Plaintiffs' Punishment**
            **Unchanged as a Matter of Law.**

8

9     Defendants assert that before the enactment of Proposition 89,

plaintiffs' punishment was "a lifetime in prison," and that is the

10 punishment they are subject to after Proposition 89.  Therefore,

11 defendants argue, there is no <u>Ex Post Facto</u> violation, citing

12 <u>Collins v. Youngblood</u>, 497 U.S. 37 (1990).  This argument fails

13 because its premise is incorrect.  The sentence before the

14 enactment of Proposition 89 was life in prison <u>with the possibility</u>

15 <u>of parole</u>, not simply "life in prison."  <u>See, e.g.</u>, <u>U.S. v. Paskow</u>,

16 11 F.3d 873, 879 (9th Cir. 1993) ("parole eligibility is part of

17 the sentence for the underlying offense").

18     It is the "possibility of parole" that is the whole focus of

19

20     [30] The Governor already had the authority to grant a reprieve,
pardon, or commutation of the sentence of any prisoner.  <u>See</u> Cal.

21 Const.  Art.  V, § 8(a).  Plaintiffs therefore argue that
Proposition 89 only added the power to lengthen incarcerations, by

22 reversing grants of parole.  However, it also added the power to

23 <u>shorten</u> an incarceration, by giving the Governor a new option,
namely, granting parole even though the Board did not authorize it

24 (however, there is no evidence in the record that this has ever
happened).  In this way, in theory, while a Governor might decline

25 to commute a sentence entirely (thus releasing the prisoner into
the population without supervision), the Governor might, at least

26 theoretically, be willing to grant parole (and its consequent
supervision) to that same prisoner.

1 this claim:

2      As we recognized in <u>Weaver</u>, retroactive alteration of

3      parole or early release provisions, like the retroactive
       application of provisions that govern initial

4      sentencing, implicates the <u>Ex Post Facto</u> Clause because
       such credits are "one determinant of petitioner's prison

5      term ... and ... [the petitioner's] effective sentence
       is altered once this determinant is changed." <u>Ibid.</u>  We

6      explained in <u>Weaver</u> that the removal of such provisions
       can constitute an increase in punishment, because a

7      "prisoner's eligibility for reduced imprisonment is a
       significant factor entering into both the defendant's

8      decision to plea bargain and the judge's calculation of
       the sentence to be imposed." <u>Ibid.</u>

9 <u>Lynce</u>, 519 U.S. at 445-446.

10          **2.   Whether Proposition 89 Effects a "Procedural"
               Change not Covered by the <u>Ex Post Facto</u> Clause.**

11

12      Once again, Defendants assert that plaintiffs' claims are

procedural and thus, not subject to an <u>Ex Post Facto</u> claim.  In
13
sum, they argue that no "as applied" challenge need be considered,
14
as Proposition 89 worked a "procedural change," and such changes
15
are categorically not subject to review under the <u>Ex Post Facto</u>
16
Clause.  According to defendants, "procedural changes, even if they
17
'disadvantage' the accused, do not violate the Ex Post Fact
18
Clause," citing <u>Collins</u>, <u>Mallett v. North Carolina</u>, 181 U.S. 589
19
(1901), and <u>Dobbert v. Florida</u>, 432 U.S. 282, 292 (1977).
20
Defendants read these cases too broadly,[31] as none of them
21
categorically excludes any and all "procedural" changes from <u>ex</u>
22
<u>post facto</u> review.  To the contrary:
23
////
24

---

25      [31] In any event, this court has already rejected defendants'
26  argument in the motion to dismiss this claim, and it is now the law
    of the case.  <u>See</u> <u>Gilman v. Davis</u>, 2010 WL 434215 at *3-*4.

1       by simply labeling a law "procedural," a legislature
does not thereby immunize it from scrutiny under the <u>Ex</u>
2       <u>Post Facto</u> Clause. ...  Subtle <u>ex post facto</u> violations
are no more permissible than overt ones.
3

4 <u>Collins</u>, 497 U.S. at 46.

5       Indeed, <u>Collins</u> clarifies language in earlier cases that

6 defendants interpret as holding that a simple "procedural" versus

7 "non-procedural" test would be sufficient to determine whether a

8 law violates the <u>Ex Post Facto</u> Clause.  For example, the Court in

9 <u>Dobbert</u> wrote:

10       In the case at hand, the change in the statute was
clearly procedural.  The new statute simply altered the
11       methods employed in determining whether the death
penalty was to be imposed; there was no change in the
12       quantum of punishment attached to the crime.   The
following language from <u>Hopt v. Utah</u>, supra, applicable
13       with equal force to the case at hand, summarizes our
conclusion that the change was procedural and not a
14       violation of the Ex Post Facto Clause: [¶] "The crime
for which the present defendant was indicted, the
15       punishment prescribed therefor, and the quantity or the
degree of proof necessary to establish his guilt, all
16       remained unaffected by the subsequent statute."   110
U.S., at 589-590.
17

18 432 U.S. at 293-294.  <u>Collins</u> clarifies that it is not simply the

19 label "procedural" that governed its holding in <u>Dobbert</u>.  Indeed,

20 the Court has come to use the term "procedural" in this context

21 almost as a term of art, meaning laws that are genuinely

22 "procedural" <u>for purposes of the Ex Post Facto Clause</u>.  Such

23 "procedural" laws are those which do not punish behavior that was

24 previously lawful, do not change the quantum of punishment

25 prescribed, do not change the quantity or the degree of proof

26 necessary to establish guilt, and do not deprive one charged with

1  crime of any defense available according to law at the time when

2  the act was committed.  <u>Id.</u> at 52; <u>Dobbert</u>, 432 U.S. at 295.

