1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11   RICHARD M. GILMAN, et al.,        No.  CIV. S-05-830 LKK/CKD

12              Plaintiffs,

13        v.                           **ORDER**

14   EDMUND G. BROWN, JR., et al.,

15              Defendants.

16

17       Plaintiffs in this certified class action are inmates in

18   California state prisons who are serving terms of life

19   imprisonment with the possibility of parole.  Plaintiffs assert

20   that Propositions 9 and 89 have retrospectively increased their

21   punishments, in violation of the Ex Post Facto Clause of the U.S.

22   Constitution.

23       Proposition 9 amended California law to, among other things,

24   increase the time between parole hearings.  2008 Cal. Legis.

25   Serv. Prop. 9 (West), amending in pertinent part, Cal. Penal Code

26   § 3041.5(b)(3) (extending deferral periods) and (b)(4) and

27   (d) (advance hearings).  The class challenging this Proposition

28   consists of "'all California state prisoners who have been

1

sentenced to a life term with the possibility of parole for an offense that occurred before November 4, 2008.'"   ECF No. 340 ¶ 1.

Proposition 89 amended the California Constitution to grant the Governor the authority to review parole decisions of California's Board of Parole Hearings (the "Board"), regarding parole decisions of prisoners convicted of murder.  1988 Cal. Legis. Serv. Prop. 89 (West), <u>amending</u> Cal. Const. Art. V, § 8. The class challenging this Proposition consists of "'all California state prisoners who have been sentenced to a life term with possibility of parole for an offense that occurred before November 8, 1988.'"   ECF No. 340 ¶ 2.

The matter came on for trial before the undersigned from June 27, 2013 through July 2, 2013.  For the reasons that follow, the court finds that both Propositions, as implemented, have violated the <u>ex post facto</u> rights of the class members.

## I. THE <u>EX POST FACTO</u> CLAUSE

"The Constitution prohibits both federal and state governments from enacting any 'ex post facto Law.'"   <u>Peugh v. U.S.</u>, 569 U.S. ___, 133 S. Ct. 2072, 2081 (2013).[1]  For purposes of this case, an "<u>ex post facto</u>" law is one "'that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.'"   <u>Id.</u>, 133 S. Ct. at 2078 (quoting <u>Calder v. Bull</u>, 3 Dall. 386, 390, 1 L. Ed. 648 (1798)). "The key <u>ex post facto</u> inquiry is the actual state of the law at

---

[1] U.S. Constitution, Art. I, Sec. 10, cl. 1 ("No State shall … pass any … ex post facto Law"); U.S. Constitution, Art. I, Sec. 9, cl. 3 ("No … ex post facto Law shall be passed").

1   the time the defendant perpetrated the offense."  <u>Watson v.</u>
2   <u>Estelle</u>, 886 F.2d 1093, 1096 (9th Cir. 1989).  Accordingly, as
3   relevant to this case, the <u>Ex Post Facto</u> Clause is violated if
4   either Proposition, as implemented by the decision-maker – the
5   Board in the case of Proposition 9, or the Governor in the case
6   of Proposition 89 – creates a "significant risk" that its
7   retroactive application to the class would result in "a longer
8   period of incarceration" for them than they would have received
9   under the law in effect when their crimes were committed.  <u>See</u>
10  <u>Garner v. Jones</u>, 529 U.S. 244, 255 (2000); <u>see also</u>, <u>Peugh</u>, 133
11  S. Ct. at 2084 (a "retrospective increase in the [Sentencing]
12  Guidelines range applicable to a defendant creates a sufficient
13  risk of a higher sentence to constitute an <u>ex post facto</u>
14  violation").

15      **II. PROPOSITION 9: INCREASED TIME BETWEEN PAROLE HEARINGS**

16      The focus of this court's inquiry is fairly narrow, thanks
17  to a substantial body of law on the effect of the <u>Ex Post Facto</u>
18  Clause on retrospective changes in the availability of parole
19  hearings.

20      In <u>California Dept. of Corrections v. Morales</u>, 514 U.S. 499
21  (1995), the Supreme Court rejected an <u>ex post facto</u> challenge to
22  a 1981 amendment to Cal. Penal Code § 3041.5.  The amendment
23  abolished mandatory annual parole hearings for prisoners
24  convicted of more than one homicide, even when annual hearings
25  were mandatory when the crimes were committed.  Instead, the
26  enactment authorized the parole board to defer subsequent
27  suitability hearings for up to three years if the Board found
28  that it was "not reasonable to expect that parole would be

1  granted at a hearing during the following years." _Morales_, 514

2  U.S. at 503.

3      _Morales_ teaches that the mere fact that parole hearings are

4  less frequent than they were when a prisoner's crime was

5  committed, is not, by itself, sufficient to establish an _ex post_

6  _facto_ violation.  Rather,

7          the controlling inquiry … was whether
           retroactive application of the change in

8          California law created "a sufficient risk of
           increasing the measure of punishment attached

9          to the covered crimes."

10  _Garner_, 529 U.S. at 250 (quoting _Morales_, 514 U.S. at 509);

11  _Gilman v. Schwarzenegger_, 638 F.3d 1101, 1106 (9th Cir. 2011)

12  ("[a] retroactive procedural change violates the _Ex Post Facto_

13  Clause when it 'creates a significant risk of prolonging [an

14  inmate's] incarceration'").

15      Similarly, in _Garner_, the Supreme Court rejected an _ex post_

16  _facto_ challenge to the Georgia parole board's decision to do away

17  with mandatory parole hearings every three (3) years.  That board

18  amended its rules so that it could defer parole hearings for up

19  to eight (8) years.  "[T]he Board's stated policy is to provide

20  for reconsideration at 8-year intervals 'when, in the Board's

21  determination, it is not reasonable to expect that parole would

22  be granted during the intervening years.'"  _Garner_, 529 U.S. at

23  254.  However, the Board "could have shortened the interval" had

24  it wished to do so.  _Id._ at 248.

25      _Garner_ teaches that no _ex post facto_ violation will be found

26  where parole hearings can be at longer intervals than was the

27  case when the prisoner's crime was committed, but the parole

28  board has the discretion to conduct hearings at the same interval

4

1    it could when the prisoner's crime was committed.

2         Plaintiffs correctly point out that Morales and Garner are

3    not directly on point, because the challenged law changes

4    involved in those cases only authorized a longer deferral period,

5    and only when the Board determined that parole was not likely to

6    be granted in the intervening years.  Proposition 9, on the other

7    hand, does away with the previously authorized annual parole

8    hearings in all cases, even if the prisoner conclusively showed

9    that he would be suitable for parole in a year.  See Gilman, 638

10   F.3d at 1108 ("Proposition 9 eliminated the Board's discretion to

11   set a one-year deferral period, even if the Board were to find by

12   clear and convincing evidence that a prisoner would be suitable

13   for parole in one year").

14        In Gilman, the Ninth Circuit made clear that

15             Plaintiffs cannot succeed on the merits of
16             their ex post facto claim unless
               (1) Proposition 9, on its face, created a
               significant risk of increasing the punishment
17             of California life-term inmates, or (2)
               Plaintiffs can "demonstrate, by evidence
18             drawn from [Proposition 9's] practical
               implementation ..., that its retroactive
19             application will result in a longer period of
               incarceration than under the [prior law]."
20

21        Gilman, 638 F.3d at 1106 (quoting Garner, 529 U.S. at 255).

22   The Ninth Circuit reversed this court's grant of a preliminary

23   injunction for plaintiffs, finding that even if plaintiffs could

24   show that there was a significant risk of longer incarceration

25   under Proposition 9, plaintiffs failed to establish that the

26   "advance hearing" procedure did not avoid that problem.

27        In a recent case addressing the Sentencing Guidelines, the

28   Supreme Court made clear that it meant what it said in Garner,

5

1  that is, a law that creates a sufficient risk of retrospectively

2  increasing a prisoner's sentence is a violation of the Ex Post

3  Facto Clause.  Peugh, 133 S. Ct. at 2084.

4      **A. Increased Deferral Periods: Findings.**

5          1. On November 4, 2008, California voters approved

6  "Proposition 9," also known as "the Victims' Bill of Rights Act

7  of 2008: Marsy's Law."  See In re Vicks, 56 Cal. 4th 274, 278

8  (2013).

9          2. The law became effective "immediately,"[2] and was

10 made expressly applicable "to all proceedings held after" its

11 effective date.  2008 Cal. Legis. Serv. Prop. 9, § 10 (West). The

12 board, however, did not instantaneously implement the new law.

13 Rather, the Board implemented the law – that is, started using

14 Proposition 9 to determine the deferral periods – on December 15,

15 2008.  Exh. 1 (ECF No. 259-1) at 7 (Exhibit A to Exh. 1).

16         3. As relevant here, Proposition 9 "amended

17 section 3041.5 [of the California Penal Code] to increase the

18 time between parole hearings."  Vicks, 56 Cal. 4th at 283.

19         4. Before Proposition 9, life prisoners received annual

20 parole suitability hearings, as required by the prior versions of

21 Cal. Penal Code § 3041.5, unless the Board found that it was not

22 reasonable to expect that parole would be granted during the

23 following year.  In those cases, the Board deferred the next

24 ────────────────────

25 [2] According to Vicks, the law became effective "immediately."
   Vicks, 56 Cal. 4th at 278.  The California Constitution provides

26 that amendments effected by initiative become effective "the day
   after the election unless the measure provides otherwise."  Cal.

27 Const. Art. XVIII, § 4; Californians For An Open Primary v.
   McPherson, 38 Cal. 4th 735, 743 (2006) (same).

28

1   parole hearing for up to two years, and for up to five years for

2   prisoners convicted of murder, as authorized by the old law.   See

3   1994 Cal. Legis. Serv. Ch. 560, § 1 (S.B. 826) (West), amending

4   Cal. Penal Code § 2041.5(b)(2)(A).

5   5. All the crimes for which Proposition 9 class members

6   were convicted occurred before Proposition 9.[3]   ECF No. 340 ¶ 1.

7   _____

8   [3] The court notes that crimes that could result in life terms
    that were committed at different times were covered by different

9   versions of the parole hearings law.  No party has suggested, or
    directed the court to evidence suggesting, that any class

10  member's crime was committed at a time when there was no right to
    periodic review of parole hearings, or when the deferral periods

11  were longer than those provided for in Proposition 9.

12  Before 1972, California prisoners had a right, established by
    case law, to "periodic" review of parole decisions, although

13  there does not appear to have been any particular time period
    within which the review had to occur.  See In re Jackson, 39

14  Cal. 3d 464, 469-70 (1985).

15

16  Between 1972 and July 1, 1977, California prisoners were
    entitled, by policy of the parole board, to annual parole

17  reconsideration, "'except in certain extreme cases where
    reconsideration of parole may be postponed for two or three

18  years.'"  See Jackson, 39 Cal. 3d at 470.

19  On July 1, 1977, the California Determinate Sentencing Law
    ("DSL") went into effect.  Watson, 886 F.2d at 1094 (citing

20  Jackson, 39 Cal. 3d at 467).  Under this enactment, all inmates
    incarcerated on or after that date were statutorily entitled to

21  annual parole hearings, without exception.  Id.

22  In 1981, California enacted an exception to the annual parole
    review requirement, permitting the Board to defer the next parole

23  hearing for three years if the prisoner had been convicted of
    "more than one offense which involves the taking of a life," and

24  the Board found, stating its bases in writing, that it was "not
    reasonable to expect that parole would be granted at a hearing

25  during the following years."  Watson, 886 F.2d 1093.

26

27  In 1990, California amended Section 3041.5 to "permit the Board
    to schedule the next hearing no later than 5 years after any

28  hearing at which parole is denied if the prisoner has been

7

1    The class members were all convicted and sentenced to life in

2    prison with the possibility of parole, before Proposition 9.