3      Similarly, <u>Gomez</u> found that Proposition 89 did not violate the

4  <u>Ex Post Facto</u> clause under the facts presented in that case, not

5  because the enactment was "procedural," but because the prisoner

6  was 'unable to demonstrate that an increase in his punishment

7  actually occurred."  <u>Gomez</u>, 92 F.3d at 967.

8      It is clear that retrospective procedural changes can violate

9  the <u>Ex Post Facto</u> Clause if they create a significant risk of

10 increasing the prisoner's punishment.  The Ninth Circuit explained

11 that "[a] retroactive <u>procedural change</u> violates the <u>Ex Post Facto</u>

12 Clause" when it creates a significant risk of prolonging an

13 inmate's incarceration.  <u>Gilman</u>, 638 F.3d at 1106 (emphasis added),

14 <u>citing</u> <u>Garner</u>, 529 U.S. at 251.  Accordingly, the court cannot

15 simply grant summary judgment to defendants on the grounds that

16 Proposition 89 effects a "procedural" change, without examining the

17 real-world effect the change has brought about.

18      **3.   Whether <u>Johnson v. Gomez</u> Precludes an Ex Post Facto**
        **Challenge as a Matter of Law.**

19

20 <u>Gomez</u> is a difficult case for plaintiffs, as it was also a

   challenge to Proposition 89, and was rejected by the Ninth Circuit.
21
   Moreover, plaintiff in <u>Gomez</u> made the same general argument
22
   plaintiffs make here, and the Ninth Circuit rejected it:
23
        Johnson argues that, unlike the administrative
24      convenience purpose of the law in <u>Morales</u>, the purpose
        and effect of the law here is to lengthen prison terms
25      by making it more difficult for convicted murderers with
        indeterminate sentences to be released on parole.
26      However, the law itself is neutral inasmuch as it gives

1     the governor power to either affirm or reverse a BPT's
      granting or denial of parole.   Moreover, the governor
2     must use the same criteria as the BPT.   The law,
      therefore, simply removes final parole decisionmaking
3     authority from the BPT and places it in the hands of the
      governor.  We cannot materially distinguish this change
4     in the law from that at issue in <u>Mallett v. North
      Carolina</u>, 181 U.S. at 590.  In <u>Mallett</u>, the Court found
5     no ex post facto violation where the new law allowed for
      higher court review of intermediate court decisions,
6     even though the petitioner would have been entitled to
      a final intermediate court decision at the time of his
7     crime.  <u>Id.</u> at 597.   We therefore conclude that the
      application of Proposition 89 to authorize the
8     governor's review of Johnson's grant of parole did not
      violate the Ex Post Facto Clause.

9

10   <u>Gomez</u>, 92 F.3d at 967.

11        <u>Gomez</u> does not end there, however.   It goes on to throw a

12   life-line to plaintiffs' claim here, thus precluding this court

13   from dismissing their claim on summary judgment.   Specifically,

14   <u>Gomez</u> went on to examine the Ninth Circuit's instruction that the

15   district court must "look to the actual effect of the new law upon

16   the petitioner."  <u>Id.</u> at 968.   In other words, a facial challenge

17   to the law is precluded by <u>Gomez</u>, but <u>Gomez</u> does not preclude a

18   challenge based upon "the actual effect" of Proposition 89 on this

19   class of plaintiffs.

20        The possibility of an as-applied challenge was confirmed by

21   the Supreme Court in <u>Garner</u>.   Under <u>Garner</u>, "when a law does not

22   facially increase punishment, 'the [petitioner] must demonstrate,

23   by evidence drawn from the rule's practical implementation by the

24   [entity] charged with exercising discretion that its retroactive

25   application will result in a longer period of incarceration than

26   under the earlier rule.'"   <u>Heller v. Powers-Mendoza</u>, 2007 WL

1  963330, 1 (E.D. Cal. 2007) (Karlton, J.), <u>quoting</u> <u>Garner</u>, 529 U.S.

2  at 245.

3      Accordingly,  defendants'  argument  that  plaintiffs'

4  Proposition 89 challenge can be dismissed "as a matter of law" is

5  incorrect.   Instead, plaintiffs must be given the opportunity to

6  prove at trial that Proposition 89 has created a significant risk

7  that their punishment would be increased.

8      **B.   Plaintiffs' Motion for Summary Judgment, Proposition 89**

9      Plaintiffs move for summary judgment on their Proposition 89

10  claim, asserting that the undisputed facts show that the enactment

11  creates a significant risk that they will serve an increased term

12  of incarceration.