3    After Proposition 9, all Proposition 9 class members remained

4    sentenced to life in prison with the possibility of parole. See

5    Undisputed Facts ("UF"), Final Pretrial Order (ECF No. 473)

6    ¶ III(2) (hereinafter "UF ¶ 2").

7         6. In the two-year period before Proposition 9 was

8    implemented, January 2007 through December 2008, the Board held

9    approximately 6,550 parole suitability hearings for life

10   prisoners.  Parole was granted in approximately 6.4% of the

11   hearings.  Of the cases in which parole was denied, two-thirds

12   resulted in one- or two-year deferrals; approximately 34.7

13   percent resulted in one-year deferrals and approximately 31.5

14   percent resulted in two-year deferrals.  UF ¶ 5.

15        7. The deferrals for those years were governed by the

16   1994 amendments to Cal. Penal Code § 3041.5.  1994 Cal. Legis.

17   Serv. 560 (SB 826) (West).  Under that law, the Board was

18   required to hold annual parole hearings unless "the Board finds

19   that it is not reasonable to expect that parole would be granted

20   at a hearing during the following year."  Id.[4]  Therefore, it is

21   convicted of more than 2 murders."  1990 Cal. Legis. Serv. 1053

22   (SB 560) (West).

23   In 1994, California amended Section 3041.5 to "require that the
     hearing be held no later than up to 5 years after the hearing

24   denying parole if the prisoner has been convicted of murder."
     1994 Cal. Legis. Serv. 560 (SB 826) (West).

25

26   [4] The court is aware of the evidence in the record indicating
     that some prisoners agree that they are not currently suitable

27   for parole, and "stipulate" to a deferral period of, say, one
     year.  Neither side has directed the court's attention to any

28   evidence that in such cases the Board agrees to such a

1   a reasonable inference that the parole board found that for the
2   life prisoners whose parole hearings came before them during that
3   time, it <u>was</u> reasonable to expect that parole would be granted
4   for 35% of them after one year.

5       8. Under the same law, where the Board found that an
6   annual review was not warranted, it was required to impose a
7   deferral of two years, unless "the Board finds that it is not
8   reasonable to expect that parole would be granted at a hearing
9   during the following years [up to five years for prisoners
10  convicted of murder]."   <u>Id.</u>   Therefore, it is a reasonable
11  inference that the Board found that for the 32% of life prisoners
12  whose parole hearings resulted in two year deferrals during that
13  time, it was reasonable to expect that parole would be granted
14  for them after two years.   Otherwise, the deferral periods would
15  have been 3, 4 or 5 years pursuant to the statute.

16      9. It is, further, a reasonable inference that of all
17  the inmates who had parole hearings during the two years prior to
18  implementation of Proposition 9, about two-thirds of them were
19  determined by the Board to be ready for parole within one or two
20  years.

21      10. In the two-year period after Proposition 9 was
22  implemented, January 2009 through December 2010, the Board held
23  approximately 6,100 hearings.   At those hearings, parole was

24  _____

25  stipulation even when it is not reasonable to expect that parole
    would be granted during that year.   Nor has either side directed
26  the court's attention to evidence showing what percentage of
    these 6,550 deferrals were stipulated.   Accordingly, the court
27  does not, for these purposes, distinguish between stipulated
    deferrals and those imposed by the Board.

28

granted in approximately 17 percent of the cases.[5]  Of the cases

in which parole was denied, approximately 48.4 percent resulted

in the lowest deferral possible under Proposition 9, three years.

UF ¶ 6.[6]

11.  For the period 2007 to 2008, before the passage of

Proposition 9, the average deferral period for all life prisoners

who were denied parole at their hearing, was 2.3 years.  See

Plaintiffs' Exh. 51.[7]  Approximately 35% of those deferrals were

for the minimum period allowed by law, one year.  An additional

32% of the deferrals were for two years.  UF ¶ 5.

12.  Following the passage of Proposition 9, the average

deferral periods for all life prisoners decided under the new law

were as follows:  4.84 years in 2009; 5.11 years in 2010; 5.08

years in 2011; 4.42 years in 2012.  See Defendants' Exh. U.[8]

---

[5] Neither side offers an explanation for why the parole rate
almost trebled.  With no evidence on it, there is no way for the
court to consider this fact except to speculate.  For example,
the Board may have been reluctant to impose a 3-year deferral on
someone it believed would be ready for parole within the year,
and therefore granted parole immediately.  Or, there could simply
have been a backlog of inmates ready for parole.  However, this
is entirely speculation, and plays no part in the court's
decision.

[6] The parties included a recounting of several cases, in which
the prisoners requested advanced hearings.  To the degree the
cases seem relevant to an issue in the case, they are discussed
or footnoted below.

[7] This number is the weighted average of the deferral periods
disclosed in Plaintiffs' Exhibit 51.  The average is a little
fuzzy, because Exhibit 51 does not specify what dates in 2007 to
2008 are included.

[8] These numbers are the weighted averages of the deferral periods
disclosed in Defendants' Exhibit U.

1 Almost 56% of those deferrals were for the minimum period then

2 allowed by law, three years.  <u>See</u> Defendants' Exh. U.

3       **B. Increased Deferral Periods: Conclusions.**

4       The evidence shows that the average deferral times for

5 Proposition 9 class members has increased since the

6 implementation of that law.  The Ninth Circuit cautioned however,

7 that it was not correct simply to assume that "more frequent

8 parole hearings produce more frequent <u>grants</u> of parole rather

9 than more frequent <u>denials</u> of parole."  <u>Gilman</u>, 638 F.3d at 1108

10 n.6 (emphasis in text).

11       The evidence adduced at trial shows however, that the

12 increased deferral periods did not happen randomly, or only to

13 those prisoners least likely to be granted parole.  Rather, the

14 evidence shows that in the two years prior to Proposition 9, the

15 Board imposed deferral periods of one or two years on two-thirds

16 of all the prisoners who were denied parole.  These are the

17 prisoners who are the <u>most</u> likely to be paroled within a year or

18 two.  That is because the statute in effect at the time

19 contemplated that the Board would grant deferrals of one or two

20 years only when there was a reasonable expectation that the

21 prisoner would be ready for parole within that time.  <u>See</u> 1994

22 Cal. Legis. Serv. 560 (West).

23       Of course, those prisoners were under no guarantee of

24 release on parole.  However, if the statute had any meaning, and

25 the Board applied the statute as written, then it is a reasonable

26 inference that there existed a reasonable expectation that those

27 prisoners would be paroled within the following year or two, if

28 they could get to a parole hearing during that time.  Yet, under

1  Proposition 9, these same prisoners cannot get to a hearing

2  before at least three years, the new minimum deferral period.

3  Cal. Penal Code § 3041.5(b)(3)(C).  It follows that since there

4  was a reasonable expectation that these prisoners would be

5  paroled within one or two years, but Proposition 9 prevents them

6  from getting to a hearing before three years, there is a

7  significant risk that their incarcerations are being lengthened

8  by Proposition 9.

9      Even as to those prisoners who received deferral periods of

10  three, four or five years under the old law, Proposition 9 has

11  created a significant risk of longer incarceration.  Under the

12  old law, deferrals of three or four years would be imposed if the

13  Board determined that there was a reasonable expectation that the

14  prisoner would be paroled during that time.  In other words, at

15  the time their crimes were committed, these prisoners'

16  incarcerations (beyond a minimum term), were to continue only as

17  long as the Board found that the prisoner was not suitable for

18  parole.

19      Under Proposition 9 however, the prisoner's incarceration

20  would continue indefinitely, unless the Board found "clear and

21  convincing evidence" that he was suitable for parole in 3, 5, 7

22  or 10 years.[9]  "Clear and convincing evidence," the Proposition 9

23  standard, refers to a quantum and quality of evidence that "could

24  place in the ultimate factfinder an <u>abiding conviction</u> that the

25  truth of its factual contentions are '<u>highly probable</u>.'"

26  _____

27  [9] No particular showing is required, under Proposition 9, to get
    a hearing after a 15-year deferral.

28
                                    12

Colorado v. New Mexico, 467 U.S. 310, 316 (1984) (emphases added).

Since the old law and Proposition 9 are thus governed by these two completely different standards, it is quite possible that a prisoner could satisfy the old-law standard, but never satisfy the Proposition 9 standard.

Indeed, this logically seems to be at greatest risk when dealing with those subjected to the longest deferral periods, those deferred for 3, 4 or 5 years under the old law.  Such prisoners, independently of how often they could get to a parole hearing, would have little chance of ever giving the Board an "abiding conviction" that it was "highly probable" that they were suitable for parole.

The court therefore concludes that Proposition 9 has created a significant risk of imposing a longer incarceration on the class than was the case when their crimes were committed.  This conclusion is drawn from the evidence presented at trial, and the reasonable inferences arising from it.  However, the plaintiffs further attempted to buttress their case by presenting actual accounts of prisoners whose incarcerations, they assert, were lengthened by Proposition 9.  It is to that showing that court now turns, keeping in mind that at the preliminary injunction stage, the Ninth Circuit found that plaintiffs had, to that date, "produced no evidence to support a finding that more frequent parole hearings result in more frequent grants of parole." Gilman, 638 F.3d at 1108 n.6.

////

////

13

### C. The <u>Rutherford</u> Litigation: Findings.

A somewhat detailed description of the <u>Rutherford</u> litigation is useful because plaintiffs argue that a subset of the class certified in <u>In re Rutherford</u> (Cal. Super. Ct., Marin County, No. SC135399A), is representative of the Proposition 9 class certified in this case, while defendants argue that there is insufficient evidence to conclude that the <u>Rutherford</u> subset is representative. Describing how the <u>Rutherford</u> class and subset came into being is helpful in determining whether the <u>Rutherford</u> subset is representative of the Proposition 9 class in this case.

13. On February 25, 2003, California life prisoner Jerry Rutherford was denied parole, and given a one-year deferral until his next hearing, pursuant to Cal. Penal Code § 3041.5, as it then existed. <u>See In re Lugo</u>, 164 Cal. App. 4th 1522, 1529 (1st Dist. 2008).[10]  However, the Board failed to provide Rutherford a parole hearing during the next year, although required to do so by the law in effect at the time. Exh. 53 (admitted, over objection, at RT 30) (ECF No. 343-9) ("Stipulated Testimony of Thomas Master") ¶ 2.[11]

14. On May 26, 2004, Rutherford filed a petition for habeas corpus in California state court, <u>In re Rutherford</u> (Cal.

---

[10] Petitioner Lugo was substituted in as class representative after Rutherford's death. <u>Id.</u>, at 1532.

[11] The parties stipulated that, if called to testify, Thomas Master would testify as described in Exhibit 53. ECF No. 343-9. At trial, with Master on the stand, defendants objected to the Stipulated Testimony on hearsay grounds. RT 30. The objection was overruled because Master was on the stand and was available to be cross-examined on the Stipulated Testimony. <u>Id.</u>

1  Super. Ct., Marin County, No. SC135399A), challenging the delay

2  in his parole hearing.  Lugo, 164 Cal. App. at 1529.

3       15. On November 29, 2004, the California Superior Court

4  hearing Rutherford certified a class of "all prisoners serving

5  indeterminate terms of life with the possibility of parole who

6  have approached or exceeded their minimum eligible parole dates

7  without receiving their parole hearings within the time required

8  by sections 3041 and 3041.5."  Lugo, 164 Cal. App. at 1530.

9       16. After the Rutherford class was certified, "the

10  Board stipulated that it was not providing timely parole

11  consideration hearings as required by the Penal Code."  Lugo, 164

12  Cal. App. at 1530.

13       17. On March 22, 2006, the parties agreed to a remedial

14  plan intended to reduce the backlog of parole hearings.  Lugo,

15  164 Cal. App. at 1532.