13          **1.   Intent of the Legislature.**

14      Plaintiffs cite the Ballot Pamphlet[32] to assert that the

15  intention of Proposition 9 was to give the Governor the power to

16  protect the public from the early release of dangerous killers.

17  PSUF ¶ C; <u>see also</u>, <u>Gomez</u>, 92 F.3d at 966 ("The voters' intent, as

18  indicated in contemporaneous accounts, was at least in part to give

19  the  governor  authority  to  prevent  convicted  murderers  from

20  receiving parole").   Plaintiffs argue that this shows that the

21  legislature intended to increase the punishment of "dangerous

22  killers" already convicted and incarcerated, and that therefore the

23  _____

24      [32] "In California, '[b]allot summaries ... in the "Voter
    Information  Guide"  are  recognized  sources  for  determining  the
25  voters' intent.'"  <u>Perry v. Brown</u>, 671 F.3d 1052, 1090 n.25 (9th
    Cir.) (<u>quoting</u> <u>People v. Garrett</u>, 92 Cal. App. 4th 1417, 1426
26  (2001)), <u>cert. granted</u>, 133 S. Ct. 786 (2012).

1    law violates the ex post facto clause "without further inquiry into

2    the law's effect," citing Smith v. Doe, 538 U.S. 84, 92 (2003).

3        Once again, common sense would indicate that if a law is

4    passed in order to increase the punishment of prisoners who have

5    already been convicted of their crimes, then this would create an

6    ex post facto issue.  However, that does not appear to be the law.

7    In fact, whether or not a court may look to the intent of the

8    legislature (or the People, in the case of a Ballot Initiative),

9    appears to depend on the type of alleged ex post facto law that is

10   at issue.

11       If the issue is whether the challenged enactment is penal or

12   civil in nature, it is well established that the courts look to the

13   intent of the legislature: "If the intention of the legislature was

14   to impose punishment, that ends the inquiry."  Smith, 538 U.S.

15   at;[33] ACLU of Nevada v. Masto, 670 F.3d 1046, 1053 (9th Cir. 2012)

16   ("If the legislature did intend to impose a criminal punishment,

17   that is the end of the inquiry — the law may not be applied

18   retroactively").

19       However, if the issue is whether the enactment increases what

20   is indisputably punishment, namely incarceration, then the court

21   focuses on "an objective appraisal of the impact of the change on

22   the length of the offender's presumptive sentence," rather than the

23

24       [33] However, if the legislature's intent "was to enact a
     regulatory scheme that is civil and nonpunitive, we must further
25   examine whether the statutory scheme is "'so punitive either in
     purpose or effect as to negate [the State's] intention' to deem it
26   'civil.'"  Id.

37

1   intent of the legislature.   *Lynce*, 519 U.S. at 442-43.   In

2   discussing whether a retroactive cancellation of early release

3   credits violated the *Ex Post Facto* Clause, *Lynce* specifically

4   rejected the "undue emphasis on the legislature's subjective intent

5   in granting the credits rather than on the consequences of their

6   revocation." *Id.*, at 442.

7       The *Lynce* Court pointed out that all of its prior decisions

8   in this context – the alleged retroactive increase in punishment

9   – focused only on the effect of the legislation, not the intent of

10  the legislature.   *Id.*, at 442-45.   The court concluded by noting

11  that "the Court has never addressed" whether intent alone – without

12  a forbidden effect – would be enough to find an *Ex Post Facto*

13  Clause violation.   *Id.*, at 445.

14      Plaintiffs are therefore incorrect in asserting that it is

15  settled law that this court is required to find a violation based

16  upon intent alone.   Given the teaching of *Lynce*, and its lengthy

17  examination of cases showing that it has never found an *ex post*

18  *facto* violation based upon intent alone, this court does not

19  believe it is free to grant summary judgment to plaintiffs solely

20  on the basis of the intent of Proposition 89.

21          **2.   The creation of an additional hurdle to parole.**

22      Plaintiffs argue that an effect of Proposition 89 is to

23  interpose an additional hurdle that prisoners must clear before

24  they can obtain parole, and that this additional hurdle did not

25  exist at the time their crimes were committed.   It is undisputed

26  that when the crimes were committed, the road to parole involved

38

convincing only the Board that the prisoner was suitable for parole.[34] After the passage of Proposition 89, another road-block was placed in the road, namely, the prisoner now has to convince the Board, and then, separately, the Governor, that he is suitable for parole.[35]

The undisputed facts also support the assertion that Proposition 89 has imposed this additional hurdle. First, while the governor reviews every <u>grant</u> of parole, he almost never reviews <u>denials</u> of parole.[36] Second, from 1991 to 2011, "the Governor reversed more than 70 percent of the grants of parole made to prisoners with murder convictions." PSUF ¶ E.[37] Had the Governor not reversed, 90% of those prisoners would have been immediately released, but because of the Governor's action, were instead held

---

[34] And, as discussed above, they were able to make their case every year, rather than once every fifteen years.