16       18. When Proposition 9 was implemented, on December 15,

17  2008, life prisoners were still having their parole hearings

18  delayed beyond the dates when they should, by law, have occurred.

19  Because of this general timeliness problem the Board was having,

20  there arose a subset of the Rutherford class ("the Rutherford

21  subset"), who should have had their parole hearings conducted

22  under the old law, before Proposition 9's implementation, but who

23  in fact did not (or would not) receive their hearings until after

24  implementation.  See Exh. 1, Exhibit A (Rutherford Stipulation)

25  (ECF No. 259-1) at 7 (admitted over objection at RT 26).  Their

26  hearings were (or were scheduled to be) conducted under

27  Proposition 9.

28       19. To avoid having their hearings decided under

1    Proposition 9, the Rutherford subset sought a preliminary

2    injunction enjoining the Board from implementing Proposition 9 as

3    to them.  See id., Exhibit A at 7.

4         20. The preliminary injunction proceeding was settled

5    with a stipulation.  Prisoners who qualified for the stipulation

6    were those prisoners in the Rutherford subset whose pre-

7    Proposition 9 hearings were delayed until after Proposition 9,

8    because of reasons attributable to the State, or because of

9    "exigent circumstances,"[12] and those whose hearings commenced

10   before Proposition 9, but which were continued to a date after

11   Proposition 9.  Exh. 1, Exhibit A at pp. 9-10 ¶ 4(a)-(d); Exh. 53

12   at ¶ 6.  Excluded from this stipulation were those Rutherford

13   subset members who were granted parole or who elected to waive or

14   postpone their hearings through no fault of the Board or exigent

15   circumstances.  Exh. 53 ¶ 6.

16        21. Under the stipulation, all qualifying Rutherford

17   subset members who should have had their parole hearings

18   conducted before December 15, 2008 under the old law, were

19   granted hearings governed by the old law, even if those hearings

20   occurred after the implementation of Proposition 9.  Master Decl.

21   (Exh. 1) ¶ 5.  Further, in the event the life prisoner's delayed

22

23   [12] Exigent circumstances are (a) natural disaster, (b) institution
     security or medical lockdown/quarantine, (c) illness or emergency
24   of an essential party, (d) power outage or equipment failure,
     (e) prisoner medically or psychiatrically unavailable,
25   (f) attorney not prepared to proceed or became unavailable after
     hearing was scheduled.  Exhibit A at p.9 ¶ 4(c) & p.14.  This
26   group includes prisoners who postponed their hearings to a date
     before Proposition 9, but the hearing was not provided before
27   Proposition 9.

28

hearing had already been conducted under Proposition 9, and parole had been denied, the Board agreed to re-calculate the deferral period using the old law.  Id.[13]  In other words, the 3-, 5-, 7-, 10- and 15-year deferrals under Proposition 9 would be recalculated to 1-, 2-, 3-, 4- or 5-year deferrals under the old law.

22. The parties in <u>Rutherford</u> stipulated that 442 such prisoners, identified at Exh. 20 (admitted per PTO), were covered by the stipulation.  UF ¶ 14; (RT 26-29, Master testimony).

23. Of the 442 prisoners who received the modifications, 305 had, as of March 2011, received their subsequent hearings after the modifications; of those 305 prisoners, 51 (16.7%) were granted parole at their hearings.  UF ¶ 15.

24. In addition to the 442 prisoners who received modifications of their Proposition 9 deferrals to old-law deferrals due to the Rutherford litigation, there were 408 other prisoners who had been entitled to their hearings before Proposition 9 but had not yet had their hearings at the time Proposition 9 was implemented; pursuant to a stipulation in the

---

[13] Some covered prisoners chose to stipulate to a deferral period, rather than go forward with their delayed, Proposition 9 parole hearing.  In those cases, all the new, old-law deferral periods were set by agreement.  Master Decl. ¶ 10.  For those convicted of murder: all 3-year stipulations were converted to 1-year, 5-year stipulations to 2-years, 7-years to 3-years, 10-years to 4-years, and 15-years to 5-years.  Master Decl. ¶ 10.  For those not convicted of murder: all 3-year stipulations were converted to 1-year (identically with those convicted of murder), and all other stipulated deferrals (5-, 7-, 10- and 15-year deferrals), were converted to 2-year deferrals.  Id.

1    <u>Rutherford</u> case, those prisoners' first post-Proposition 9

2    hearings were to be governed by the old law.  As of April 6,

3    2011, of those 408 prisoners, 247 were denied parole and given

4    old-law (one- to five-year) deferrals.  As of April 6, 2011, 88

5    of the 247 had reached their next hearing (because they had

6    received only one- or two-year deferrals at their first post-

7    Proposition 9 hearings), and 25 (28 percent) were granted parole

8    at their hearings.  UF ¶ 16.

9        25. Of the 240 prisoners in the <u>Rutherford</u> subset who

10   received or stipulated to the minimum 3-year deferral under

11   Proposition 9, (a) 102 had their deferral dates reduced to the

12   minimum 1-year deferral in a hearing under the old law,[14] (b) 60

13   had their deferral dates reduced to a 2-year deferral (the

14   second-shortest deferral) in new hearings under the old law, and

15   (c) none had their deferral dates stay the same or get increased

16   using the old law.  Exh. 20 (admitted per PTO).[15]  Parole was

17   granted in 43 of those cases.  Exh. 54 (admitted at RT 32).[16]  As

18

19   [14] An additional 78 <u>stipulated</u> to parole unsuitability for 3 years

20   at their Proposition 9 hearings.  Exh. 20 at 43-49 (entries with
     "S" in the decision column are these stipulations).  In that

21   case, the old-law deferral period was reduced to one year by
     agreement, apparently without the need for a new hearing

22   conducted under the old law.  Exh. 1 at 10 ¶ 10.

23   [15] Exhibit 20 is a chart of the prisoners covered by the

24   <u>Rutherford</u> stipulation.  It includes a column that shows the
     original deferral date calculated under Proposition 9 ("Original

25   Hearing Info / Result Length"), and a column that shows the new
     deferral date, calculated under the old law ("Modified Hearing

26   Info / Length").  <u>See</u> RT 27-28.

27   [16] Exhibit 54 is a summary chart showing parole grants after the

     <u>Rutherford</u> modifications.
28

noted above, the Board's decision to defer a parole hearing for
only one or two years is made when there is a reasonable
expectation that the prisoner will be granted parole during the
next year or two.  The conclusion appears to be inescapable,
then, that for most of those 240 prisoners (that is, 162 of them,
which excludes those subject to the agreed-to deferrals), there
was a reasonable expectation that they would be granted parole in
one or two years.  Yet, if their Proposition 9 deferrals had
stood, they would have been unable to even get to a parole
hearing for three years.

26.  Of the 104 prisoners in the Rutherford subset who
received or stipulated to a five (5) year deferral under
Proposition 9, seventy-four of them had their deferral periods
re-calculated under the old law.[17]  As a result, (a) one had the
deferral reduced to the 1-year minimum, (b) forty-eight had their
deferrals reduced to two years, the next-shortest available,
(c) seventeen had their deferrals reduced to 3 years, and
(d) eight had their deferrals reduced to 4 years in new hearings
conducted under the old law.  None had their deferrals stay the
same, and it was not possible to get a greater deferral under the
old law.  Exhs. 20 & 54.  Therefore, for most of these prisoners
(74, which excludes those subject to agreed-to deferrals), there
was a reasonable expectation that they would be granted parole in
one to four years.  Yet, if their Proposition 9 deferrals had

---

[17] An additional thirty of these prisoners stipulated to 5-year
deferrals under Proposition 9, and so their deferrals were
reduced to 2-year old-law deferrals by agreement.  See Exhibit A,
¶ 10.

1  stood, they would have been unable to even get to a parole

2  hearing for five years.

3       27.  Of the 53 prisoners in the <u>Rutherford</u> subset who

4  received or stipulated to a seven (7) year deferral under

5  Proposition 9, thirty-nine had their deferral periods re-

6  calculated under the old law.[18]  As a result, (a) none received

7  either the 1-year minimum or the 5-year maximum deferral, (b) six

8  had the deferral reduced to 2 years, the next shortest deferral

9  under the old law, (c) seventeen had their deferrals reduced to

10  three (3) years, and (d) 16 had their deferrals reduced to 4

11  years.  Exhs. 20 & 54.  It was not possible to get an equal or

12  longer deferral under the old law.  Therefore, for most of these

13  prisoners, there was a reasonable expectation that they would be

14  granted parole in one to four years.  Yet, if their Proposition 9

15  deferrals had stood, they would have been unable to even get to a

16  parole hearing for seven (7) years.

17       28. The 31 prisoners in the <u>Rutherford</u> subset who

18  received a ten (10) year deferral (the next-to-longest deferral

19  possible) under Proposition 9, all had their deferrals re-

20  calculated under the old-law.[19]  As a result, (a) none received

21  the 1-year minimum deferral, (b) somewhat surprisingly, six (6)

22  had the deferral reduced to 2 years, the next shortest deferral

23  _____

24  [18] An additional fourteen of these prisoners stipulated to 7-year
deferrals under Proposition 9, and so their deferrals were
reduced, by agreement, to 2-year old-law deferrals, or 3-year

25  old-law deferrals if their convictions were for murder.  <u>See</u>
Exhibit A, ¶ 10.

26

27  [19] According to Exh. 20, none of these prisoners stipulated to
deferrals under Proposition 9.

28

1  under the old law,[20] (c) 20 had their deferrals reduced to four

2  (4) years and (d) 5 had their deferrals reduced to 5 years, the

3  maximum deferral under the old law.  Exhs. 20 & 54.  It was not

4  possible to get an equal or longer deferral under the old law.

5       29. Therefore, for the majority of these prisoners (26

6  out of 31), there was a reasonable expectation that they would be

7  granted parole in one to four years.  Yet, if their Proposition 9

8  deferrals had stood, they would have been unable to even get to a

9  parole hearing for ten (10) years.

10      30.  Of the 14 prisoners in the Rutherford subset who

11  received the maximum, 15-year deferral under Proposition 9,

12  (a) none received the 1-year minimum deferral, (b) somewhat

13  remarkably, five (5) had the deferral reduced to 2 years, the

14  next shortest deferral under the old law, (c) none had their

15  deferrals reduced to 3 years, (d) one had the deferral reduced to

16  four (4) years and (d) eight (8) had their deferrals reduced to 5

17  years, the maximum deferral under the old law.  Exhs. 20 & 54.

18  It was not possible to get an equal or longer deferral under the

19  old law.

20      31. Thus, most of those who received the maximum, 15-

21  year, deferral under Proposition 9, also received the maximum, 5-

22  year, deferral under the old law.  The law thus imposed an

23  irrebutable presumption on these prisoners that they would not be

24  _____

25  [20] This is the old-law deferral these six would have received by
    agreement, if they had stipulated to deferrals under

26  Proposition 9, and if their commitment offenses were other than
    murder.  Without this agreement, it seems surprising that their

27  next-to-longest deferrals would be re-calculated to the next-to-
    shortest level.

28

1  suitable for parole for 15-years, removing the old-law

2  possibility that at least every five years, the prisoner could

3  demonstrate suitability.

4      32. As for the five prisoners whose deferrals dropped

5  from 15 years under Proposition 9 to 2 years under the old law,

6  the reduction seems remarkable because having received the

7  maximum, 15-year deferral under Proposition 9, these five

8  prisoners received the next shortest deferral available under the

9  old law.  It is a reasonable inference from this that in December

10 2008 and January 2009, the Board did not have "clear and

11 convincing evidence" that those prisoners would be ready for

12 release for the next 15 years.  Yet, making the calculation under

13 the old law about three months later (in March and April 2009),

14 the Board concluded that these same prisoners would be ready for

15 release within 2 years.  Exh. 20.