[35] In fact, the hurdle is even greater than might otherwise appear, since it appears the prisoner does not even have the right to make his case to the Governor.

[36] It is undisputed that from 1991 to 2011, the Governor reviewed only three (3) denials of parole, and he affirmed all three. PSUF ¶ D. During the same period, the Governor reversed 70% of Board decisions finding the prisoner "suitable" for parole. PSUF ¶ E.

[37] Plaintiffs also assert: "The evidence establishes a significant risk that prisoners with murder convictions will do more custodial time after Proposition 89 than they would do if the old law still applied." Plaintiff's SJ Motion at 9 (ECF No. 428-1). However, the undisputed evidence does not show this. The only evidence in plaintiffs' statement of undisputed facts relates to parole decisions under the new law. Plaintiffs have asserted in their <u>Reply</u> brief that the Board's suitability finding was 6.1% under the old law and the new law. However this assertion is not included in the Statement of Undisputed Facts, and defendants have had no opportunity to dispute or concede it.

1  in custody.  <u>Id.</u>[38]  The question, then, is whether adding this

2  additional hurdle creates a "significant risk of prolonging"

3  plaintiffs' incarceration.  <u>Garner</u>, 529 U.S. at 251.

4      Common sense would indicate that a prisoner has a

5  significantly increased chance of longer incarceration if he must

6  convince two decision-makers that he is entitled to parole, rather

7  than just one.  In addition, actual experience with the law shows

8  that most of the time – 70% of the time – even after the prisoner

9  convinces the first decision-maker that he is entitled to parole,

10  the Governor reverses that decision.  The evidence presented thus

11  shows that plaintiffs have a heavier burden to achieve parole than

12  they would have had at the time their crimes were committed.[39]

13      In this context however, the court cannot simply rely on

14  experience and common sense, or even the undisputed facts of this

15  case.  Rather, it must apply the law as determined by the Supreme

16  Court and the Ninth Circuit.  Under this binding authority,

17  although the law clearly disadvantages plaintiffs after the fact

18  – by now requiring them to clear two hurdles in seeking parole

19  rather than one – there is no <u>Ex Post Facto</u> violation <u>unless</u>

20  plaintiffs can additionally show that the law creates a

21  "significant risk" that their incarceration will be increased.  <u>See</u>

22  _____

23      [38] Plaintiffs also assert that 70 percent of challenges to the
Governor's reversals "resulted in the prisoner obtaining relief."

24  The court is not clear as to what the assertions means, and in any
event, the assertion does not explain how that affects this case.

25      [39] It may well be that the frequency of reversal will vary

26  from Governor to Governor, that however, does not affect the risk
of prolonged incarceration.

Garner, 529 U.S. at 251 ("The question is whether the amended Georgia Rule creates a significant risk of prolonging respondent's incarceration").  That is because the earlier rule – recognizing that increasing such a burden implicated the Ex Post Facto Clause – is no longer the law.

In Thompson v. State of Utah, 170 U.S. 343 (1898), the Supreme Court held that increasing the petitioner's burden to obtain an acquittal than existed when the crime was committed, violated the Ex Post Facto Clause.  In that case, the crime of which petitioner was accused was committed at a time when he had a right to a trial by twelve (12) jurors, who had to reach a unanimous verdict in order to convict him.  By the time of his second trial however (his first conviction was overturned), a change in the governing law[40] permitted a trial by eight (8) jurors, who again had to reach a unanimous verdict in order to convict.  The Court held:

> In our opinion, the provision in the constitution of Utah providing for the trial in courts of general jurisdiction of criminal cases ... by a jury composed of

---

[40]   When petitioner's crime was committed, Utah was a territory, and thus was considered bound by the Sixth Amendment. At the time, it was thought that the Sixth Amendment required a twelve-person jury.  By the time of petitioner's second trial, Utah had become a state.  At the time, it was thought that States were not bound by the Sixth Amendment, and therefore no longer required to use twelve-person juries.  Later cases established that the Sixth Amendment does apply to the States, but that it does not require twelve-person juries.  Williams v. Florida, 399 U.S. 78, 103 (1970) (after petitioner was convicted by 6-person jury and sentenced to life in prison, Court holds that "the 12-man panel is not a necessary ingredient of 'trial by jury,' and that respondent's refusal to impanel more than the six members provided for by Florida law did not violate petitioner's Sixth Amendment rights as applied to the States through the Fourteenth").

1        eight persons, is ex post facto in its application to
2        felonies committed before the territory became a state,
       because, in respect of such crimes, the constitution of
3        the United States gave the accused, at the time of the
       commission of his offense, the right to be tried by a
4        jury of twelve persons, <u>and made it impossible to</u>
       <u>deprive him of his liberty except by the unanimous</u>
5        <u>verdict of such a jury</u>.