16     33. These five prisoners may thus have played out the

17 disturbing scenario mentioned earlier, namely that prisoners who

18 would be paroled under the old law could never show with the

19 "clear and convincing evidence" required by Proposition 9, that

20 they were ready for parole.[21]

21     34. There exists a separate group of 408 prisoners who

22 also had post-Proposition 9 deferrals decided under the old law.

23 Exh. 56 (ECF No. 343-12) (admitted at RT 117).  Of the 247

24 prisoners in that group who were denied parole, 91 received the

25 ────────────────
[21] These five (Ambers, Pinell, Storey, Case and Martin) are not
26 recorded as having stipulated to a deferral.  See Exhibit 20.
   Had they stipulated, and if their crimes were other than murder,
27 then the deferral would have dropped from 15 years to 2 years
   under the Rutherford agreement.

28

1   minimum one-year deferrals, and 22 of them were granted parole.

2   Id.  Of the group, 87 received 2 year deferrals (the next

3   shortest under the old law), and 2 of them were granted parole.

4   Id.

5       35. The actual effect of Proposition 9 on a sample

6   group of life prisoners affected by the Rutherford litigation is

7   set forth below.  See Exh. 20 & 55 (binder) (all columns except

8   the last two admitted at RT 222-23).[22]

9           a. Life prisoner A. Taylor (Exh. 20 ¶ 300)

10  received a Proposition 9 parole hearing in January 2009.  Taylor

11  was denied parole, and given the minimum deferral permitted under

12  Proposition 9, three years, on January 2012.  However, because

13  the prisoner was covered by the Rutherford litigation, the Board

14  re-calculated the deferral, using the old law.  Using the old

15  law, the Board deferred Taylor's hearing two (2) years, or until

16  January 2011.  This meant that the Board believed that there was

17  a reasonable chance that the prisoner would be granted parole in

18  two years (otherwise, it was required by the old law to defer the

19  hearing 3, 4 or 5 years).  In fact, the Board granted Taylor

20  parole at the January 2011 hearing, and the prisoner was released

21  on parole in June 2011.  Thus, Taylor was released under the old

22  law before a parole hearing could even have occurred under

23

24  _____

25  [22] The court determined that the last two columns, although not
    admitted as evidence, represented what the witness, Monica Knox,

26  would have testified to, if the court were inclined to drag out
    the trial.  RT 222-23.  Defendant was granted the opportunity to

27  cross-examine the witness on those columns as if she had so
    testified in court.

28

1   Proposition 9.[23]

2           b. Life prisoner H. Tuey (Exh. 20 ¶ 152) received

3   a Proposition 9 parole hearing in December 2008.  Tuey was denied

4   parole, and given the minimum 3-year deferral permitted under

5   Proposition 9, to December 2011.  However, because the prisoner

6   was covered by the Rutherford litigation, the Board re-calculated

7   the deferral under the old law.  Using the old law, the Board

8   gave Tuey the minimum 1-year deferral, to December 2009.  This

9   meant that the Board believed that there was a reasonable chance

10  that Tuey would be granted parole the following year (otherwise,

11  it was required by the old law to defer the hearing 2, 3, 4 or 5

12  years).  In fact, the Board granted Tuey parole at the

13  December 2009 hearing, and the prisoner was released on parole in

14  May 2010.  Thus, Tuey was released under the old law one and one-

15  half years before the next parole hearing could even have

16  occurred under Proposition 9.[24]

17          c.   Life prisoner A. Flores (Exh. 20 ¶ 302)

18  received a Proposition 9 parole hearing in December 2008, but

19  was denied parole, and given a seven (7) year deferral, to

20  ────────────────────────

    [23] Similar results obtain for seven (7) other life prisoners
21  identified by plaintiffs, namely, P. Guerrero, J. Morales,
    R. Willis, R. Morton, R. DeCid, N. Powell and G. Balaoing.
22
    [24] Similar results obtain for 42 other life prisoners identified
23  by plaintiffs, namely, I. Kegler, R. Anderson, Curry, M. Arthur,
    S. Law, P. Syzemore, D. James, R. Hamilton, C. Henderson,
24  G. Zavala, R. Perez, R. Stewart, O. Boone, C. Salgado, G. Rounds,
    G. Counts, A. Saucedo, A. Marin, E. Reams, B. Barnard,
25  T. Pacheco, B. Jackaway, J. Anderson, J. Moreno, J. Acosta,
    B. Weatherly, T. Davis, J. Masoner, D. Cordar, A. Harrell,
26  C. Racca, M. Gaona, D. Schlappi, H. Oropeza, A. Garcia, E.
    Russell, Kwitkowski, J. Bonilla, R. Espinola, J. Crespo, F. Hill
27  and A. Hanna.

28

December 2015.  Under Proposition 9, this deferral is given when
the Board finds "by clear and convincing evidence" that the
prisoner need not be incarcerated for more than seven additional
years.  Under this circumstance, the Board had the choice of
deferring for 3, 5 or 7 years.  Because the prisoner was covered
by the Rutherford litigation, the Board re-calculated the
deferral under the old law.  Using the old law, the Board gave
Flores a 3-year deferral, to December 2011.  This meant that the
Board believed that there was a reasonable chance that Flores
would be granted parole in three years, (otherwise, it was
required by the old law to defer the hearing 4 or 5 years).  In
fact, the Board granted Flores parole at the November 2011
hearing, and the prisoner was released on parole in May 2012.
Thus, Flores was released under the old law three years before
the next parole hearing that had been granted under
Proposition 9.

        d.   Life prisoner C. Orduna (Exh. 55 ¶ 19)
received a Proposition 9 parole hearing in March 2009.  Orduna
was denied parole, and given a five (5) year deferral, to March
2014.  Under Proposition 9, this deferral is given when the Board
finds "by clear and convincing evidence" that the prisoner need
not be incarcerated for more than five (5) additional years.
Under this circumstance, the Board had the choice of deferring
for 3, 5 or 7 years.  Because the prisoner was covered by the
Rutherford litigation, the Board re-calculated the deferral under
the old law.  Using the old law, the Board gave Orduna a 2-year
deferral, to 2011.  This meant that the Board believed that there
was a reasonable chance that Orduna would be granted parole in

1   two years, (otherwise, it was required by the old law to defer

2   the hearing 3, 4 or 5 years).  In fact, the Board granted Orduna

3   parole at the April 2010 hearing, and the prisoner was released

4   on parole in October 2010.

5       Thus, Orduna was released under the old law before the

6   earliest date the next parole hearing could even have occurred

7   under Proposition 9.[25]

8       36. An additional group of 24 life prisoners had their

9   3-year Proposition 9 deferrals (the minimum permitted under

10  Proposition 9), reduced through individual court orders.[26]  See

11  Exh. 58 (binder) (all columns except the last two admitted at RT

---

12  [25] Similar results obtain for 4 other life prisoners identified by
13  plaintiffs, namely, C. Luong, J. Barrigan, M. Luna and M. Bunney.

14  The court rejects, however, Knox's testimony of what is the
    "earliest release" date under Proposition 9 for several
15  prisoners.  See Exh. 55. According to Knox's testimony, this was
    the earliest release date if the prisoner "had gotten the
16  shortest Prop 9 deferral possible."  RT 219.  The shortest
17  deferral possible under Proposition 9 was three (3) years.  See
    Cal. Penal. Code § 3041.5(b)(3)(C) (defer for 3, 5, or 7 years if
18  prisoner does not require incarceration for more than seven
    additional years).  However, it appears that Knox used the actual
19  deferral given under Proposition 9 rather than the "shortest"
    deferral possible, in her calculation.
20
    This apparent error was avoided in the calculation for J.
21  Alvarez, but repeated for J. Coleman, B. Jimenez, C. Luong, B.
    Martinez, J. Barrigan, C. Escobar, M. Luna, P. Velazquez, M.
22  Bunney and G. Tuzon.  However, even correcting these errors,
    Orduna, Luong, Barrigan, Luna and Bunney were released under the
23  old law sooner that they could even have gotten a parole hearing
24  under Proposition 9.

25  [26] L. Garcia, A. Marcelo, A. Criscione, A. Bics, S. Murphy, R.
26  Young, J. Powell, M. Fairfax, E. Juarez, R. Hudson, J. Alexander,
    D. Kurtzman, R. DeLaBarcena, M. Berger, I. Sepulveda, M. Barajas,
27  O. Willis, H. Rosales, A. Aguilar, S. Contreras, E. Estrada, J.
    Portillo, H. Jimenez and L. Liftee.  Exh. 58.

28

1   222-23).[27]  Each of these life prisoners received parole hearings

2   earlier than would have been permitted under Proposition 9, and

3   each was released on parole before they even could have had a

4   parole hearing under Proposition 9.   Id.

5        37. Dr. Barry Krisberg was qualified to testify as an

6   expert on criminology, sociology and statistics.  (RT 73-74.)

7   Dr. Krisberg opined that there was no systematic bias in the

8   Rutherford subset that would make it different from the class in

9   this case.  (RT 76.)

10        38. According to Dr. Krisberg, "comparing the outcomes

11   of the Rutherford Group to the class as a whole is a valid

12   research design to determine the effect of the new law."

13   (RT 85.)

14        39. Dr. Stephen Klein was qualified to testify as an

15   expert in statistics.  (RT 100.)  Dr. Klein opined that "it's too

16   soon to know what the effects of Proposition 9 are."  (RT 101.)

17   Dr. Klein disagreed with Dr. Krisberg that the Rutherford subset

18   was unbiased, or was representative of the plaintiff class as a

19   whole.  Dr. Klein believed that Dr. Krisberg erred by not

20   "controlling" the Rutherford subset for "case characteristics."

21        40. Dr. Klein identified two factors that, he opined,

22   defeated Dr. Krisberg's assertion that the Rutherford subset was

23   an unbiased "natural experiment," and was therefore

24   representative of the class as a whole.  The first is Dr. Klein's

25   _____

[27] Once again, the court found that the last two columns
26   represented what the witness, Monica Knox, would have testified
     to, if the court were inclined to drag out the trial.  Defendant
27   was granted the opportunity to cross-examine the witness on those
     columns as if she had so testified in court.

28

assertion that the hearing mandated by the Rutherford litigation

"could be two years" after the initial post-Proposition 9

hearing.  RT 106.  Neither Dr. Klein nor defendants' counsel ever

identified any document or other evidence from which he drew this

"two years" figure.

41. The other factor Dr. Klein identified is that "the

people doing the second hearing may or may not have known the

outcome of the first hearing, and that could be affecting

things." (RT 106.)  Dr. Klein does not identify any law,

document or other evidence indicating that the decision-makers in

the second hearing knew the outcome of the first hearing.[28]  Nor

does he identify any document or evidence showing that knowing

the prior outcome would make any difference to the second

decision-makers.

42. Dr. Klein opined that in order for Dr. Krisberg's

"natural experiment" to be valid, "[w]hat you'd want to do is you

want to get the characteristics of the Rutherford Group and the

characteristics of the non-Rutherford group in the larger

population to see whether those characteristics are the same."

(RT 108-09.)  Dr. Klein concluded that because Dr. Krisberg did

not do this, his "natural experiment" was not valid.  Dr. Klein

did not identify any case characteristics between the two groups

that were different, or that could affect the outcome.

---

[28] Under Proposition 9, the Board is expressly directed to
consider the findings and conclusions "reached in a prior parole
hearing," although it is not binding.  Even assuming a similar
direction applied under the old law or regulations, it is not
clear that the vacated hearings in Rutherford would qualify as a
prior parole hearing.