6 <u>Thompson</u>, 170 U.S. at 355 (emphasis added). In other words, an <u>Ex</u>

7 <u>Post Facto</u> violation occurred because, after the crime was

8 committed, the law imposed a heavier burden on petitioner to obtain

9 an acquittal: now the State had to convince only eight jurors to

10 convict, rather than twelve.[41]

11     The Supreme Court overruled <u>Thompson</u> in <u>Collins</u>:

12        The right to jury trial provided by the Sixth Amendment
       is obviously a "substantial" one, but it is not a right
13        that has anything to do with the definition of crimes,
       defenses, or punishments, which is the concern of the <u>Ex</u>
14        <u>Post Facto</u> Clause. To the extent that <u>Thompson v. Utah</u>
       rested on the <u>Ex Post Facto</u> Clause and not the Sixth
15        Amendment, we overrule it.

16 497 U.S. at 52. In <u>Collins</u>, the Court held that "a new law which

17 gave an appellate court the authority to reform an improper

18 verdict, where previously a defendant was entitled to a new trial,"

19 did not violate the <u>Ex Post Facto</u> Clause. That is because the

20 Clause does not prevent the State from retroactively making it more

21 difficult to be acquitted of a crime, so long as the law did not:

22        punish as a crime an act previously committed, which was
       innocent when done; ... make more burdensome the
23        punishment for a crime, after its commission; nor
       deprive one charged with crime of any defense available
24        according to law at the time when the act was committed.

25 _____

26     [41] Viewed another way, petitioner now had to convince 1 out of
8 jurors to acquit, rather than only 1 out of 12.

Id., overruling Kring v. Missouri, 107 U.S. 221 (1883), and Thompson v. Utah, 170 U.S. 343 (1898).[42]

The Collins ruling was foreshadowed by Mallett, in which the petitioner was convicted by the criminal court of a "conspiracy to cheat and defraud." See State v. Mallett, 125 N.C. 718, 34 S.E. 651, 651-52 (1899). Petitioner appealed to the superior court, which overturned the conviction and ordered a new trial. Id. 34 S.E. at 652; Mallet, 181 U.S. at 590 (Statement of Mr. Justice Shiras).[43]

At the time the crime was committed, the state had no right of appeal. Therefore, Petitioner would have been granted the possibility of an acquittal at the new trial. However, after the crime was committed, the state enacted legislation granting the state a right of appeal from decisions of the superior court. Mallett, 181 U.S. at 590 (Statement of Mr. Justice Shiras). The state exercised that right in Petitioner's case, and obtained a reversal of the Superior Court, "with directions that the sentence imposed by that court should be carried into execution." Id.

Petitioner appealed to the U.S. Supreme Court, asserting that

_____

[42] Thompson was overruled to the degree it held that retroactive procedural statutes violate the Ex Post Facto Clause unless they "'leave untouched all the substantial protections with which existing law surrounds the person accused of crime,'" Lynaugh, supra, at 959 (quoting 170 U.S., at 352).

[43] The superior court determined that the criminal court had allowed facts to be used against Petitioner even though the law prohibited their use, and because the trial judge failed to submit to the jury the question of whether the prosecution was barred by the statute of limitations. Mallett, 34 S.E. at 652.

1  the new law was <u>ex post facto</u> when it was applied to him.   The

2  specifics of Petitioner's argument is not set forth in the Court's

3  decision,  but  it  would  appear  that  the  new  law  interposed  an

4  additional hurdle for Petitioner to clear before he could get his

5  conviction overturned.   At the time the crime was committed, he

6  would  have  had  to  convince  only  the  superior  court  that  his

7  conviction should be overturned, which he did.   However, after he

8  was convicted, he also had to convince the state's Supreme Court

9  that his conviction should be overturned, which he failed to do.

10  The  U.S.  Supreme  Court  rejected  the  <u>ex post facto</u>  challenge,

11  finding that the law:

12         did not make that a criminal act which was innocent when
           done;  did  not  aggravate  an  offense  or  change  the
13         punishment  and  make  it  greater  than  when  it  was
           committed;  did  not  alter  the  rules  of  evidence,  and
14         require less or different evidence than the law required
           at the time of the commission of the offense; and did
15         not  deprive  the  accused  of  any  substantial  right  or
           immunity possessed by them at the time of the commission
16         of the offense charged.

17  <u>Mallett</u>, 181 U.S. at 597.

18         The  rule  this  court  must  apply,  then,  is  that  the  mere

19  placement of additional hurdles in the path of a prisoner seeking

20  parole is not, by itself, a violation of the <u>Ex Post Facto</u> Clause.

21  Accordingly, plaintiffs cannot be granted summary judgment on this

22  basis.   However, nothing in any of the above cases indicates that

23  this court must ignore these additional, retrospectively imposed

24  hurdles, if plaintiffs can show that they create a significant risk

25  that their incarceration will be increased.   Thus, plaintiffs have

26  the  right  to  present  evidence  regarding  the  issue  at  trial,  and

1 defendants have the right to rebut the case.

2        **3.  The Governor's actions.**

3        Plaintiffs seek summary judgment because, they assert, the

4 undisputed facts show that the Governor's exercise of his powers

5 under Proposition 89 has resulted in increased incarceration times

6 for plaintiffs.  <u>See</u> Plaintiffs' SJ Motion at 5.  However,

7 plaintiffs base their assertion on a theory that has already been

8 rejected by the Ninth Circuit.