**D. The _Rutherford_ Litigation: Conclusions.**

The court finds that Dr. Klein's testimony does not really bear on the question before the court, namely, whether Proposition 9 created a "significant risk" of longer incarceration. This is not the same as waiting to see what the different lengths of incarceration are, years from now, and looking back to see whether they were longer after Proposition 9 passed. The question is whether, looking forward, there is a significant risk of increased incarceration. If the court were to rely upon Dr. Klein's testimony, this court could not reach any conclusion about the constitutionality of Proposition 9 until some time in the indefinite future when all the class members had either been released or died.

Even if Dr. Klein's testimony were pertinent, the court rejects it. Dr. Klein opines that there is no way for Dr. Krisberg to know that the _Rutherford_ subset is representative of the class as a whole. The basis for this opinion is that Dr. Krisberg did not "control" for case characteristics. Because of this, Dr. Klein opines, there is no way to know whether something other than the accident of calendaring -- such as individual case characteristics, or some biasing factor that caused the "accident" of calendaring – distinguishes the _Rutherford_ subset from the class here.

There are several problems with this assertion. First, neither the defendants nor Dr. Klein offer any evidence of any case characteristics that would distinguish the _Rutherford_ subset from the class. Defendants have access to all the prisoners' central files, and yet they have not identified any of the

29

1  differences that Dr. Klein speculates might possibly exist.  The

2  court infers from this failure to produce any such evidence, that

3  there is none.

4      Second, the evidence before the court plainly shows that

5  there is no overall difference that would make a difference

6  between the Rutherford subset and the class.  Dr. Klein

7  identifies two possible differences in case characteristics.  He

8  asserts that "the time between the two hearings could be two

9  years, things could happen that would be affecting whether

10 somebody got a parole grant during that two-year period."

11 RT 106.

12     This basis is flatly contradicted by the evidence.

13 Exhibit 20 is the defendants' own compilation of every member of

14 the Rutherford subset.  It shows that in almost every single

15 case, the time between the two hearings for the Rutherford

16 prisoners is just under one month (e.g., Tilford), to just under

17 five (5) months (e.g., Hill), with the overwhelming majority

18 being about 3 or 4 months apart.  Exhibit 20.  In only two cases

19 that the court was able to identify, namely, Harrell (11 months)

20 and Moore (10 months), was the time difference greater than 5

21 months.

22     If Dr. Klein's assertion had been based upon actual evidence

23 in the case, the court would consider it, since the time between

24 hearings, and possibility of changes in case characteristics that

25 could occur during that time, most notably "institutional

26 behavior," is pertinent to whether parole would be granted.  See

27 Cal. Admin. Code, tit. 15, § 2281(d)(9) (finding of suitability

28 for release is better when "[i]nstitutional activities indicate

30

1   an enhanced ability to function within the law upon release").

2   Since Dr. Klein's assertion was based upon an apparently made-up

3   number of "years" between the initial Proposition 9 hearing and

4   the old-law hearing gained through the Rutherford litigation, the

5   court must discard Dr. Klein's opinion, as to this factor.

6        Finally, the evidence before the court tends to show that

7   the relevant case characteristics were not different between the

8   two groups.  This conclusion can be inferred from the fact that

9   the case characteristics that matter are set forth in the

10  regulations governing the determination of parole suitability,

11  id. § 2281(b)-(d), and the fact that both groups wound up with

12  the full range of outcomes.  In other words, the case

13  characteristics are inferable from the outcome.  If the

14  Rutherford subset was, for example, crowded with multiple

15  murderers who showed no remorse, there would be few among them

16  receiving the minimum deferral, and many receiving the maximum.

17  But defendants have identified no such skewing in the

18  distribution of outcomes in the record.

19       The court finds that the Rutherford subset is representative

20  of the Proposition 9 class as a whole.  The evidence submitted on

21  this matter shows that the Rutherford subset is distinguished

22  from the Proposition 9 class only by the accident of when their

23  parole hearings were scheduled on the calendar.  There is no

24  evidence that the case characteristics are different between the

25  two groups.  There is no evidence that something about the

26  accident of calendaring was anything other than an accident of

27  the calendar.

28       For example, there is no evidence that only those most or

least likely to be paroled moved into the Rutherford subset.

Rather, the evidence is clear that the Rutherford subset came

into existence because the Board had a backlog that applied to

all life prisoners, not any particular subset of them based upon

any case characteristics.  Dr. Klein's speculation on possible

differences in case characteristics is therefore a red herring,

especially since Dr. Klein, who presumably had access to the

central files of the class as well as the Rutherford group, did

not identify a single case characteristic that distinguished the

two groups.

     The court therefore finds that plaintiffs have properly

buttressed their showing that Proposition 9 actually did create a

significant risk that their incarcerations would be lengthened.

In addition to the inferences to be drawn from how the Board

imposes deferral periods, the Rutherford subset shows that in

fact, some members of the class had their incarcerations

lengthened by Proposition 9, but were rescued from that result by

the Rutherford stipulation.

     The experience of the Rutherford subset thus shows that

while it is true that more frequent parole hearings result in

more frequent denials for some, it is also true that they result

in more frequent grants of parole for others.

     **III.   PROPOSITION 9: THE "ADVANCED HEARING" PROCESS**

     **A. Findings.**

          43. A life prisoner who has been denied parole may

request that the Board exercise its discretion to advance a

hearing to an earlier date.  See UF ¶ 4.

          44. From the passage of Proposition 9 through April 6,

1  2011, when a full review of a petition to advance was ordered,

2  the review was conducted by a Board employee at the prison where

3  the prisoner was housed so that the prisoner's entire file could

4  be reviewed.  The prisoners were not present or represented by

5  counsel when their files were reviewed.  UF ¶ 13.

6         45. During the period from January 1, 2009 through

7  December 31, 2010, there were 119 petitions to advance filed by

8  prisoners.  Of those, 114 (approximately 96%) were denied; 106

9  (approximately 93%) were summarily denied and eight

10 (approximately 7%) were denied following a full review.  UF ¶ 7.

11        46. From 2009 to June 2012, the Board has not exercised

12 its discretion to advance a hearing absent a prisoner filing a

13 petition to advance.  UF ¶ 26.

14        47. Although the procedure for making this request does

15 not appear to be reflected in the Board's official regulations,

16 the Board's Executive Officer, Jennifer Shaffer, testified about

17 the Board's process for determining whether an expedited hearing

18 is warranted for a particular inmate.  (RT 263-95.)

19        48. The prisoner starts this process by completing Form

20 1045, Exhibit 35 (ECF No. 341-3), entitled "State of California /

21 Board of Parole Hearings / Petition To Advance Hearing Date."

22 (RT 265.)  The form instructs the prisoner to list the changed

23 circumstances or new information that "show a reasonable

24 likelihood that consideration of the public and victim's safety

25 does not require the additional period of incarceration" that was

26 set at the last parole suitability hearing.  Exh. 35 at BPH-44.

27 The prisoner is also instructed to submit with the petition all

28

1    supporting documents.  Id.[29]

2        49. Prior to March 1, 2014, the submitted petition was

3    first given a "preliminary review."  See Exh. 35 at BPH-45.  At

4    this stage, according to Exhibit 35, the petition could be

5    "Summarily Denied" if (1) the prisoner was seeking to advance the

6    wrong type of hearing, (2) the petition was not timely or (3) the

7    petition contained "[n]o evidence of new information or a change

8    in circumstances warranting further review."  Id.  The first two

9    reasons were plainly jurisdictional, in that such petitions were

10   not within the statute.  See Exh. 38 at BPH-12 (BPH training

11   material) (admitted at RT 210).

12       50. As for the third issue, the training provided to

13   the decision-makers states that the prisoner first had to assert

14   that there was "new information" or a "change in circumstances"

15   without regard to any showing or assertion of suitability.  See

16   Exh. 38 at BPH-14.  In other words, a mere showing of suitability

17   was not sufficient to warrant an advance hearing; there had to

18   be, in addition, some "new information" or "change in

19   circumstances."  See also Exh. 40 (admitted at RT 211) (ECF

20   No. 341-8) at BPH-36 (defendants' explanation of "preliminary

21   review" states that "[m]inimally, the prisoner must make a valid

22   assertion of a change in circumstances or new information in

23   order to avoid the BPH summarily denying the petition").

24       51. In addition to that assertion (of changed

25   circumstances or new evidence), the prisoner then had to

26

27   [29] The form was amended on March 1, 2014, although it appears that
     prisoners still fill out Exhibit 35.  However, the decision-
28   makers now use Exhibit 2B instead.  (RT 265-66.)

establish, still in the "preliminary review" stage, that there
was a "reasonable likelihood" that the prisoner no longer
required additional incarceration.   See Exh. 38 at BPH-15.   The
petition would be "Summarily Denied" if "other evidence shows"
that the prisoner was "unsuitable for parole despite the change
in circumstances" or "new information."   Id.

52. The "full review" required the prisoner to again
establish "a reasonable likelihood," considering the safety of
the public and victim, that the prisoner no longer required
incarceration.   See Exh. 38 at BPH-17.

53. After March 1, 2014, the decision-making process
was changed.   Instead of a "preliminary review" followed by a
"full review," there is now a "jurisdictional review," followed
by a "full review."   (RT 272) (Shaffer Testimony).

54.   The jurisdictional review is conducted by legal
analysts, and determines only whether to screen out petitions
where (1) the prisoner was seeking to advance the wrong type of
hearing,[30] or (2) the petition was not timely.   (RT 272-73.)

55. The jurisdictional review does not involve any
determination on the merits.   (RT 276.)   This is in contrast to
the pre-March 1, 2014 procedure, in which the "preliminary
review" included a merits determination on whether the prisoner
had shown a change of circumstances warranting further review.
See, e.g., Exh. 38 of BPH-145.

56. If the petition survives the jurisdictional review,

---

[30] For example, there are medical parole suitability hearings,
documentation hearings and progress hearings, none of which are
included in the advance hearing process.   (RT 275.)

1  it moves to a "full review," which is a merits review conducted

2  by a Commissioner or Deputy Commissioner. (RT 277-83.) This

3  review is conducted based upon documents, possibly including the

4  prisoner's "central file," or some portion of it, and does not

5  include a hearing. (RT 284-308.)

6        57. The standard for advancing a hearing is whether

7  there is a "reasonable likelihood that additional incarceration,

8  after consideration of the public safety and the [victim's]

9  safety, is no longer necessary." (RT 284.) It is not the

10 suitability standard.[31] (RT at 288.)

11       58. When the PTA is submitted, the Board places a hold

12 on a hearing date 9 months from that date, in order to ensure

13 that a hearing date will be available if the PTA is granted.

14 (RT 277-78.) Accordingly, a prisoner who wishes to have a new

15 hearing in a year must file the PTA immediately, but in any

16 event, no later than 3 months from the date of the parole denial.

17 Thus, the inmate can use at most 3 months worth of "changed

18 circumstances" or "new information" to convince the decision-

19 maker to grant him an advance hearing. Accordingly, whatever

20

---

21 [31] The standard for suitability is:

22         The panel or the Board, sitting en banc,
           shall set a release date unless it determines

23         that the gravity of the current convicted
           offense or offenses, or the timing and

24         gravity of current or past convicted offense
           or offenses, is such that consideration of

25         the public safety requires a more lengthy

26         period of incarceration for this individual.

27

   Cal. Penal Code § 3041(b).

28

1    work the inmate does in the subsequent 9 months is not

2    considered.

3           59. The inmate may file a new petition to advance no

4    sooner than three years after the last petition to advance was

5    denied.  (RT 274-75.)