9        As plaintiffs assert, it is undisputed that the Governor has

10 reversed over 70% of the parole grants issued by the Board, almost

11 all of which were for prisoners whose release date had already

12 passed.  After the Governor reversed the Board's decision, these

13 prisoners remained incarcerated, although they would have been

14 released if the Governor had not intervened.  Therefore, plaintiffs

15 argue, the undisputed facts show that these prisoners have actually

16 had their incarcerations prolonged by the Governor's exercise of

17 his Proposition 89 authority.

18       Unfortunately for plaintiffs, this perfectly logical argument

19 fails to come to terms with the reasoning of the Ninth Circuit in

20 <u>Gomez</u>, a habeas case in which a prisoner also challenged the

21 Governor's exercise of his authority under Proposition 89.

22       There, as here, the Board had made a decision to grant parole

23 under Proposition 89.  <u>Gomez</u>, 92 F.3d at 965.  There, as here, the

24 Governor reversed the decision.  <u>Id.</u>  However, since the Board did

25 not possess the "final power to decide," in that its decision was

26 subject to gubernatorial review, the Ninth Circuit reasoned that

1 there was no way to tell, "with certainty," if the Board would have

2 granted parole if Proposition 89 did not exist:

> In this case, Johnson is similarly unable to demonstrate
> that an increase in his punishment actually occurred
> ....   Johnson's case is like <u>Dobbert</u>, where the
> petitioner could only speculate whether the jury would
> have imposed a life sentence had it possessed the final
> power to decide.   Here, because the BPT's parole
> decision is not final until after the expiration of the
> thirty-day gubernatorial review period, it cannot be
> said with certainty that the BPT would have granted
> Johnson parole had it possessed the final review
> authority.

9 <u>Id.</u>, at 967 (citations omitted).[44]   In reaching this conclusion,

10 the Ninth Circuit adopted the reasoning set forth in a footnote in

11 <u>Dobbert</u>:

> For example, the jury's recommendation may have been
> affected by the fact that the members of the jury were
> not the final arbiters of life or death.   They may have
> chosen leniency when they knew that that decision rested
> ultimately on the shoulders of the trial judge, but
> might not have followed the same course if their vote
> were final.

16  432 U.S. at 294 n.7.

17      Accordingly, this court cannot grant summary judgment solely

18 on the undisputed facts that the plaintiffs were granted parole by

19 the Board and had those decisions reversed by the Governor.

20 Plaintiffs at trial will need to establish other facts tending to

21 show, sufficient to meet their burden of proof, that the Governor's

22 ////

23 ////

24 ─────────────────

25      [44] The Supreme Court clarified that the standard here is
whether the enactment creates a "significant risk" of increased
incarceration, rather than a "certainty" of increased
26 incarceration.   <u>See</u> <u>Garner</u>, 529 U.S. at 251.

1 actions created a significant risk of increased incarceration.[45]

2 **4. The Governor's Exercise of discretion.**

3 Finally, plaintiffs seem to argue that the Governor's exercise

4 of discretion is so much stricter than that exercised by the Board

5 at the time of plaintiffs' crimes, that this also violates the Ex

6 Post Facto clause.   The   resolution   of   this   question   seems

7 particularly difficult because the actual length of incarceration

8 depends upon the discretion of the decision-maker, whether it is

9 the Board or the Governor.  We are cautioned that:

> The presence of discretion does not displace the
> protections of the Ex Post Facto Clause, however.  The
> danger that legislatures might disfavor certain persons
> after the fact is present even in the parole context,
> and the Court has stated that the Ex Post Facto Clause
> guards against such abuse.

14 Garner, at 253 (citation omitted), citing Miller v. Florida, 482

15 U.S. 423, 435 (1987).

16 Despite this quoted language however, Garner does not stand

17 for the proposition that a change in the exercise of discretion is

18 a matter for the Ex Post Facto Clause.  What Garner addressed was

19 not "that discretion has been changed in its exercise," but that

20 "it will not be exercised at all." Id., at 254.  Moreover, the

21 case upon which Garner relies for its discretion discussion, Miller

22 v. Florida, similarly was not concerned with how discretion was

---

24   [45] For  example,  plaintiffs  may  be  able  to  show  that  the
Board's rate of parole grants did not change once Proposition 89
25 was enacted.  This would undermine any speculation that the Board
became more lenient only because it knew that the final decision-
26 maker, the Governor, could reverse their decision.

1  exercised, but rather the fact that discretion could no longer be

2  exercised at all until a newly interposed, "high hurdle" had been

3  cleared.  <u>Miller</u>, 482 U.S. at 435.[46]

4      In this case, plaintiffs do not present any evidence that the

5  Governor failed to exercise his discretion.[47]  Rather, they have

6  presented evidence that the Governor exercised his discretion in

7  a manner that resulted in a 70% reversal rate of parole grants by

8  the Board.  This cannot in itself be enough for this court to infer

9  that the Governor did not exercise his discretion.

10      Moreover, it is not enough for the court to find that there

11  was a significant risk of increased incarceration, as measured from

12  the time the crime was committed.  At the time the crimes were

13  committed, the punishment included a <u>discretionary</u> grant of parole.