6           60. Although the Board has the authority to grant an

7    advanced hearing sua sponte, it has never done so, because until

8    recently, there has been no process for doing so.  See RT 297.

9           61. Post-Vicks, the Board is apparently implementing a

10   procedure to implement sua sponte reviews.  (RT 289-95).  The

11   board is currently conducting sua sponte reviews, although as of

12   the date of Shaffer's testimony, none had ever been granted.

13   (RT 289-95, 297-98.)

14          **B. Advance Hearing Examples.**

15       The parties have directed the court's attention to several

16   examples of the petition to advance process.  Some of the

17   examples point to cases where advanced hearings were granted or

18   denied, and appear to show that the advance hearing process can

19   afford prisoners an opportunity to avoid the ex post facto

20   problems associated with Proposition 9.[32]

21       Other examples show the Petition to Advance ("PTA") process

22   identifying prisoners whose PTAs apparently ought to be denied.

23   _____

24   [32] See, e.g., R. Evans (petition to advance granted, denied
     parole), UF ¶ 8; L. Gooseberry (petition to advance granted, and
25   parole granted after some voluntary deferrals), UF ¶ 9;
     J. Martinez (petition to advance granted, parole granted), UF
26   ¶ 10; R. Singh (petition to advance granted after prisoner
     stipulated to 3-year deferral, parole denied), UF ¶ 11;
27   D. Vanlandingham (petition to advance granted, parole granted,
     Governor reversed, parole again granted), UF ¶ 12.
28

                                  37

For example, T. Faatiliga's advance hearing petition made it past the preliminary review stage.  See Exh. 80, Vol. 2, at BPH-22042 (full review ordered on April 5, 2011).  At the full review stage, the petition was denied, for the following reasons:

> Although the inmate has remained disciplinary free, earned 6 laudatory chronos, and provided a letter regarding insight and remorse, he has only participated in 2 additional self help programs since his last review.  He attended a one day program on victim recognition, reflection and healing on 11-10-10 and has continued his participation in the YAPP program.  The transcripts indicate the panel would like him to participate in an anger management program as well and to continue self help that would further improve his level of insight.

Id.  This advance petition denial appears to squarely address the issue presented, that is, whether the inmate should get an advance hearing.  The decision-maker denied the petition because the prisoner had not done what the last panel indicated he should do before he could be ready for release, namely, "participate in an anger management program."[33]  These examples tend to show that

---

[33] Similar examples are: D. Washington (Exh. 80 at Y 25025) (prisoner failed to address issues identified at the last parole hearings); D. Plata (Exh. 80 at Y 20560) (same); T. Porter (Exh. 80 at Y 33758) (prisoner failed to document participation in a program apparently); S. Mendoza (Exh. 80 at Y 18391) (denial fully explained, addressed relevant factors); M. Heller (Exh. 80 at Y 18481) (level of insight is improving but "still deemed inadequate"); R. Holguin (Exh. 80 at Y 30144) (recent disciplinary incidents); B. Werner (Exh. 80 at Y 25063) (continued failure of "insight"); T. Cobos (Exh. 80 at Y 12776) (continued failure of "insight," superficial comments to the contrary are not enough); A. Monteon (Exh. 80 at Y 18674) (inmate was untruthful in evaluation); M. Loveless (Exh. 80 at Y 17242) (petition failed to address concerns of last panel); R. Elam (Exh. 80 at Y 13861) (inmate failed to update parole plans, as asked for by prior panel).

Plaintiffs have identified several examples where they disagree

substantively with the decision-maker, even though they do not
identify any structural problem with the decision.  See, e.g., E.
Sanders (Exh. 48 (binder) at BPH-3499) (plaintiffs assert that
the decision-maker "discounts" prior panel's comments that the
prisoner is close to suitability); F. Salas (Exh. 47 (binder) at
BPH-1491) (plaintiffs say that the decision-maker denied PTA even
though prisoner completed relevant courses and was a great
student); and Dawn Ayres (Exh. 80 at Y 10180) (plaintiffs
apparently feel that the inmate's 400 pages of documentation
should have resulted in a grant of parole).

However, this court does not sit to review individual parole
decisions.  The question here is not whether the decision-makers
reached the correct decision or not.  The question is whether the
system in which they make their decisions is enough to rescue
Proposition 9 from its ex post facto problems.

In the case of J. Barajas (Exh. 80 at Y 10820), plaintiffs
complain that the petition was denied because the decision-maker
determined that "more time" is needed.  This court knows of no
reason that the decision-maker cannot independently determine
that more time is needed, as apparently was the case here.  The
same applies to: T. Tuvalu (Exh. 80 at Y 24699) ("[a]nything less
than three years would be insufficient"); J. Stephen (Exh. 80 at
Y 15973) ("additional time is needed to evaluate [inmate's
recent] gains/knowledge and understanding in this area"); S.
Sevior (Exh. 80 at Y 23514)  (not enough time has elapsed for
prisoner to work on his anger); I. Verdugo (Exh. 80 at Y 35615)
("[a]llthough his programming is positive a longer period of time
to participate and fully understand and use the concepts is
needed"); A. Cook (Exh. 80 at Y 28003) ("[w]hile his ongoing
participation in self help is commendable, the extent and length
of his involvement remains inadequate in light of the prior
panel's comments as to lack of insight and remorse"); J. Kuhnke
(Exh. 80 at Y 31650) ("[i]t is believed that Mr. [Kuhnke] needs
more time to continue on this positive path to lay a stronger
foundation to insure that he is not a public safety risk when
released into the free community"); and L. Haynes (Exh. 80
at Y 17145) ("it is still an inadequate amount of time in terms
of ongoing participation in these self-help groups") (the court
notes that he was also denied because his parole plans were
"barely adequate, and does not mention a plan for staying out of
the gang lifestyle").

This is a different matter than if the decision-maker were to
simply rely on the prior panel's determination that more time is
needed.

the PTA system works at denying petitions that ought to be denied.  The remaining question is whether it grants petitions that ought to be granted.

Several examples show that even when the Board decides a case under an apparently reasonable interpretation of Proposition 9 and the implementing regulations, the advance hearing process can be rendered meaningless or illusory.  The most profound failure of this process is in the Board's apparent interpretation of the statute authorizing advance petitions.  The statute provides that the inmate may request an advance hearing by submitting a petition that sets forth "the change in circumstances or new information that establishes a reasonable likelihood that consideration of the public safety does not require the additional period of incarceration of the inmate." Cal. Penal Code § 3041.5(d)(1).  A sensible interpretation of this authorization is that the "change in circumstances or new information" is <u>tied</u> to the question of suitability for parole.

However, some examples identified by plaintiffs show that the Board has interpreted the authorization in a way that separates the "change in circumstances or new information" from the question of suitability.  Rather, the Board requires a showing of "change in circumstances or new information" before it will even consider the question of suitability for parole.  This is a problem first because the most fundamental change in circumstances would be a move from unsuitability to suitability.  But as the examples show, that is apparently not a change in

circumstance that will satisfy the Board.   Second, when this
requirement is spun off from the suitability requirement, it
imposes an additional, substantive burden on the prisoner's
ability to obtain parole.

This is not a harmless procedural change.   This is a change
that says that the prisoner must now show something that he never
had to show before, namely, this amorphous "change in
circumstances or new information."   At the time the crime was
committed, the sentence was incarceration until such time as the
Board determined that the prisoner was suitable for parole.
Under Proposition 9, it is incarceration indefinitely, unless the
Board finds clear and convincing evidence of (a) a change in
circumstances or new information, and separately,
(b) suitability.

### (1)  M. Brodheim: Change in Circumstances or New Evidence.

Plaintiffs have directed the court's attention to the
case of M. Brodheim as an example of the advance hearing process
in action.[34]   At a parole hearing on June 4, 2009, the Board
denied parole for Brodheim, and deferred his next hearing for the
minimum 3-year period allowed under Proposition 9.   See
Exhibit 80, Vol. 2 at BPH-21458.   On November 1, 2010, this court
granted Brodheim's habeas corpus petition on the ground that the
record did not contain "some evidence" of Brodheim's current or

---

[34] There appear to be over 40,000 pages of advance hearing
documents in Plaintiffs' Exhibit 80 (submitted on two CD's).   It
is not practical for the court to review them all, so the court
considers only the documents specifically brought to its
attention by the parties.

future dangerousness.  Id. at BPH 21468.  This court ordered

Brodheim released within 45 days unless the Board conducted a new

suitability hearing in accordance with Due Process and the

court's order.  Id.  The board scheduled the new hearing for

December 1, 2010.  At that hearing, the Board found that Brodheim

was suitable for parole.  Id. at BPH 21567.  However, on March

15, 2011, the Ninth Circuit reversed this court's order, citing

the intervening authority of Swarthout v. Cooke, 562 U.S. ___,

131 S. Ct. 859 (2011) (per curiam).  Id. at BPH-21459-60.  Even

though the Board had already found Brodheim suitable for parole,

it immediately (March 18, 2011) vacated its decision, solely

because the earlier-than-planned – but already conducted –

December 2010 hearing was no longer legally required.  Id. at BPH

21458.  Id.  The board re-instated the 3-year deferral of the

original hearing.  Id.  The board did not state or otherwise

indicate that it had substantively changed its view, or had

decided that Brodheim was no longer suitable for parole.  Rather,

the decision was vacated solely because it was held at an earlier

date than was found to be legally required.

      On April 20, 2011, Brodheim filed a petition to advance his

hearing.  Id. at BPH 21462.  Brodheim relied, among other things,

upon the transcript from the December 10, 2011 hearing at which

the Board had already found that he was suitable for parole.  Id.

On May 11, 2011, the Board "Summarily Denied" Brodheim's

petition, on the boilerplate grounds that there was "[n]o

evidence of new information or a change in circumstances

warranting further review."  Id. at BPH 21463.

      From the Brodheim example, the court infers that the

1   Advanced Hearing process requires the inmate to make a showing

2   beyond simple "suitability" for parole.  Rather, the inmate must,

3   in addition, show "new information or a change in circumstances"

4   from the last parole denial.

5       The inference is supported by the Board's training manual

6   and instructions to decision-makers.  See Exhibit 40 (ECF

7   No. 341-8).  The manual makes clear that in order to pass

8   "preliminary review," the prisoner must make the assertion that

9   there are "changed circumstances" or "new information."  Id., at

10  BPH-36.  Only once this assertion has been made does the petition

11  survive summary denial, and the Board go on to determine whether

12  those changed circumstances or new information establish whether

13  additional incarceration is required.  See id.

14      Examples of the "change in circumstances" or "new

15  information" that would enable a prisoner to avoid summary denial

16  are having updated or stable parole plans, job offers, vocational

17  or educational certificates, completion of self help and/or drug

18  or other treatment programs, or changed outcome of disciplinary

19  actions.  See Exhibit 42 (ECF No. 341-10) at BPH-33.  Although

20  this list is stated to be not exclusive, it does appear to

21  consist of things in a different category than, for example, the

22  mere passage of an additional year of incarceration.[35]

23  ─────────────
    [35] As another example, J. Kyne was denied parole on June 18, 2009.
24  Exh. 45 (binder).  On August 9, 2010, he filed a PTA.  Submitted
    with the PTA was a large volume of documentation that, even under
25  the most skeptical and jaundiced eye, clearly presents new
    information and changed circumstances that addressed his
26  suitability for parole (although of course, they do not compel a
    conclusion one way or another).  His PTA was summarily denied, on
27  the grounds that it failed to present new information or changed
    circumstances.  There is no other explanation for the summary
28

43

1  **(2) T. Nguyen: The Next Panel Should Decide.**

2         In another set of examples, the decision-maker made no

3  finding on whether the prisoner had shown a reasonable likelihood

4  that further incarceration was not needed, and therefore the next

5  parole hearing should be advanced, even though that was the only

6  question he had to decide.[36]  Rather, they determined that this

7  was a question for the next parole review panel.  Yet, the

8  decision-maker denied the prisoner the opportunity to get to the

9  next review panel until the original deferral period had elapsed.