14  _____

15      [46] As the Court stated:

16      Nor do the revised guidelines simply provide flexible
       "guideposts" for use in the exercise of discretion:
17      instead, they create a high hurdle that must be cleared
       before discretion can be exercised.
18

19  <u>Miller</u>, 482 U.S. at 435.

20      [47] Plaintiffs have produced no undisputed evidence that the
    Governor refuses to exercise his discretion at all, nor that he
21  reversed parole grants regardless of the circumstances, and without
    considering the factors he is required to consider.  The court
22  assumes, without deciding, that such conduct would illegally
    increase the penalty prescribed by law by changing the penalty from
23  "life with the possibility of parole" to "life without the
    possibility of parole."  Nor is there evidence that the Governor
24  is using proscribed criteria to make his parole decisions, such as
    "no parole unless at least 20 years have been served," or "no
25  parole unless Haley's Comet is in the sky."  The court assumes,
    without deciding, that such conduct would illegally increase the
26  penalty to "life without the possibility of parole for the first
    20 years," or "life with only a very remote possibility of parole."

1   That is the punishment assigned by law, and that is the punishment

2   that cannot be increased for these plaintiffs.[48]  The punishment

3   included no promise that the discretion would be exercised

4   liberally.  Even assuming that the discretion was exercised in a

5   profoundly more restrictive manner when plaintiffs came up for

6   parole, than it was at the time of the offense, this court knows

7   of no authority that this is prohibited by the Ex Post Facto

8   Clause.  Indeed, it is difficult to imagine this being the rule.

9       In essence, plaintiffs are asserting that the State may not

10  shift the parole decision-making authority to a person who will

11  exercise his discretion in a stricter manner than was being

12  exercised at the time of the offense.  The court knows of no legal

13  basis for this view.[49]  To the contrary, changes in the exercise of

14  _____

        [48] The Ex Post Facto Clause
15

16          forbids the imposition of punishment more severe than
            the punishment assigned by law when the act to be
17          punished occurred.  Critical to relief under the Ex Post
            Facto Clause is not an individual's right to less
18          punishment, but the lack of fair notice and governmental
            restraint when the legislature increases punishment
19          beyond what was prescribed when the crime was
            consummated.
20
    Weaver, 450 U.S. at 30-31 (emphases added).

21      [49] Plaintiffs implicitly seem to agree with this analysis.
    Plaintiffs' only request for relief set forth in the Complaint is
22  that the Governor review parole decisions "based on the same
    factors the Board is required to consider, as required by
23  [Proposition 89]."  Complaint ¶ 5.  In effect, plaintiffs seek an
    "obey the law" injunction. There is no request that the law be
24  declared in violation of the ex post facto clause, or that the
    Governor be required to decrease his reversal rate, or that he be
25  required to review more parole denials.  The only request sought
    is that the Governor be required to exercise his discretion as set
26  forth in Proposition 89.  Unfortunately for plaintiffs' summary

                                    49

discretion – sometime stricter, sometimes less strict – are
inherent in the very concept of discretionary parole:

> to the extent there inheres in _ex post facto_ doctrine
> some idea of actual or constructive notice to the
> criminal before commission of the offense of the penalty
> for the transgression, we can say with some assurance
> that where parole is concerned discretion, by its very
> definition, is subject to changes in the manner in which
> it is informed and then exercised. The idea of
> discretion is that it has the capacity, and the
> obligation, to change and adapt based on experience.
> New insights into the accuracy of predictions about the
> offense and the risk of recidivism consequent upon the
> offender's release, along with a complex of other
> factors, will inform parole decisions.

_Garner_, 529 U.S. at 253-254.[50]

Accordingly, even if it is true that the Governor is stricter
in granting parole, this is not a grounds for summary judgment for
plaintiffs, if the Governor is properly exercising his discretion
under the law.  However, plaintiffs are free to attempt to show at
trial, that the Governor is not actually exercising his discretion,
or that he is abusing it, solely for the purpose of denying parole
to prisoners.  Such a showing would tend to support the charge that

---

judgment motion, nothing they have submitted shows – beyond any
genuine dispute – that the Governor is not already doing so.
Rather, their evidence permits the court to draw the reasonable
inference that the Governor is simply reaching different
conclusions than the Board.

[50] At oral argument, the Court pondered whether the real-world
impact of politics on the Governors' decisions could play a role
in his parole decisions, since the Board is more insulated from
such considerations, whereas the Governor may feel under pressure
to opt for longer punishment to avoid the wrath of the voters.
Ultimately, however, this pressure is what democracy is all about.
Equally important, it only addresses _how_ the Governor chooses to
exercise his discretion, a matter that, as _Garner_ explains, is
contemplated by the very nature of "discretion."

1  the enactment, as applied, has created a significant risk that

2  plaintiffs' punishments are being increased retroactively.