10  These examples tend to show that some PTA decision-makers viewed

11  denial.

12  Similar results are: J. Ferioli (Exh. 80 at Exh Y 29405 (at full

13  review, the sole reason for denying the PTA was that, while the
   prisoner was doing well, "there is insufficient reason/change of

14  circumstances to warrant advancing the date of the suitability
   hearing, as such"); C. Chruniak (Exh. 80 at Y 27915) (at full

15  review, decision-maker denies PTA because although the prisoner
   is doing well, he demonstrated "neither new information nor

16  changed circumstances").

17

18  [36] In denying the petition, the decision-maker checks the box next
   to the following paragraph:

19

20         Denied, after conducting a review of the case
          factors and considering the new information

21         of change in circumstances, the prisoner did
          not establish a reasonable likelihood that

22         consideration of the public and victim's
          safety does not require the additional

23         incarceration.

24  See, e.g. Exh. 80 at Exh Y 25932.  However, the Board appears to

25  concede that this boilerplate language does not actually give the
   reason the advance petition was denied.  See RT 267 ("a lot of

26  decisions were going back to inmates … saying summarily denied,
   and it didn't give enough reason to explain our decision … [s] we

27  expanded that").  The actual reason is given in the "Comments"
   section.

28

certain issues as categorically exempt from the PTA process, and therefore could only be decided by panels after the deferral period imposed by the last panel.  In fact, there is no such categorical exemption in the law or regulations.  In such cases, the PTA process was illusory.

T. Nguyen's advance hearing petition, for example, made it past the preliminary review stage.  See Exh. 80 at Exh Y 19163 (full review ordered on February 21, 2012).  At the full review stage, the petition was denied.  Id. (April 25, 2012).  The reason for the denial was:

> Prior panel's primary factor that tend to show unsuitability … was his past and present mental state and attitude towards the crime. These concerns need to be address[ed] by the panel and will be at next hearing.  All other areas continue to be positive.

Id. at 19164.[37]

### (3) M. Killingsworth: Comprehensive Risk Assessment.

A structural barrier to a meaningful PTA process is the Comprehensive Risk Assessment ("CRA").  The CRA is one factor the decision-maker must consider in determining whether to grant an advance hearing petition (RT 284).  The CRA is completed every five (5) years.  Cal. Code Regs. tit. 15, § 2240(b).  A Subsequent Risk Assessment ("SRA") can be made before any regularly scheduled hearing.  There are two problems here. First, the SRA "will not include an opinion regarding the

---

[37] Similar denials occurred in the other cases:  K.E. Woods (Exh. 80 at Y 25932) (last panel's concerns must be evaluated "by a future panel"); K. Blackman (Exh. 80 at Y 11362) ("the [panel's] concerns that not enough time has elapsed since his last CDC 115 and counseling chronos has not changed").

1  inmate's potential for future violence because it supplements,

2  but does not replace, the Comprehensive Risk Assessment." Id.,

3  § 2240.  Second, there is no authorization for the CRA or the SRA

4  to be issued for a PTA.  Under the regulations, these reports are

5  prepared in advance of a hearing, not a request for a hearing.

6  Plaintiffs therefore argue that "any prisoner who is denied

7  parole in part because of the CRA has no chance of obtaining an

8  advanced hearing."  Plaintiff's Summation (ECF No. 517) at 25

9  n.37.

10      The undisputed examples identified by plaintiffs support

11  this assertion.  For example, M. Killingsworth's advance hearing

12  petition made it past the preliminary review stage.  See Exh. 80

13  at Exh Y 17970 (full review ordered on June 28, 2011).  At the

14  full review stage, the petition was denied, for the following

15  reasons:

16          I/M Killingsworth is to be commended for his
            additional/continued participation in self
17          help programming and disciplinary free
            behavior.  The panel's concerns with the
18          psychiatric evaluation completed by Dr. Smith
            in August 2008 indicating that P presents a
19          moderate risk of violence are still valid.

20  Id. at 17971.  This denial does appear to address squarely the

21  question presented, that is, whether considerations of public and

22  victim safety indicate that the prisoner should be granted an

23  advanced hearing.  The decision-maker denied the petition,

24  finding that the concerns about the prisoner's "moderate risk of

25  violence" were still valid.

26      However, the psychiatric evaluation it relies upon,

27  addressing risk assessment, is completed only every five years,

28  so there would appear to be no way for the prisoner to show that

46

circumstances have changed.  Moreover, since this is only a request for a hearing, the prisoner does not even have the right to obtain a supplemental risk assessment report.[38]

### (4) A. Mendoza: Translation Services Unavailable.

Another structural barrier to making the PTA anything other than an illusory benefit is the apparent inability of the decision-makers to get documents translated in time for them to rule on the petition.  For example, A. Mendoza's advance hearing petition made it past the preliminary review stage.  See Exh. 80 at Exh Y 32900 (full review ordered on June 28, 2011).  At the full review stage, the petition was denied because some of the documents the prisoner submitted were in Spanish, and the decision-maker therefore could not determine whether the standard had been met until the documents were translated.  Id. at Y 32901.

This situation appears to contradict the testimony that prisoners who need assistance receive such assistance in preparing their petitions to advance.  (See RT 273.)  If in fact, no translation services are provided at the PTA stage, then the PTA process is illusory for those prisoners who communicate only

[38] Other examples of this result are: V. Pleitez (Exh. 80 at Y 20606) (at full review, decision-maker states, "[i]f new CRA is found reschedule inmate for full review"); W. Crawford (Exh. 80 at Y 13359) (at full review, decision-maker states the prisoner "submitted nothing to document any change in these important areas" identified in the CRA); B. Jimenez (Exh. 80 at Y 11616) (at full review, decision-maker states "[a] new psychiatric evaluation has not been completed; hereby reflecting no change to the major reasons for the unsuitability determination," namely, the risk assessment); J. Stevenson (Exh. 80 at Y 24063) (at full review, advance hearing is denied based upon "unresolved issues" identified by the CRA).

1 | in Spanish.[39]

2 |     **C.   Conclusions.**

3 |     The evidence shows that the advance hearing process

4 | sometimes works and sometimes does not work.  It certainly

5 | appears to deny advance hearings where there is good cause to

6 | deny them.

7 |     However, the PTA appears to deny advance hearings even to

8 | those who facially appear to deserve them.  The evidence shows

9 | that the Board interprets Proposition 9 to impose a substantive

10 | new "changed circumstances or "new information" requirement on

11 | prisoners, separate and apart from the requirement that they show

12 | suitability.  The PTA decision-makers rely on CRA's to determine

13 | whether to even grant an advance hearing, even though no new CRA

14 | can be done earlier than five years from the last one, and no SRA

15 | is available for a hearing <u>request</u>, like the PTA.  The board

16 | apparently fails to provide translation services for the PTA

17 | process.  Finally, the PTA decision-makers from time to time,

18 | simply rely on the last panel's assessments about whether the

19 | prisoner is ready for parole, and deny advance hearings because

20 | they think another panel should decide the question.

21 |     Thus, these PTA process's failings appear to be built in to

22 | the PTA system, rather than simply resulting from occasional

23 |

24 | [39] Plaintiffs also complain that inmates are denied parole because of "classification scores."  ECF No. 517 at 28-29.  However, this

25 | appears to have no bearing on the value of the PTA process. Classification scores apparently arise from the inmate's behavior

26 | in prison.  If a prisoner is denied parole because he has spent the first 20 years in prison conducting gang activities, and is

27 | classified pursuant to those activities, that is a matter unrelated to the validity of the PTA process.

28 |

1   errors.  The PTA process is structured such that it fails, in

2   many cases, to afford inmates a fair opportunity to obtain an

3   advance hearing.  All told, the PTA process is not sufficient to

4   protect inmates from the ex post facto problems inherent in

5   Proposition 9.

6   ### III. PROPOSITION 89

7   **A.   Findings of Facts.**

8       62. On November 4, 1988, California voters approved

9   Proposition 89, which granted the Governor the ability to reverse

10  the decisions of the parole board regarding prisoners convicted

11  of murder.  1988 Cal. Legis. Serv. Prop. 89  (West).

12      63. Proposition 89 is neutral on its face, allowing the

13  Governor to reverse parole grants and denials alike.  Id.

14      64. However, its intent was stated to be to give the

15  Governor "the power to block the parole of convicted murderers."

16  Exh. 72 (ECF No. 428-9) (Proposition 89 Ballot Pamphlet (Argument

17  in Favor of Proposition 89)) at 46 (admitted per PTO).[40]

18  Intending to "correct a weakness in the state's parole system,"

19  Proposition 89 would, according to its proponents, "provide an

20  extra measure of safety to law-abiding citizens by giving the

21

22  [40] In California, '[b]allot summaries … in the Voter Information
    Guide" are recognized sources for determining the voters'
23  intent.'"  Perry v. Brown, 671 F.3d 1052, 1090 n.25 (9th Cir.),
    vacated on standing grounds sub nom., Hollingsworth v. Perry, 570
24  U.S. ___, 133 S. Ct. 2652 (2013); Hodges v. Superior Court, 21
    Cal. 4th 109, 114 & 115-18 (1999) ("the voters should get what
25  they enacted, not more and not less.  In this matter, therefore,
    we are obliged to interrogate the electorate's purpose, as
26  indicated in the ballot arguments and elsewhere").

27

28

1  Governor the authority to block the parole of criminals who still

2  pose a significant threat to society."  Exh. 72 at 47 (Rebuttal

3  to Argument Against Proposition 89).

4      65. In 2007, Governor Schwarzenegger reviewed 172

5  decisions by the Board granting parole; the Governor reversed 115

6  (66.9%) of those decisions, he referred 18 (10.5%) to the Board

7  to review the cases en banc, he modified 2 decisions (1.1%), and

8  he declined to review 37 decisions (21.5%).  In 2008, Governor

9  Schwarzenegger reviewed 170 decisions by the Board granting

10 parole; the Governor reversed 81 (47.6%) of those decisions, he

11 referred 33 (19.4%) to the Board to review the cases en banc, he

12 affirmed 1 decision (0.6%), and he declined to review 55

13 decisions (32.4%).  In 2009, the former Governor reviewed 454

14 decisions by the Board granting parole, the Governor reversed 285

15 (62.8%) of those decisions, he referred 49 (10.8%) to the Board

16 to review the cases en banc, he modified 2 decisions (0.4%), and

17 he declined to review 118 decisions (26%).  In 2010, the former

18 Governor reviewed 503 decisions by the Board granting parole, the

19 Governor reversed 290 (57.7%) of those decisions, he referred 58

20 (11.5%) to the Board to review the cases en banc, he modified 3

21 decisions (0.6%), and he declined to review 152 decisions

22 (30.2%).  UF ¶ 17.

23      66. Between January 2007 and December 2010, the

24 Governor referred 158 cases in which the Board had granted parole

25 to the prisoner back to the Board for en banc consideration;

26 following the referral for en banc consideration, 153 (97%) of

27 the cases resulted in the prisoners' release, either because the

28 en banc Board affirmed the grant of parole or the en banc Board

50

1  sent the matter to rescission but the panel voted not to rescind.

2  UF ¶ 18.

3        67. During the review process, the chief counsel (or

4  designee) prepares a written report ("Executive Case Summary" or

5  "ECS") on each case in which parole has been granted, which

6  includes: (1) an overview of the prisoner's central prison files

7  as well as the evidence and the findings from the hearing that

8  resulted in a parole grant; (2) information about the prisoner's

9  term as set by the panel that granted parole; and (3) the

10  calculated release date for the prisoner based on that term.   UF

11  ¶ 3.