3      **C.   Plaintiffs' Alternative Motion for Preliminary**

        **Injunction.**

4

5       Plaintiffs move for an order preliminarily enjoining

6  defendants from enforcing the provisions of Proposition 89, in the

7  event they are not granted summary judgment on the claim.  Although

8  plaintiffs have adduced sufficient evidence to survive summary

9  judgment, the court cannot find at this point, and to a preliminary

10  injunction standard, that plaintiffs are "likely" to succeed on the

11  merits of their Proposition 89 claim.  Accordingly, the court will

12  deny their alternate motion for a preliminary injunction.

13  **IV.   DEFENDANTS' MOTION FOR CLASS DECERTIFICATION**

14       Defendants assert that the remaining classes should be

15  decertified pursuant to <u>Wal-Mart</u>, 131 S. Ct. 2541.  Specifically,

16  they assert that under <u>Wal-Mart</u>, plaintiffs do not satisfy the

17  "commonality" requirement.

18       This court has previously found, and the Ninth Circuit has

19  affirmed, that plaintiffs satisfy the numerosity, commonality,

20  typicality and adequacy requirements of Rule 23(a).  <u>Gilman v.</u>

21  <u>Davis</u>, 2009 WL 577767 (E.D. Cal.) (Karlton, J.), <u>aff'd mem.</u>, 382

22  Fed. Appx. 544 (9th Cir. 2010).  Defendants do not challenge the

23  Rule 23(a) numerosity, typicality and adequacy findings, nor the

24  Rule 23(b)(2) findings, and they are re-affirmed here.  The only

25  issue therefore, is Rule 23(a) "commonality."

26       To establish commonality, plaintiffs must establish that "that

1  there are one or more questions of law or fact common to the

2  class." Ellis, 657 F.3d at 980 citing Fed. R. Civ. P. 23(a)(2).

3  It is sufficient that there be one common question "apt to drive

4  the resolution of the litigation." Wal-Mart, 131 S. Ct. at 2556

5  ("We quite agree that for purposes of Rule 23(a)(2) even a single

6  [common] question will do") (internal quotation marks omitted):

7          What matters to class certification ... is not the
           raising of common "questions" – even in droves – but,
8          rather the capacity of a classwide proceeding to
           generate common answers apt to drive the resolution of
9          the litigation. Dissimilarities within the proposed
           class are what have the potential to impede the
10         generation of common answers.

11  Wal-Mart, 131 S. Ct. at 2551.[51]

12      Here, plaintiffs have shown that there is a common question

13  that will affect every member of both classes: whether the

14  challenged Propositions, as applied, have retrospectively created

15  a significant risk that their punishment will be increased, by

16  retrospectively lengthening their terms of incarceration.

17  Moreover, they have adduced evidence from which the court could

18  infer that the application of these Propositions has created this

19  risk.[52]

20      Among the undisputed evidence plaintiffs presented to this

21  effect in regard to Proposition 89 is that the Governor reviews

22  every Board decision finding that a prisoner is "suitable" for

23  _____

24      [51]  Quoting Nagareda, Class Certification in the Age of
    Aggregate Proof, 84 N.Y.U.L. Rev. 97, 131–132 (2009).

25      [52]  At the extremes, the court could infer that their terms
    were retrospectively increased from life with the possibility of
26  parole, to life without the possibility of parole.

1   parole, but reviews almost no Board decisions finding that a
2   prisoner is "unsuitable" for parole.  See PSUF ¶ D.  In addition,
3   plaintiffs' undisputed evidence shows that the Governor has
4   reversed over 70% of the Board's decisions that prisoners were
5   "suitable" for parole, but that of the few "unsuitable"
6   determinations he reviewed, he affirmed 100% percent of them.  Id.,
7   ¶¶ D & E.

8       As for Proposition 9, plaintiffs have shown that the Board's
9   previous ability to carefully "tailor" the frequency of parole
10  hearings as been removed as to all plaintiffs, as discussed above.
11  They have also shown that the 90% or greater summary dismissal rate
12  of advance hearing petitions affects the class members as a whole,
13  as discussed above.

14      A declaration that the Governor has not properly applied
15  Proposition 89, and an injunction requiring him to do so, would
16  affect every member of the class, regardless of whether he has even
17  reached his parole eligibility date.  If plaintiffs can establish
18  that the application of Proposition 89 has created a significant
19  risk that their terms of incarceration would be increased -- and
20  especially if they can show that their sentences were increased to
21  life without the possibility of parole -- then the relief
22  plaintiffs seek would eliminate the significant risk of increased
23  punishment.  Accordingly, the court will not decertify the
24  remaining classes.

25  **VII. CONCLUSION**

26      For the foregoing reasons:

1        1.   Plaintiffs' motion for summary judgment or, in the

2   alternative, a preliminary injunction on Claim 9 (regarding

3   Proposition 89) (ECF No. 428), is **DENIED**;

4        2.   Defendants' motion for summary judgment on Claims

5   8 (regarding Proposition 9) and 9 (ECF No. 425), is **DENIED**;

6        3.   Defendants' motion to decertify the remaining

7   classes (ECF No. 426), is **DENIED**; and

8        4.   All currently scheduled dates in this matter are

9   **CONFIRMED.**

10       IT IS SO ORDERED.

11       DATED:  May 6, 2013.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

54