12        68. The evidence presented at trial shows that

13  Proposition 89 was carried out consistent with its intent.

14  Plaintiffs' Exhibit 67 (admitted over objection at RT 164), is a

15  summary listing of all grants of parole during the years 1999 to

16  2011, to life prisoners.  RT 164-68.  "Release now" means that by

17  the time the parole grant came through, the inmate had already

18  served his life term, and could be paroled immediately, that is,

19  after finalization (120 days) and gubernatorial review (30 days).

20  Id.

21        69. Exhibit 68 (admitted over objection at RT 170), is

22  a summary of Exhibit 67, without the names and individual

23  information.  Exhibit 69 (admitted at RT 205), is a summary of

24  the governor's modifications of life parole grants.  Exhibit 77

25  (admitted at RT 175), is a summary of every parole decision that

26  the Governor reviewed.

27        70.  Executive Case Summaries are prepared when the

28  parole board grants parole to a life prisoner.  RT 206 (Knox

1    testimony).  Exhibit 71 (admitted over objection at RT 207), is

2    an example of such a summary.

3         71. In 1991, the Governor requested that all parole

4    grants involving murder convictions be forwarded to the

5    Governor's office for review.  Exh. 75 (admitted at RT 176).

6    There is no evidence that the governor requested the review of

7    any parole denials, nor that there was any process to get such

8    decisions to the governor for review.

9         72. Of the parole grant reversals, most were of

10   prisoners who were already beyond their "life terms," so that but

11   for Proposition 89 and the Governor's reversal, they would have

12   been released already.  See Exh. 67.[41]

13        73. The Executive Reports on Parole Review Decisions

14   reflect that, for the 21-year period from 1991 through 2011, the

15   Governor reported reviewing only three decisions denying parole,

16   affirming all three denials.  UF ¶ 23.  See Exh. A at 383 (D.

17   Sanders, Nov. 2002, Gov. Davis), 517 (P. Agrio, Apr. 2003, Gov.

18   Davis), 893 (M. Lindley, Dec. 2003, Gov. Schwarzenegger).

19        74. The Governor fulfills the reporting mandate of

20   Proposition 89 by annually filing the "Executive Report on Parole

21   Review Decisions for the State of California."  UF ¶ 24.

22        75. The Executive Reports show that in the twenty-year

23   period from 1991 through 2010, the Governor reversed more than 70

24   percent of the grants of parole made to prisoners with murder

25   _____

26   [41] Plaintiffs say 90% were beyond their release dates (ECF No. 517
     at 42), a percentage defendant does not dispute.  The court has
27   not done the count and calculation, but the raw numbers are
     available in Exhibit 67.
28

1    convictions.  UF ¶ 25.

2        **B.  Conclusions**

3        The facts are essentially undisputed.  The court reviews,

4    once again, the law of ex post facto, but in light of this

5    evidence.  The inquiry for the court is whether Proposition 89

6    has created a "significant risk" of longer incarceration for life

7    prisoners whose crimes were committed before the law's passage.

8    I find that it does.

9        **1.  Is plaintiffs' challenge foreclosed by Biggs?**

10       Defendants assert that plaintiffs' ex post facto challenge

11   to Proposition 89 fails as a matter of law.  ECF No. 516 at 18.

12   They argue that Supreme Court and Ninth Circuit precedent

13   forecloses plaintiffs' challenge.  This court has already

14   rejected defendants' argument to the degree it is based upon

15   Collins v. Youngblood, 497 U.S. 37 (1990), Mallett v. North

16   Carolina, 181 U.S. 589 (1901), Dobbert v. Florida, 432 U.S. 282

17   (1977), Garner v. Jones, 529 U.S. 244 (2000), and Johnson v.

18   Gomez, 92 F.3d 964 (9th Cir. 1996), cert. denied, 520 U.S. 1242

19   (1997).  See Gilman v. Brown, 2013 WL 1904424 at *11-*15 (E.D.

20   Cal. 2013) (Karlton, J.).  Reviewing those cases in light of the

21   evidence presented at trial, the court sees no basis for changing

22   its views.

23       This court concluded that under Johnson v. Gomez, no facial

24   challenge to Proposition 89 can succeed in light of the cited

25   cases, as the new law "simply removes final parole decision-

26   making authority from the BPT and places it in the hands of the

27   governor."  Johnson v. Gomez, 92 F.3d at 967.  The facial

28   challenge was only one route plaintiffs had available to

1  challenge Proposition 89.  The Ninth Circuit has made clear that

2  plaintiffs could nevertheless succeed on the merits of their

3  challenge if they:

4          can "demonstrate, by evidence drawn from
   [Proposition 9's] practical implementation …,
5          that its retroactive application will result
   in a longer period of incarceration than
6          under the [prior law]."

7  Gilman, 638 F.3d at 1106 (quoting Garner, 529 U.S. at 255).[42]

8      Defendants argue that the possibility of an "as-applied"

9  challenge, expressly recognized by the Ninth Circuit in Gilman,

10 has now been foreclosed, as matter of law, by Biggs v. Secretary

11 of the California Dept. of Corrections and Rehabilitation, 717

12 F.3d 678 (9th Cir. 2013), a habeas case decided under the

13 Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28

14 U.S.C. § 2254(d).  Defendants' argument appears wrong on several

15 levels.

16     First, the argument simply assumes that Biggs overruled

17 Gilman.  In fact, panels of the Ninth Circuit do not overrule

18 each other, at least not in the absence of intervening Supreme

19 Court, en banc or statutory authority.  Montana v. Johnson, 738

20 F.2d 1074, 1077 (9th Cir. 1984).  This court knows of no such

21 intervening authority.  Second, Biggs does not even purport to

22 overrule Gilman.  Indeed, its only reference to Gilman is to

23 reiterate that:

24         in Gilman v. Schwarzenegger, we said that the
   plaintiffs could succeed on their Ex Post
25

26 [42] See Gilman, 2013 WL 1904424 at *15-15 (plaintiffs are still
   entitled to go to trial so that they could make an "as-applied"
27 challenge to the law, "based upon the 'actual effect' of
   Proposition 89 on this class of plaintiffs") (citing Garner).
28

> _Facto_ Clause claim through an evidentiary
> demonstration that retroactive application of
> the change in law in question would result in
> increased incarceration time, citing _Garner_.
> 638 F.3d 1101, 1106 (9th Cir. 2011).

_Biggs_, 717 F.3d at 692.  Third, _Biggs_ distinguishes _Gilman_ on the very point that defendants say is of "no moment," namely, that _Biggs_ is an AEDPA case, while _Gilman_ is a Section 1983 case.  _Id._ ("But Gilman was a § 1983 case, _id._ at 1105, and thus contained no holding about clearly established federal law").  Because _Biggs_ was an AEDPA case, the question presented was not whether plaintiff could make an "as-applied" challenge to Proposition 89. The question was whether the California Supreme Court had failed to apply "clearly established federal law" by not subjecting Proposition 89 to an as-applied analysis.  _Biggs_ found that no such analysis was _required_ by clearly established Supreme Court law:

> The Supreme Court did not clearly establish
> in _Garner_ that an as-applied analysis of the
> significance of the risk of increased
> punishment is required with regard to the
> retroactive application of a change in law
> like California's gubernatorial review of
> parole board decisions.  The California
> Supreme Court's decision in _Rosenkrantz_ was
> thus not an unreasonable application of
> clearly established federal law, and neither
> was the Superior Court's decision in Biggs'
> case that relied on it.

_Biggs_, 717 F.3d at 693.  That is not at all the same as saying that such an analysis is now _foreclosed_ in a Section 1983 case.

        **2.**     **Proposition 89 violates the _Ex Post Facto_ Clause.**

Turning to the evidence presented at trial, it is clear that Proposition 89, in actual practice, is not the "neutral" transfer of final decision-making authority from one decision-maker to

1   another.  In practice the governors have used it to tip the

2   scales against parole.  Every governor since passage of

3   Proposition 89 has done this, and there is no evidence that this

4   practice has stopped.  Thus, while the governors could use the

5   law to review parole decisions to ensure that they are accurate

6   and fair, they appear to have no such concern about decisions

7   that deny parole.

8        Prior to the new law, the sentence faced by class members

9   was life with the possibility of parole.  The parameters for

10  determining the grant or denial of parole was fixed in the

11  statutes, and the length of the "life term" was fixed in the

12  Board's regulations.  The new law was passed in order to lengthen

13  the amount of time class members would spend in prison by

14  creating a new mechanism for withholding parole, namely, the

15  governor's veto.  True to the law's intentions, California

16  governors have used the new law to withdraw the possibility of

17  parole from most class members.  In short, the voters did not

18  simply switch the final decision-making authority from the Board

19  to the Governor.  They switched it with an instruction that the

20  Governor should put his finger on the scale to correct a

21  "weakness" they perceived to exist when the Board made the final

22  decision, namely, too many murderers being paroled, too soon.

23  The governors have carried out the people's will by putting their

24  fingers on the scale and reversing 70% of parole grants for these

25  class members.

26       There is no evidence presented here that the plaintiffs were

27  ever entitled to a liberal application of the parole rules.

28  However, they have always been entitled to a neutral

interpretation of those rules.  That is, whether the Board made the final decision, or the governor, or anyone else, they are required to apply the rules as directed by the statute and the California Constitution.  When the governors put their fingers on the scale to obtain a result of longer prison sentences, regardless of the inmate's showing of suitability, they failed to apply the statute in a neutral manner.  Whether or not this is a violation of California law is not for this court to say.  However, it is a plain violation of the ex post facto clause as to those to inmates whose crimes were committed before Proposition 89.

There is no claim here that California cannot instruct the Governor to keep certain people in prison longer, or to place his finger on the scale when deciding the question.  In general, states are free to experiment with parole however they see fit.  However they may not experiment in such a way as to increase the quantum of punishment for those who committed their crimes before the new punishment went into effect.

### IV. REMEDY

Plaintiffs' surviving requests are for (a) a declaration that defendants have denied plaintiffs' rights under the Ex Post Facto Clause of the U.S. Constitution, and (b) injunctive relief.

The court accordingly **DECLARES** that Proposition 9, as implemented by the Board, violates the ex post facto rights of the class members.

The court further **DECLARES** that Proposition 89, as implemented by the governors of California, violates the ex post facto rights of the class members.

57

1        The court orders injunctive relief as follows:

2        1.    Going forward, the Board shall apply Cal. Penal Code

3   § 3041.5, as it existed prior to Proposition 9, to all class

4   members.   That is, all class members are entitled to a parole

5   hearing annually, unless the Board finds, under former

6   Section 3041.5(b) that a longer deferral period is warranted.

7        2.    The Governor of California shall refrain from imposing

8   longer sentences on class members than are called for by

9   application of the same factors the Board is required to

10  consider, as provided for by Proposition 89.[43]

11       This order is stayed for 31 days, and goes into effect

12  immediately thereafter, unless a timely appeal is filed.

13       IT IS SO ORDERED.

14       DATED:  February 27, 2014.

15

16

17                              _____
                                LAWRENCE K. KARLTON
18                              SENIOR JUDGE
                                UNITED STATES DISTRICT COURT
19

20

21

22

23  _____

24  [43] Defendants assert that no injunction is warranted because there
    is no evidence that the current Governor is violating the Ex Post
25  Facto Clause, or that future governors will do so.  The only
    evidence before the court however, is what all governors thus far
26  have done, and there is no evidence of any change.

27  All other requests for relief are denied as moot (because based
    upon dismissed claims), or are beyond the power of this court to
28  grant.